# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE                                    NEWS RELEASE #077

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinion handed down on the **19th day of December, 2016**, is as follows:

**BY HUGHES, J.**:

2012-KA-0508        STATE OF LOUISIANA  v. JEFFREY CLARK (Parish of West Feliciana)
                    For the reasons assigned herein, the defendant's conviction and
                    death sentence are affirmed.  In the event this judgment becomes
                    final on direct review when either:  (1) the defendant fails to
                    petition timely the United States Supreme Court for certiorari;
                    or (2) that Court denies his petition for certiorari; and either
                    (a) the defendant, having filed for and been denied certiorari,
                    fails to petition the United States Supreme Court timely, under
                    its prevailing rules, for rehearing of denial of certiorari; or
                    (b) that Court denies his petition for rehearing, the trial judge
                    shall, upon receiving notice from this court under LSA-C.Cr.P.
                    art. 923 of finality of direct appeal, and before signing the
                    warrant of execution, as provided by LSA-R.S. 15:567(B),
                    immediately notify the Louisiana Public Defender Board and
                    provide the Board with reasonable time in which:  (1) to enroll
                    counsel to represent the defendant in any state post-conviction
                    proceedings, if appropriate, pursuant to its authority under LSA-
                    R.S. 15:178; and (2) to litigate expeditiously the claims raised
                    in that original application, if filed, in the state courts.
                    CONVICTION AND SENTENCE AFFIRMED.

                    CRICHTON, J., additionally concurs and assigns reasons.

SUPREME COURT OF LOUISIANA

NO. 2012-KA-0508

STATE OF LOUISIANA

VERSUS

JEFFREY CLARK

ON APPEAL
FROM THE TWENTIETH JUDICIAL DISTRICT COURT,
FOR THE PARISH OF WEST FELICIANA

**HUGHES, J.**

The defendant, Jeffrey Clark, and a number of fellow inmates incarcerated at the Louisiana State Penitentiary in Angola, Louisiana ("Angola") conspired to escape from prison. In furtherance of that plot, on the evening of December 28, 1999, they smuggled improvised weapons into the Angola Camp D education building, where various scheduled meetings and classes were taking place; there, they launched an attack on the prison guards present, hoping to obtain keys necessary to gain access to a nearby vehicle and to exit a secure access sally port to leave the prison and escape to Canada. The escape attempt was thwarted when prison officials discovered the disturbance and quickly surrounded the education building. Captain David N. Knapps, who had been taken hostage by the inmates, was bludgeoned and stabbed to death. Each inmate involved was tried separately, and the defendant was convicted of the first degree murder of Captain Knapps (in violation of LSA-R.S. 14:30) and sentenced to death.

On appeal to this court, pursuant to LSA-Const. Art. V, Sec. 5(D)(2),[1] the defendant relies on thirty-seven assignments of error, contending his conviction and sentence should be reversed. After a thorough review of the law and evidence, we find no merit in any of the assignments of error. Therefore, we affirm the defendant's conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

On March 15, 2004 a West Feliciana Parish grand jury indicted Angola inmate Jeffrey Clark and fellow inmates David Mathis, David Brown, Barry Edge, and Robert Carley[2] for the December 28, 1999 first degree murder of Capt. Knapps (in violation of LSA-R.S. 14:30), which occurred in the officers' restroom of the Angola Camp D education building.

In July and August of 2004, respectively, the State notified the defendant that it intended to seek the death penalty and would rely on eight aggravating circumstances:[3] (1) the perpetration or attempted perpetration of the aggravated kidnapping of Lieutenant Douglas Chaney and Sergeant Reddia Walker; (2) the perpetration or attempted perpetration of an aggravated escape; (3) the victim was a peace officer engaged in his lawful duties; (4) the offender has been previously convicted of an unrelated murder; (5) the offender created a risk of death or great bodily harm to more than one person; (6) the offender was imprisoned for the commission of an unrelated forcible felony at the time of commission of the offense; (7) the offense was committed in an especially heinous, atrocious, or cruel

---

[1] Article V, Section 5(D) provides, in pertinent part: "[A] case shall be appealable to the supreme court if . . . the defendant has been convicted of a capital offense and a penalty of death actually has been imposed."

[2] These five defendants have come to be referred to as the "Angola 5." A sixth inmate, Joel Durham, was also involved but he was shot and killed on the night of the incident, during the rescue of hostage Sergeant Reddia Walker. Mathis was also shot when he and Durham refused to surrender. A seventh inmate, Robert Cooper, was involved in the escape attempt but was not charged with the murder or any other crime, though he was the subject of a subsequent DOC disciplinary action.

[3] See LSA-C.Cr.P. art. 905.4(A)(1)-(4), (6), (7), and (9).

manner; and (8) the victim was a correctional officer who, in the normal course of his employment was required to come in close contact with persons incarcerated in a state prison facility, and the victim was engaged in his lawful duties at the time of the offense.

On February 5, 2010 the State amended the indictment to charge the co-defendants as principals. It also amended the list of aggravating circumstances on which it intended to rely from eight to four.

Although the trial court addressed a majority of pretrial matters in a consolidated manner,[4] each co-defendant's trial was held separately.[5] The defendant was the first to go to trial in July of 2010. The trial court declared a mistrial because, during the guilt phase opening statements, the State referenced the fact that the defendant was already serving a life sentence.[6] The court of appeal disagreed, but this court reversed and reinstated the trial court's ruling. **State v. Clark**, 10-1676 (La. 7/17/10), 39 So.3d 594.

On April 27, 2011, the day before jury selection was set to commence in the defendant's second trial, the defendant sought to represent himself in certain aspects of his trial with the assistance of his appointed attorneys. After the trial

---

[4] These pretrial motions were presided over, variously, by the Honorable George H. Ware, Jr., Judge, Division A; the Honorable Dennis J. Waldron, Judge Ad Hoc; and the Honorable Jerome M. Winsberg, Judge Ad Hoc.

[5] Mathis pled guilty and received a life sentence. Carley and Edge were found guilty as charged and received life sentences, as neither of these defendants' jury voted unanimously to impose the death penalty. Brown's jury found him guilty as charged and imposed the death penalty. The trial court granted a motion for new trial as to Brown's penalty phase, however, because it found the State withheld **Brady** material, under **Brady v. Maryland**, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The court of appeal reversed, and this court denied writs. **State v. Brown**, 15-2001 (La. 2/19/16), 184 So.3d 1265 (wherein this court concluded that the withheld statements of an uninvolved inmate, inculpating Edge and Clark as the inmates who decided to kill Capt. Knapps, based on the inmate's conversations with Edge, did not constitute **Brady** material as to Brown and provided no evidence regarding which inmates actually killed Capt. Knapps), cert. denied, ___ U.S. ___, 136 S.Ct. 2489, ___ L.Ed.2d ___ (2016). The defendant's jury did not hear this evidence.

[6] The Honorable Dennis J. Waldron, Judge Ad Hoc, presided over the July 2010 trial.

court conducted extensive **Faretta**[7] colloquies with the defendant and his counsel, the defendant ultimately gave the opening and closing statements and questioned numerous fact witnesses during the guilt phase of his trial.[8] The record reflects that the defendant's appointed attorneys provided assistance with these tasks. Under the defendant's direction, as lead counsel, his appointed attorneys conducted the penalty phase qualification and general *voir dire* and questioned all of the expert witnesses during the guilt phase. The defendant waived his right to self-representation during the penalty phase.

Jury selection commenced on April 28, 2011 and concluded May 6, 2011.[9] Twelve jurors and four alternates were selected.

The State and the defendant gave opening statements on May 7, 2011. The State described how it believed the crime occurred, summarized the evidence it would present, explained how that evidence established the elements of the crime, and discussed the conditions of employment and confinement at Angola. The State conceded that the jury would "never . . . know which inmate wielded which weapon inside that bathroom." The defendant's opening statement to the jury stressed the State's lack of evidence tying him to Capt. Knapps' murder and lack of evidence of his specific intent to kill or inflict great bodily harm, as well as issues related to crime scene contamination, the failure to properly collect evidence from the crime scene, bias among the State's witnesses, and correctional officer misconduct by abusing inmates in securing control of the education building and investigating the crime.

---

[7] **Faretta v. California**, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

[8] The Honorable Jerome M. Winsberg, Judge Ad Hoc, presided over the defendant's second trial.

[9] The jury venire was comprised of residents from St. Tammany Parish because the trial court granted the co-defendants' motion to change venue with respect to jury selection due to the extensive ties between the residents of West Feliciana Parish and Angola.

During the guilt phase, the State presented the testimony of thirty-three lay and expert witnesses, and the defense called twelve witnesses. Much of the testimony focused on whether Angola's tactical team used excessive force in retaking control of the education building and whether correctional officers abused inmates in the days that followed Capt. Knapps' death. The jury also visited the crime scene.

This case is unusually complex, given the number of inmates and correctional officers involved in the events leading up to the foiled escape attempt, the murder of Capt. Knapps, the various locations at which these events unfolded, the extended time frame over which these events occurred, the co-defendants' control of the crime scene and evidence prior to the correctional officers regaining control, and the volume and variety of peripheral issues that have arisen over the course of the succeeding two decades. A summary of the evidence heard by the jury follows.

In October of 1999 inmate Joel Durham approached inmate Doyle Billiot about joining a plan to escape Angola, which included inmates Carley, Edge, Mathis, and Brown. Billiot learned the inmates planned to execute their escape plan during evening call-outs in the Camp D education building on December 28, 1999, and the defendant had agreed to join the escape team. The addition of the defendant to the plot coincided with circumstances that had led him to believe his goal of becoming a trustee in January or February of 2000 was unlikely, which upset him and had made him amenable to the escape plot. The defendant's position in an inmate social organization rendered it possible for him to list the participating inmates on the "call-out sheet" for that night so they could access the various rooms in the education building, thus furthering the escape plans.

According to the defendant's initial statements to investigators, the inmates' plan was to target correctional officers unlikely to fight back (such as those nearing

5

retirement, like Lieutenants Charles Cockerham and Douglas Chaney, or female officers, like Sergeant Reddia Walker) or those allegedly involved in mistreating inmates housed on Angola's most restrictive confinement tier in Camp J (such as Lieutenant David Ross). The inmates also needed to target a correctional officer with the rank of captain in order to acquire the keys necessary to execute their plan. After handcuffing the targeted officers and taking their keys, radios, and parts of their uniforms, the inmates planned to exit the Camp D sally port, take a car parked nearby, travel via a dirt road off Angola grounds, which some of the involved inmates had identified while on a "blade" crew, and then proceed to Tylertown, Mississippi, where they would obtain food, money, and an eighteen-wheeler before heading to Canada. If escape proved impossible, they would seek transfer to federal prison or die.

Apparently the inmates were inspired by an incident, earlier in the month, in which federal Cuban detainees, housed in a St. Martinville, Louisiana facility, held correctional officers hostage over the course of several days and successfully negotiated their release via federal and state negotiators.[10] Angola officials, however, maintained, and trained for, a strict no-negotiation policy.

On December 28, 1999 Carley, Durham, Edge, Mathis, and the defendant attended the AA/NA meeting call-out in "Classroom One" of the Camp D education building.[11] Brown was on call-out for an inmate-led legal class[12] in

---

[10] The handling of the St. Martinville hostage situation raised serious concerns within the Louisiana Department of Public Safety and Corrections. Angola Warden Burl Cain had predicted that inmates at some correctional facility would act soon after the St. Martinville incident because the St. Martinville inmates had been successful.

[11] Uninvolved inmates attending the AA/NA call-out included Jonah Menard, Brian Johns, John Daniels, Donald Williamson, Joel Miller, and Henry Hadwin. Inmate Robert Cooper was also on AA/NA call-out. Daniels, Johns, and Miller testified during the trial on the defendant's behalf.

[12] Inmate Alvin Loyd led the legal class, and inmates Eugene Jeanpierre, Gregory Rice, Vernon Mitchell, Arthur Siedel, Gregory Wimberly, and Brown attended. Inmate Dennis Taylor later joined some of the inmates on legal call-out. Loyd, Jeanpierre, and Taylor testified during the State's case in chief. The defendant called Wimberly to testify for the defense.

6

"Classroom Two." Billiot stayed in his dorm, having decided not to participate in the escape attempt. Several other uninvolved inmates were also present in the education building attending the AA/NA meeting, legal call-out, and band practice call-out.[13] In total, over twenty inmates were in the education building at some point that evening.

Inmate Michael Robinson testified that he was working as an orderly that night. His responsibilities included preparing the education building for the evening call-outs and assisting correctional officers with distribution of snack trays to diabetic inmates and of inmate property held in storage lockers in the "bundle" rooms[14] of the Camp D education building. Early that evening, Robinson noticed paper taped up over the glass window in the door to the education building. When he went to remove the paper, he observed the defendant, Brown, Carley, Edge, Mathis, and Durham in the hallway, and one of them told him not to worry about the paper as he attempted to pull it down. According to Robinson, the defendant and Brown also showed "great concern about where the captain, where the lieutenant and everybody was at."[15]

Sometime later, Robinson assisted Lt. Chaney with snack tray distribution. Lt. Chaney entered the education building several times to access and return keys to the nearby kitchen from one of the bundle rooms. When Lt. Chaney first entered the education building at around 7:00 or 7:15 p.m., the defendant asked

---

[13] Attendees of the band practice call-out included inmates Kenneth Edwards, Earl Lowe, Tyrone Clofer, Mickey Lanerie, Michael Wardlaw, and Theodore Butler. Lowe, Clofer, and Wardlaw were called to testify for the defense.

[14] In general, "bundle" rooms functioned as storage areas at Angola. The dorm bundle room contained bundles of inmate clothing and other personal items. The cell block bundle room contained linens and other general supplies, as well as a desk and office supplies used by correctional officers and overflow inmate items.

[15] Robinson did not believe their excuse for needing to talk to Capt. Knapps (that Brown had a headache), because the appropriate person regarding assistance with a minor medical concern was a dorm sergeant.

him where Lt. Cockerham was, a question the defendant repeated about forty-five minutes later.

As Lt. Chaney re-entered the education building, Robinson observed Capt. Knapps enter the building, walk down the hallway past Brown, and toward the defendant, who was standing near the officers' restroom at the far end of the hallway.[16] When Lt. Chaney took longer than usual to rejoin Robinson on the walkway outside the education building, Robinson entered the building to check on him and saw Lt. Chaney's keys hanging in the lock of the dorm bundle room door, which alerted Robinson to the fact that something was wrong.[17] Robinson forced his way into the dorm bundle room and saw Lt. Chaney pinned to the floor with one inmate at his feet and another near his head.[18] One of the inmates came after Robinson, but Robinson escaped and ran toward the security booth on the walkway, with several other fleeing inmates, to tell Sgt. Walker that inmates were jumping Lt. Chaney and that she needed to hit her beeper. Ignoring the suggestion to hit her beeper, which would have alerted other officers of a security problem, Sgt. Walker immediately went to check on Capt. Knapps and Lt. Chaney.[19]

---

[16] Other inmates were also on the hallway. On cross-examination, Robinson admitted he did not mention the defendant was at the end of the hallway near the officers' restroom when Capt. Knapps entered the education building, in his December 30, 1999 statement to investigators. Robinson also confirmed that he did not see the defendant involved in the kidnapping of Lt. Chaney and Sgt. Walker, and he never saw the defendant with a weapon. This appears to have been one of the last times anyone not involved in the crime saw Capt. Knapps alive.

[17] On cross-examination, Robinson stated he did not see the defendant in the hallway when he went to check on Lt. Chaney.

[18] Robinson identified Brown as the inmate at Lt. Chaney's head and Durham as the inmate at his feet. However, on cross-examination, Robinson admitted he had mistakenly identified Edge, instead of Durham, as one of Lt. Chaney's attackers in his December 30, 1999 statement to investigators. Robinson also appears to have been mistaken about the second inmate attacker. Lt. Chaney testified, in his December 1, 2004 deposition, that Mathis and Durham were the inmates who initially attacked him. In a handwritten statement prepared on December 30, 1999, Lt. Chaney described his initial attackers as "two white inmates" and stated the inmate who went after Robinson was white. Brown is black and the rest of the co-defendants, including Durham, are white.

[19] Inmate Jeanpierre's testimony corroborated Robinson's account. Jeanpierre testified he and inmates Rice, Mitchell, and Siedel fled the legal class call-out at the same time Robinson fled from Lt. Chaney's attackers. Jeanpierre had heard keys shaking in the hallway outside Classroom Two and believed something was wrong, based on the reactions of Rice and Mitchell,

Lt. Chaney had managed to get to the education building doorway before the inmates pulled him back into the building and another inmate pushed Sgt. Walker inside. Carley began ordering inmates fleeing from the legal class to return to the education building. As Robinson ran to get help, he saw Cooper burying a shank in the ground near the walkway. Robinson called out to the next officer he saw, Lt. Cockerham, saying, "we need help, we need help down here," but Robinson was ignored. Robinson then ran toward the dorms and jumped a fence, knowing that he was risking getting shot as he did so, in order to let an officer at the Camp D sally port know that corrections officers in the education building were being attacked.[20]

Lt. Chaney testified that Mathis and Durham pushed him into the dorm bundle room, grabbed him around the neck, hit him all over, and wrestled his keys, radio, and scissors away from him. He was able to get away from Durham when Mathis tried to grab Robinson, but was soon overpowered, slammed to the floor of the hallway, handcuffed, had a sock stuffed into his mouth, a coat thrown partially over his head, and his shoelaces tied together.[21] Although he was dizzy and had blurred vision from his head injuries, Lt. Chaney could see Carley had blood on his pants and held a homemade weapon consisting of half a pair of scissors. Some of the involved inmates then dragged Lt. Chaney into Classroom One, where he heard Sgt. Walker crying behind him and Edge telling some of the uninvolved inmates

who had looked into the hallway. He observed one inmate trying to block the exit door and heard yelling in one of the bundle rooms. At some point, Jeanpierre warned Lt. Ross and Sgt. Smith not to go into the education building. Once back at his dorm in Camp D, Falcon 4, Jeanpierre watched out through a window and observed the tactical team retake the building. He did not witness any inmate beatings on the walkway or the in the portions of the hallway that he could see.

[20] Thereafter, Robinson was treated for injuries he sustained in jumping the fence at the medical treatment center, and he was then placed into lockup while investigators sorted out the details of what happened. At no point was Robinson beaten, and he did not observe any inmate being beaten or even complaining about beatings that night. On cross-examination, Robinson admitted that he later complained about being harassed by inmates and security personnel alike for telling the truth about what he saw on December 28, 1999.

[21] On cross-examination, Lt. Chaney acknowledged that the involved inmates asked him to calm down several times and informed him that they did not want to hurt him.

that he was sorry they gotten caught up in the failed escape plan and that Capt. Knapps was badly injured. Carley entered Classroom One with several sets of keys, a radio, and a weapon, threatening to kill Lt. Chaney if he did not help identify certain keys, before Carley escorted Sgt. Walker out of Classroom One. At some point, Brown or Durham came in with a mallet and placed it in a chair near Edge who appeared to be guarding Lt. Chaney and the uninvolved inmate hostages. At no point did the defendant bring water and a blanket or protect and comfort Lt. Chaney as he later claimed.[22] Just before the tactical team stormed the building, Lt. Chaney heard Brown come into Classroom One, hollering that everyone was going to be killed.

Sgt. Walker testified that on December 28, 1999 she was assigned to the medium gate guard shack, as security for the walkway between the Camp D education building and the sally port. She became aware of an issue at around 8:20 p.m., when she observed several inmates running out of the education building, including Robinson. As she approached the ramp to the entrance of the education building, the door opened, and she observed Lt. Chaney holding an inmate she did not know in a headlock. Someone pushed her from behind into the building and onto the floor of the hallway. Carley tied her shoelaces together, informing her she was a hostage and the situation was "like St. Martinville" because the planned escape had gone wrong. After Sgt. Walker realized her hands had not been tied, she pressed her beeper, notifying security of the need for assistance in Camp D. Carley attempted to intercept the call for assistance by stating into one of the officers' radio that the situation was under control; he then took Sgt. Walker's beeper from her and moved her to Classroom One, where Edge appeared to be guarding several uninvolved inmates. Carley next brought in Lt. Chaney; the

---

[22] Lt. Chaney testified that inmate Hadwin gave him water, held his hand, and tried to comfort him.

defendant then entered the classroom. It did not appear to Sgt. Walker that Edge or anyone else was limiting the defendant's ability to go anywhere or do what he wanted. While in Classroom One, the defendant informed Sgt. Walker that he was not going to hurt her, but he wanted to talk to the Attorney General, stating his belief that they were going to die. The defendant also requested Sgt. Walker, if she got out alive, to call and tell his mother that he loved her, he was sorry, and he did not want to be buried at Angola. The defendant then left Classroom One without anyone attempting to stop him.

Inmate Hadwin tried to comfort and pray with Sgt. Walker before Carley returned with a large ice pick-like shank in his bloody hands. Carley held the shank to Sgt. Walker's throat and forced her to leave Classroom One and go into the cell block bundle room, where the defendant was looking through Angola's telephone directory and Brown was holding a telephone. They asked her how to get an outside line, and she was responding that she did not know when the phone rang. As Brown was speaking to the caller (who was obviously an Angola official), the defendant told Brown to say, "We need to talk to an Attorney General and then we need an outside line," which Brown relayed to the caller. Carley, Mathis, and Durham entered the cell block bundle room, and the inmates began talking about dying. Then, a telephone number was broadcast across the radio system. Brown dialed the number, and the defendant told him to repeat their demand to speak to the Attorney General and for an outside line.[23] When Carley held the shank to Sgt. Walker's throat again and told her to get on the phone to tell Angola personnel she was okay, she complied. The defendant did nothing to interfere with Carley's threatening behavior, and he informed Sgt. Walker that they

---

[23] Warden Cain testified that he spoke on the phone with one of the hostage-takers, who demanded to be allowed to contact the FBI or the Justice Department. In response, Warden Cain told the inmate that he was in charge and that the hostage-takers would not be talking to anyone else.

could not let her go when she asked him to release her. Sgt. Walker also observed that Mathis had a weapon made from scissors and Durham had a weapon made from a metal door hinge arm.

Sgt. Walker further testified that when the phone rang again, Brown answered. After hearing it was Warden Cain, the defendant stated they were all going to die and expressed his desire to return to his dorm. All the involved inmates indicated their unwillingness to serve time in Angola's restrictive confinement tier at Camp J, and Mathis and Durham made clear they would rather die than be confined at Camp J. As the defendant told the others that they needed to change their clothing and left the bundle room, Sgt. Walker noticed blood on the defendant's grey sweatshirt.[24] When the defendant returned wearing a different grey sweatshirt, he wrote a note to his mother and placed it in Sgt. Walker's pocket. The defendant then left Sgt. Walker with Durham and Mathis. She testified that the defendant did not make either inmate promise not to harm her before he left, as he later claimed.

Sgt. Walker next heard Warden Cain enter the building and present an amnesty (with no-consequences) note that the involved inmates could sign. She heard Carley respond, "You-all aren't going to let us go back to no dorms after you see what we did." Shortly thereafter, she heard Mathis and Durham reaffirm their commitment to die rather than go to Camp J; then she heard shots and saw them on the floor. Sgt. Walker was taken to the infirmary and, later that evening and on December 30, 1999, she provided statements to investigators.

---

[24] On cross-examination, Sergeant Walker admitted that she had not mentioned, in prior testimony or statements, this exchange with the defendant or the fact that she observed blood on the defendant's grey sweatshirt before he replaced it with a cleaner sweatshirt. She stated that no one had asked her about those specific aspects of the night, explaining that her initial two-and-a half page handwritten statement was not complete and she had only answered the questions asked in her prior testimony.

Former inmate Dennis Taylor testified[25] that he was with Lt. Cockerham and another correctional officer when they observed inmates running on the walkway and Sgt. Walker missing from her post. Taylor recalled his concern for his half-brother, inmate Gregory Wimberly, who was inside, prompting Taylor to enter the education building. He saw Durham and Carley and a discharged fire extinguisher in the hallway. He also observed Lt. Chaney and Sgt. Walker on the floor in Classroom One, with one black and one white inmate beating Lt. Chaney; he went to the legal aid office to find out what was going on and decided to try to leave the building. When he re-entered the hallway, he saw the defendant, Brown, Durham, Mathis, and Carley. The exit door was locked, but Brown offered him the keys to unlock it, which Taylor refused to touch. Brown and Mathis also had radios, and Durham had another set of keys.

Taylor testified that the defendant, Durham, Mathis, and Carley had blood on their clothing. Specifically, Taylor observed what appeared to be blood on the defendant's hooded sweatshirt, down the side of his pants, and on his hands. Taylor also saw what he thought was a weapon in the defendant's hand and spots of blood in the hallway near the inmates' restroom door. On cross-examination, the defendant elicited testimony from Taylor about his reluctance to testify, a threat regarding his incarceration if he failed to do so, and his 2005 brain surgery to remove a tumor, which left him with memory damage. Taylor also admitted the item he saw in the defendant's hand could possibly have been a 2.5 x .5 inch metallic cross that some inmates carry.[26]

---

[25] Taylor served twenty-eight years for armed robbery and while in Angola, he served as an inmate counsel.

[26] We note that there is no indication in the trial court record that anyone recovered a metal cross from the defendant, any other inmate, or the crime scene. Further, although Taylor indicated that he saw what appeared to be blood on the defendant's "hooded" sweatshirt, the totality of the evidence presented at trial indicated that, at some point after the victim's blood was deposited on the defendant's denim jacket and sweatshirt, which had no hood, he changed into a different and cleaner jacket and sweatshirt, which had a hood (though he continued to wear the same dark-colored pants, which were saturated with blood). Thus, Taylor's assertion that the defendant's

13

Deputy Warden Vannoy testified that he was one of the first officers to respond to the hostage situation that evening, and he initiated telephone contact with the involved inmates before Warden Cain arrived. Warden Vannoy spoke first with Carley, who he described as "very upset." Warden Vannoy also stated that Carley demanded to be allowed contact with the FBI and the U.S. Attorney in Baton Rouge, and he threatened to kill the hostages if security approached the education building. At the time, Carley informed Warden Vannoy that no one was hurt and allowed him to speak with Sgt. Walker briefly. Warden Vannoy also spoke with Durham and Brown, both of whom made similar demands and threats. Warden Vannoy recalled that he was the first person to speak with Carley in person, after some of the involved inmates, including the defendant, opened the education building door and surrendered. On the walkway, Carley informed Warden Vannoy that Capt. Knapps was in the officers' restroom "seriously injured and possibly dead." Warden Vannoy yelled to Richard Stalder, then-Secretary of the Department of Public Safety and Corrections, to check the restroom. Warden Vannoy also testified that the defendant spoke to him on the walkway, after he surrendered, stating, "All I ever wanted to be was a trustee." After the building was secure, Deputy Warden Vannoy's supervisor, Deputy Warden Paul Perkins, instructed him to pick up Capt. Knapps' sister, Caroline Whitstine, from another Angola building where she worked and to inform Capt. Knapps' mother of her son's death.

Former Secretary Stalder testified about his participation in efforts to rescue the hostages and retake the Camp D education building. When he arrived at Angola, Warden Cain, as well as Deputy Wardens Vannoy, Perkins, and Jimmy

---

"hooded" sweatshirt appeared to have blood on it may not have been accurate; however, in light of Taylor's indication that his brain tumor and 2005 surgery left him with some memory impairment and other evidence on the issue, the discrepancy in Taylor's testimony is not significant.

Johnson, were already staged at the education building door with tactical team support surrounding the building. Secretary Stalder testified that the defendant was the first inmate to leave the building, followed by Carley and Brown.[27] While Warden Cain stopped in the hallway next to the dorm bundle room with Sgt. Walker, Mathis, and Durham inside, Secretary Stalder proceeded to Classroom One with Deputy Wardens Perkins and Johnson to rescue Lt. Chaney. After securing Lt. Chaney's release, they went down the hallway and discovered Capt. Knapps' body in the officers' restroom. Secretary Stalder signaled to Warden Cain the urgent need to rescue Sgt. Walker. The tactical team deployed a flash grenade, rescued Sgt. Walker from Mathis and Durham, and regained control of the education building.

Deputy Warden Perkins' testimony verified that of Secretary Stalder. Warden Perkins further testified that he entered the restroom to "get a good look at [Capt. Knapps]," who he said was "unrecognizable" due to his injuries, even though he and Capt. Knapps had grown up together.[28]

Immediately after regaining control of the education building, corrections officials considered all inmates in the building as suspects and, as they had been trained, used the force necessary to regain control, searched the inmates for additional weapons, and lined them up in a submissive position (i.e., on knees with

---

[27] Other witnesses consistently testified that inmate Carley left the building first and informed Warden Vannoy of Capt. Knapps' condition and location, while Brown and the defendant exited the education building after signing Warden Cain's amnesty note.

[28] Former Camp D Colonel Charles Stewart also testified about efforts to retake the education building on December 28, 1999. Col. Stewart stated that he talked to an unknown inmate on the telephone (believed to be the defendant, based on a subsequent statement by the defendant) and entered the building when Carley, Brown, and the defendant opened the door. He recalled Brown patted him down in front of Warden Cain and the rest of the initial response team entering the building, while the defendant was agitated, pacing in circles and saying "You-all going to kill me. They going to kill me. We have f'ed up, and you-all are going to kill me." On cross-examination, Col. Stewart acknowledged that he had not mentioned the defendant's alleged statements in any prior statement or testimony. In addition, Col. Stewart could not identify the defendant in the courtroom initially, though he was able to identify the defendant's December 28, 1999 photograph and he did recognize the defendant when the defendant began to cross-examine him.

wrists cuffed behind the back, legs crossed, and head against the hallway wall) until investigators and crime lab technicians could photograph them, collect their clothing and shoes, and take samples from their hands of suspected blood stains.

Warden Cain's testimony corroborated the testimony of the other officials. He also explained that his goal, prior to regaining access to the education building, was to have the involved inmates open the education building door themselves to avoid the additional time and increased risk to the hostages required to blow open a door or wall and overcome whatever internal barricades the hostage-takers may have erected. Warden Cain achieved this goal by agreeing to personally write and deliver an amnesty note for the involved inmates to sign when they surrendered, which were to be effective on the provision that no one had been hurt.[29] Carley opened and ran out the door toward Warden Vannoy, while Warden Cain had Brown and the defendant sign the amnesty note on the stack of large metal locker boxes partially blocking the doorway before allowing them to leave.

As Warden Cain was trying to convince Mathis and Durham to give up and release Sgt. Walker from the bundle room, Durham said, "You haven't looked in the bathroom yet." When Secretary Stalder confirmed the inmates had killed Capt. Knapps, Warden Cain decided to rescue Sgt. Walker with force. After setting off a flash grenade, Colonel Joe Norwood and Captain Russell Bordelon, who functioned as trained snipers on the tactical team, opened the bundle room door. Col. Norwood testified that he observed, through the crack in the door hinge, Durham standing over Sgt. Walker with a shiny weapon in his hand, and he shot Durham twice in the chest through the crack; he also fired another couple of shots

---

[29] The amnesty note stated, "No harm or charges or [disciplinary board] reports will be written nor any official document of this event be recorded." The signatures of Warden Cain, David Brown, and the defendant appear on the amnesty note. Warden Cain testified that he personally observed the defendant sign the amnesty note, though as pointed out during Warden Cain's cross-examination the defendant's first name appears to have been written as "Jeffery," rather than the correct spelling of "Jeffrey."

when Durham continued to move towards Sgt. Walker. Capt. Bordelon, who testified at the suppression hearings but not at the defendant's trial, stated that he shot Mathis in the face as Mathis came toward the Angola personnel in the doorway. Durham died, but Mathis survived.

Retired Colonel Darren Bordelon, who was a lieutenant colonel at the time of the 1999 incident, testified that he was part of the Angola restraint team and assisted in securing and clearing out the call-out rooms after the education building was retaken. Col. Bordelon explained that the team's training required security personnel to consider all inmates as suspects and to use the force necessary to take down an inmate who failed to comply with an order to get on the floor, before being searched for weapons and restrained. Col. Bordelon testified that most of the inmates complied, but a few did not and sustained injuries. Col. Bordelon also testified that he came into contact with the defendant that evening near the "medium gate," outside of the education building at around 2:30 a.m.; he described their conversation as follows:

> I asked him, if I was to walk in the building that night, what would have happened to me? And he said the same thing would have happened to me. He said they would have took care of me like they took care of Captain Knapps . . . . [H]e said they would take me down the same way that they took down Captain Knapps.

Col. Bordelon also observed Capt. Knapps in the officers' restroom while medics were trying to save him, noting Capt. Knapps' "condition was terrible" and "[h]is face was almost unrecognizable" because "the top of his head looked like a bowl because they beat him."

Lieutenant Colonel Chad Oubre, who was a sergeant in 1999, testified that he transported several inmates, including the defendant, from Camp D via transport bus to new housing locations, following initial processing by crime lab technicians. During the transport of the defendant to Camp J, Lt. Col. Oubre heard the defendant spontaneously and repeatedly state that he planned to turn State's

17

evidence. Lt. Col. Oubre also stated that he did not observe anyone beating the defendant near the transport bus. On cross-examination, however, the defendant was able to show that Lt. Col. Oubre's testimony, in which he claimed he never entered the education building that evening and did not see any inmates until they got on the bus, was inconsistent with a prior statement given on August 3, 2005.

Pat Lane of the Louisiana State Police Crime Lab, a stipulated expert in crime scene investigation and reconstruction and bloodstain pattern interpretation, testified that he and co-worker Alejandro Vara arrived at the Camp D education building at around midnight, spoke with investigators from the West Feliciana Parish Sheriff's Office ("WFPSO"), Angola, and the State Police and began processing the crime scene. Mr. Lane explained that he and Mr. Vara walked through the crime scene to assess what needed to be done, processed the inmates individually, and collected additional evidence, including clothing and weapons located throughout and around the education building.[30] They also photographed and videotaped various bloodstain types as well as bloody finger, palm, and shoe prints found in the officers' restroom, as well as photographed Capt. Knapps' body during the autopsy.

Inmate processing included photographing each inmate present in the education building, having them remove their clothing and place it in individually marked brown paper bags, examining their bodies for blood and collecting samples where necessary, and providing them with prison jumpsuits so they could proceed to speak with investigators. As to the defendant, Mr. Lane and Mr. Vara collected

---

[30] Mr. Lane and Mr. Vara observed and/or recovered: a yellow plastic-headed mallet near a cleaning bucket on the walkway outside the education building; bullet casings/impact markings, the half pair of scissors, the door arm hinge, and locker boxes with broken tamper-indicating, metallic tape from the dorm bundle room; the homemade shank with wooden handle and a discarded blood-stained denim jacket in a garbage can from the cell block bundle room; another yellow plastic-headed mallet, grey sweatshirt, white T-shirt, and black gloves from Classroom One; and Capt. Knapps' jacket from the hallway. State Police recovered and provided to Mr. Lane three additional potential weapons (i.e., a U-shaped piece of metal, a chisel-type tool, and a 9-inch green-handled spatula).

two bags of clothing worn by the defendant at the time of processing,[31] as well as other clothing items found at the crime scene and later linked to the defendant; they also swabbed his hands. Mr. Lane testified that the only fingerprints recovered from the crime scene belonged to the victim. He made clear there was no opportunity for Col. Bordelon or Lt. Ross to tamper with the defendant's collected clothing by placing Brown's bloody sweatpants in one of the defendant's bags, as the defendant later claimed.

On cross-examination, Mr. Lane acknowledged that: the entire building was the crime scene; inmates and security remained in and moved about the scene for hours before processing commenced, including in the hallway where the attack on Capt. Knapps likely started and in the officers' restroom where he died; and numerous items of evidence including weapons and clothing had been gathered and provided to him without any indication of who collected it, when or where. Mr. Lane also admitted at least one bag of inmate clothing (unrelated to the defendant) had been mislabeled and clothing from all inmates was not collected at the initial processing (including the clothing of Durham, Mathis, and Edge because they were undergoing medical treatment). On redirect, Mr. Lane testified that none of the alleged irregularities or oversights had any impact on the evidence linking the defendant to the murder.

The testimony of Mr. Vara, Carolyn Booker, and George Schiro, who were all stipulated as experts in forensic DNA analysis, corroborated the testimony of Mr. Lane and further revealed the following:

- Clothing from involved and uninvolved inmates in the education building that evening contained 692 bloodstains, and DNA testing was not performed on each of those stains;

---

[31] These items included a denim jacket, cut-off thermal underpants, white boxer shorts, grey socks with red cuffs, white socks, white Reebok tennis shoes, jeans, grey sweat pants, and a grey hooded zipper-front sweatshirt with pockets.

- With respect to the bloodstains on which Crime Lab technicians conducted DNA testing, they found:

  • Capt. Knapps' blood on the shank and a denim jacket found in the cell block bundle room; the white T-shirt and the mallet found in Classroom One; and on the shoes, jeans, and sweatpants worn by defendant at the time of processing;

  • co-defendant Carley's blood on the denim jacket collected from the defendant at processing;

  • the defendant's blood on the socks and boxers collected from him at processing;

  • Capt. Knapps' blood on Brown's sock, white pants, and jeans, Carley's socks, long-john shirt, pants, and shoes, and Durham's shoe and jeans;

  • the samples taken from bloodstains on the clothing of Edge and Mathis matched only the wearer or another involved inmate, but not the victim, although the copious amounts of blood from the wearer's injuries could have masked smaller amounts of the victim's DNA; and

  • clothing worn by most of the uninvolved inmates at the time of collection had bloodstains from various unknown sources on them, and some of that clothing had bloodstains from known sources, including items with the blood of an involved inmate on it (i.e., the sweatshirt worn by inmate Brown at the time of processing had Edge's blood on it; a bloodstain from inmate Kenneth Edwards' white hooded sweatshirt may have contained a blood mixture that included Mathis's blood), and some items had the victim's blood on them (i.e., the shirt worn by inmate Mickey Lanerie, the grey sweatshirt worn by inmate Brian Johns, the dark grey sweatshirt and shoes of inmate Taylor; and the sweatshirt worn by inmate John Daniels).

- Swabs from the defendant's hands contained a blood mixture consistent with the DNA of Capt. Knapps and the defendant;[32] and

- The probability of the DNA found on the defendant's jeans and sweatpants and the grey sweatshirt linked to the defendant found in Classroom One belonging to someone randomly selected other than Capt. Knapps was 1 in 17 trillion.

In addition, Alan Keel, another stipulated forensic DNA analysis expert, whose private practice called for him to testify routinely in cases on behalf of both the defense and the prosecution, conducted additional DNA testing on samples

---

[32] On cross-examination, Ms. Booker admitted the mixture of blood on the defendant's hands could have gotten there when the defendant attempted to wash Capt. Knapps' blood from the first sweatshirt he wore, as claimed in his initial statement to investigators.

from several items of clothing to determine the habitual wearer of the items and additional testing on weapons found at the crime scene. Mr. Keel testified that the grey sweatshirt found in Classroom One had spatter stains of Capt. Knapps' blood on the front of it, a smear of Capt. Knapps' blood on the inside of it, and a large quantity of biological samples from areas known to be fertile with the habitual wearer's DNA (such as the collar, front waist hem, and outside front) that contained the defendant's DNA or low level mixtures containing higher levels of the defendant's DNA.[33] Mr. Keel further stated that the denim jacket found in the cell block bundle room had the victim's blood on the outside left front sleeve, the defendant's blood in a transfer stain on the inside, as well as Durham's epithelial cells on the front of it next to a rivet.[34] As to the tested weapons, sample levels were too low to link the defendant to any weapon, although Mr. Keel confirmed the victim's blood was on the mallet and ice pick-like shank.

Dr. Alfredo Suarez conducted the autopsy of Capt. Knapps. Following a stipulation as to his expertise in forensic pathology, he testified as follows regarding Capt. Knapps' injuries, before walking the jury through a limited number of photographs of the injuries and linking those injuries to the recovered weapons:

> This man sustained multiple and different injuries. The, the fatal blows were in the head. He had several lacerations due to blunt trauma that caused multiple fractures of the bones forming the skull, the temporal, the left parietal, and the occipital. So there were at least three blows to the head, heavy and with force, that one of the major injuries was a depressed fracture. In other words, the bone was inserted into the brain. And that's a major blow to be able to fracture a thick bone. And the bone ends up poking, if you will, into the brain. In there that led to considerable hemorrhage inside the cranial cavity. And that's, that's a fatal -- those were the fatal blows altogether.
> In addition, there were puncture wounds. There were three puncture wounds on the left lateral chest wall, one of which

---

[33] Mr. Keel also testified that a stain on the inside of the back of the sweatshirt contained Edge's DNA.

[34] In addition, the denim jacket had the names of four individuals written on it. None of them appear to have been inmates present in the education building on the night of the attempted escape and murder.

penetrated two inches into the spleen. The spleen is that organ that's on the left that's very, very vascularized, so it bleeds quite a bit. And that potentially could have been a fatal injury; however, the amount of blood that I found in the abdomen, free in the belly, if you will, in the abdomen, was not very abundant. It was only 50 ML. It's like a pint and a half maybe.

And the other two perforations didn't injure any fatal structures, no blood vessels and no organs.

There were defense wounds. There were defense wounds is what we call the attempt from the victim to ward off the weapon. And they sustain injuries to sometimes forearm, and, predominately in this case, were the fingers. Those are so-called defense wounds.

There were other lacerations on the both shoulders, and the -- this man was hit pretty good in the perioral region, around the mouth. Why? The, the maxillary teeth were loose and the prosthesis that he had was out of mouth. And there were lacerations in both lips. So that's due to probably fist, punch him in the mouth. That's basically what he sustained.

\* \* \*

. . . [T]here [were] superficial cuts, and there was a puncture wound to the left neck that penetrated about two inches and produced hemorrhage about the cervical esophagus. But that injury, although with maybe a 5-degree angle, could have perforated both the carotid artery and/or the internal jugular vein. But that particular wound didn't do that, so that's not fatal.[35]

Dr. Suarez opined that, given the injuries and multiple weapons used, he suspected more than one person was involved in the attack, and he noted that Capt. Knapps likely sustained the puncture wounds to his torso after the fatal blows to his head.

The parties stipulated to the expertise of Colonel Timothy Scanlan of the Jefferson Parish Sheriff's Office Crime Laboratory in the fields of crime scene investigation, crime scene reconstruction, and bloodstain pattern analysis. Col. Scanlan testified that he believed the inmates killed Capt. Knapps in the restroom, rather than in the hallway or doorway, and he described the various types of bloodstain patterns in the crime scene and on clothing and what they revealed to him as a crime scene reconstructionist. Most notably, Col. Scanlan discussed the implications of a takeaway print from the defendant's notched left Reebok shoe in the officer's restroom, the blood spatter on the grey sweatshirt found in Classroom

---

[35] On cross-examination, Dr. Suarez added some details, including that he believed the fatal blow could have been any one of three heavy blows, two of which were delivered to the back of Capt. Knapps' head and one was to the front.

One linked to the defendant as the habitual wearer, and the blood spatter and transfer patterns on the denim jacket found in the cell block bundle room also linked to the defendant, which indicated the defendant was moving about the restroom after Capt. Knapps sustained significant injury and was on top of the victim or right next to him when Capt. Knapps sustained blows to previously injured and bleeding areas of his body. Col. Scanlan testified that this evidence was inconsistent with the defendant's initial statements to investigators indicating that Mathis, Carley, and Durham were the only ones with knowledge of what took place in the officers' restroom and that the defendant was unaware Capt. Knapps was seriously hurt until after he was out of the education building on the walkway.

Col. Scanlan noted that, while the denim jacket and hooded, zippered, grey sweatshirt with pockets, collected from the defendant during processing, did not have the tell-tale spatter patterns, the defendant's jeans had direct transfer blood stains and blood spatter, indicative of dynamic bloodshed, and saturation stains showing prolonged contact with active bleeding. The saturation was so significant that the sweatpants worn under the defendant's jeans had a secondary transfer blood pattern in the corresponding location, and both the jeans and sweatpants were soaked through with Capt. Knapps' blood. Col. Scanlan also observed that the small size of the blood spatter on clothing collected from or linked to the defendant showed that the defendant was in "very close proximity" and "actively involved." While Col. Scanlan stated that he did not believe the initial attack took place in the hallway, he acknowledged on cross-examination that the inmates' control over the crime scene and reported efforts to clean the hallway may have obscured that version of events, and he explained that his responsibility was to reconstruct the crime scene with the physical evidence presented to him.

Major Randy Holden, formerly a WFPSO investigator, and State Trooper Brad Cook conducted the initial interviews of Brown, Edge, and the defendant in

the early morning hours of December 29, 1999. Major Holden and Trooper Cook

testified that Major Holden advised the defendant of his rights and had the

defendant read and sign a waiver of rights form. Neither Major Holden nor

Trooper Cook inflicted, observed evidence of, or heard complaints about, abuse or

coercion of the defendant.[36] The defendant's recorded statement commenced at

7:47 a.m., during which he informed officers that:

- On December 27, 1999, the defendant was informed of a pending unwanted move in his housing location, which led him to believe his desire to become a trustee in January or February 2000 was unlikely to happen, and he was upset about this development (he said it "messed [him] up" when he realized his chances to become a trustee appeared slim).
- Durham and Carley approached him about joining an escape plan about a week before December 28, 1999, and they asked him to prepare a list of inmates for the call-outs scheduled for that evening, which he did.
- The escape plan involved targeting correctional officers either close to retirement or female (and therefore believed to be less likely to resist),[37] tackling and handcuffing them, taking their uniforms, keys, and beepers, and leaving them unharmed in one of the two bundle rooms in the education building. From there, the inmates would exit the Camp D sally port, take one of the cars parked near the sally port, drive off the property via a dirt road, which had been observed by some of the involved inmates while working a blade crew, proceed to Tylertown, Mississippi, to gather food, money, and an eighteen-wheeler before heading to Canada.
- The defendant claimed he agreed to join the plan that evening and, despite his claims of no intent or awareness of any intent to harm on anyone's part, he observed Edge with a mallet or hammer in his jacket and a shank up his left sleeve, and the defendant knew 265-pound Brown was recruited to handle the targeted officers physically.
- Planned targets Lieutenants Ross and Cockerham were not in the building, and the involved inmates missed their initial chance to secure Lt. Chaney, so when Capt. Knapps came in the education building to use the officers' restroom, the inmates seized the opportunity. Specifically, the defendant claimed Durham approached Capt. Knapps in the hallway, as Capt. Knapps exited the restroom, and punched him, causing him to fall down near the watercooler. The defendant stated that as Capt. Knapps struggled, Durham

---

[36] In contrast, Major Holden and Trooper Cook observed that inmate Edge had some injuries (i.e., bruising around an eye and a bloody nose) from the tactical team's efforts to retake control of the education building and inquired about them. Edge had apparently tried to blend in with the uninvolved inmates and failed to comply with tactical team orders, thus sustaining injuries as he was subdued; however, Edge received medical attention and thereafter confirmed his willingness to proceed with the interview.

[37] In a later statement, the defendant also admitted targeting at least one officer, Lt. Ross, who had been previously involved in alleged mistreatment of one or more inmates on the Camp J tier, which housed inmates under the most severe confinement restrictions. Lieutenants Cockerham and Chaney fell into the close-to-retirement category of targeted officers, and Sergeant Walker is female.

- continued to hit him, and Edge approached with the mallet and hit Capt. Knapps on the head several times.
- The defendant claimed that he and Brown approached to convince Capt. Knapps to let them handcuff him when Capt. Knapps, then "bleeding bad" from the head and his hands, grabbed the defendant around his legs. Brown then dragged Capt. Knapps into the officers' restroom by his pants cuffs.
- The defendant asserted that he saw Mathis, Carley, and Durham enter the officers' restroom as the defendant entered the inmates' restroom, where the defendant attempted to remove blood from his sweatshirt. He heard "kicking noise" from the officers' restroom next door.
- When the defendant's attempts to rinse the blood off his sweatshirt proved unsuccessful, he removed it and threw it in the waste basket in the inmates' restroom, replacing it with a different sweatshirt from one of the bundle rooms.
- By the time the defendant joined the other inmates, they had grabbed Lt. Chaney and Sgt. Walker, and Edge was guarding them with a mallet in Classroom One. Lt. Chaney appeared dazed as if he too had been beaten.
- The defendant claimed that he fetched water and blankets for the officers and attempted to comfort Sgt. Walker by saying that no one would hurt her and that he would protect her.
- The defendant stated that Carley and Mathis indicated security was aware of the situation, so Carley, Mathis, and Durham started taping paper over the small windows in the doors and discharging a fire extinguisher to create confusion when security came inside. They also blocked one of the doors into the education building with locker boxes from one of the bundle rooms.
- The defendant claimed that it was his idea to get on the telephone, demand to speak with non-Angola authorities, and to surrender.
- The defendant described Sgt. Walker's brief telephone conversation with Warden Cain, his placing a note to his mother in Sgt. Walker's pocket (in which he apologized for his actions and asked not to be buried at Angola), and his own telephone conversation with Col. Stewart before he, Brown, and Carley surrendered to Warden Cain, as the tactical team commenced efforts to rescue Lt. Chaney and Sgt. Walker and retake the building.
- The defendant claimed that he "had no idea" Capt. Knapps was "hurt . . . not like that" in the officers' restroom.
- At no point did the defendant claim that he was beaten or otherwise abused by correctional officers before giving the statement.

Further, on December 29, 1999, Major Holden interviewed uninvolved inmates Hadwin, Daniels, and Williamson, none of whom appeared injured or complained of injuries. On December 30, 1999 Major Holden interviewed inmates Rice, Jeanpierre, Mitchell, Billiot, Cooper, and Robinson, as well as Lt. Chaney and Sgt. Walker. An arrest warrant was obtained by the State, on December 30, 1999, for the defendant, accusing him of the first degree murder of Capt. Knapps,

in violation of LSA-R.S. 14:30, and the aggravated kidnapping of Lt. Chaney and Sgt. Walker, in violation of LSA-R.S. 14:44.

On January 3, 2000 the defendant gave a supplemental recorded statement to Major Holden, WFPSO Chief Investigator Ivy Cutrer, Angola investigator Major Warren Melancon, and Col. Donald Ray Davis, after signing another waiver of rights form. The defendant confirmed, "I participated in an escape attempt that resulted in Capt. Knapps' death," and "saw [Edge] hit Capt. Knapps in the head with a yellow mallet or hammer out in the hallway . . . maybe four to six times . . . maybe more." The defendant reiterated his claim that Durham hit Capt. Knapps first, and he added that Carley, Mathis, and Edge jumped on Capt. Knapps while Capt. Knapps was down on the hallway floor. The defendant also attempted to explain some of the physical evidence linking him to the murder. He stated that when he and Brown approached, Capt. Knapps grabbed his legs and sweatshirt before Brown pulled Capt. Knapps into the restroom. The defendant said he, Brown, and Edge left, leaving Mathis, Carley, and Durham in the officers' restroom with Capt. Knapps. The defendant claimed that he only saw Edge with a mallet or hammer and Carley with the large ice pick-like shank. The defendant also heard Capt. Knapps saying, "What are y'all doing," and hollering, "Help me, help me." The defendant stated that he felt "partly responsible for" Capt. Knapps' death, and he believed the law would hold him responsible because he did nothing to stop it. The defendant also stated that he thought he would receive the death penalty, and he planned to plead guilty for his family's sake. The defendant made no mention of any beating or abuse by investigators or correctional officers.

Nonetheless, on January 6, 2000, the defendant informed one of his appointed attorneys, Burton Guidry, that correctional officers beat him on numerous occasions with various types of riot batons and revealed extensive bruising on his legs (on the upper front and sides of his thighs and on the lower

back of his thighs).  Mr. Guidry photographed the injuries, and the photographs were introduced into evidence.  Stipulated expert witnesses in forensic pathology and correctional investigations testified at trial that the defendant's injuries were not consistent with multiple beatings with riot batons in the early morning hours of December 29, 1999, as claimed, and the injuries appeared to be self-inflicted.  Medical personnel from Angola also testified the defendant did not present injuries from the alleged beatings to any staff members contemporaneously with the time the defendant claimed his injuries were inflicted.

The jury also heard evidence of additional inculpatory statements made by the defendant to authorities and other inmates.  For example, on October 17, 2001, the defendant wrote a thirteen-page letter to Deputy Warden Vannoy, seeking assistance in negotiating a deal with the State in exchange for testimony and identification of additional evidence located at the crime scene (even though the defendant acknowledged in the letter that Warden Vannoy had no such authority and the defendant's appointed counsel remained on his case).  In his letter to Warden Vannoy, the defendant also claimed that his initial statements were "based on half-truths" because he "feared for [his] life, due to the beatings and threats."

The defendant asserted to Warden Vannoy that his other co-defendants all "hung together" and "shared the same religious belief in Wicca," which meant they were not afraid of dying because of their belief in reincarnation.  The inmates' plan in December, 1999 was to escape, be transferred to federal prison, or die.  The defendant admitted the other inmates "told [him] that they intended to kill Lt. David Ross because he beat many inmates at Camp J, including their friend Jessie Rogers."  When the inmates could not locate Lt. Ross, they killed Capt. Knapps instead, reasoning they would then be taken seriously and somehow improve their chances of transfer to federal prison by killing one guard but releasing the others.  When Warden Cain refused to negotiate, the inmates amended their plan, deciding

27

that if the only options were confinement at Camp J or death, they would kill the officer hostages and die. Carley and Brown, however, surrendered. The defendant claimed that he remained in the bundle room with Sgt. Walker to protect her, and he left only after Durham promised not to injure her.

The defendant also wrote to Warden Vannoy that he had heard more details related to Capt. Knapps' death from rumors on the tier (i.e., that Carley had instructed Edge to clean the blood from the hallway, while Carley, Brown, and Durham went into the officers' restroom and tried to beat Capt. Knapps into disclosing Lt. Ross's location; and that they later went back and stabbed Capt. Knapps to death). The defendant offered to help authorities locate additional evidence in the education building, including Carley's bloody clothing and a second knife-like weapon. The defendant also denied, in the letter, that he told Col. Bordelon that "if [Col. Bordelon] would have come in the building that night we would have taken him down like Knapps." The defendant further claimed that Col. Bordelon and Lt. Ross removed bloody sweatpants from a bag containing Brown's clothing and put them into a bag with the defendant's clothing. The defendant complained in the letter of multiple beatings, which coerced him to say that he participated in the plan when he did not. The defendant also promised to Warden Vannoy to testify at a civil trial (presumably the wrongful death case brought by Durham's heirs) that Durham was armed when security rescued Sgt. Walker, and that Durham had demanded to be transferred to Hunt Correctional Center and to be given a job as a trustee or as an inmate counsel.

The defendant added, in a postscript to the letter, a detailed description of what most likely happened to Capt. Knapps in the officers' restroom. Specifically, the defendant stated that he knew Capt. Knapps crawled into the stall after Brown dragged the captain into the officers' restroom; and inmates Brown, Carley, and Durham "beat [Capt. Knapps] until he passed out because he would not tell [them]

28

where Lt. Ross was."[38]  The defendant further detailed that Brown, Carley, and Durham returned to the officers' restroom, when the building was surrounded by the Angola tactical team, to stab Capt. Knapps twice in the side and several times in the head with the ice pick-like shank and in the chest with the half-scissors blade.  The defendant advised Deputy Warden Vannoy to confirm the accuracy of this account from the autopsy report, and he claimed the other inmates informed him of these details during their first weeks in Camp J.

In addition, inmate Christopher Shockley testified at the defendant's trial regarding the defendant's jailhouse confession.  Shockley and the defendant met in 2005, while serving time at Hunt Correctional Center.[39]  In 2006 they discussed Capt. Knapps' death one morning.  The defendant informed Shockley that Durham had stabbed Capt. Knapps in the chest, and the defendant had hit Capt. Knapps in the head with a mallet.  Shockley also provided testimony about what he believed were the defendant's efforts to discredit his testimony about the jailhouse confession.  Although, on cross-examination, the defendant highlighted Shockley's numerous convictions and pending charges in this state and other jurisdictions, Shockley maintained that the State had promised him nothing and his decision to testify was motivated by the defendant's attempts to "throw[] [him] under the bus."

Inmate Alvin Loyd testified regarding the defendant's efforts to obtain false exculpatory testimony.  Although Loyd was in the education building on the night of the attempted escape and murder, he did not witness the attacks on Capt. Knapps, Lt. Chaney, or Sgt. Walker because he was either in Classroom Two

---

[38] Physical evidence and Col. Scanlan's analysis thereof, which show latent fingerprints of Capt. Knapps from the wall inside the stall and bloody fingerprint swipes of Capt. Knapps in the same location, indicating someone dragged Capt. Knapps out of the stall into the open area of the restroom, support this account.

[39] Deputy Warden Vannoy had the defendant returned to Angola and housed on a restricted confinement tier after learning the defendant had somehow been transferred to Hunt and convinced Hunt personnel to place him on a working cell block.

teaching the legal class or in the law library across the hall from the officers' restroom. Loyd was, however, aware of a commotion in the hallway because he heard inmates running around, observed a smear of blood on the wall of the hallway near the officers' restroom when he went to the law library to place inmate legal documents in a cabinet. Loyd also saw Robinson wrestle away from an inmate who attacked him, as Loyd tried to leave the building. Loyd stated that he returned to the law library to wait for security after Carley blocked his exit. Nonetheless, in July 2010, just before the commencement of the defendant's first trial for Capt. Knapps' murder, the defendant sent Loyd a fourteen-page, handwritten document[40] detailing yet another version of events and seeking Loyd's testimony in support of that version.[41] In this version, the defendant claimed that he was never part of the escape plan, that he actively sought to prevent the attack on Capt. Knapps by interfering with Edge and Carley's efforts to hit Capt. Knapps on the head with a mallet, that he stayed with Sgt. Walker to protect her throughout the ordeal until he left the building, and that he never signed Warden Cain's amnesty note.

After the State rested, the defendant called numerous witnesses, the bulk of whom were uninvolved inmates who provided testimony consistent with that presented at pre-trial motion to suppress hearings regarding alleged correctional

---

[40] The defendant's fourteen-page document to Loyd was comprised of a six-page letter to Loyd, with a new version of events, and an eight-page questionnaire guiding Loyd through the testimony the defendant wanted him to provide. The defendant's letter also stated that the defendant wanted Loyd to tell the truth. However, the method by which the defendant sent the letter to Loyd was apparently designed to avoid detection and review by Angola authorities. The defendant addressed the envelope to a non-existent "attorney" in Baton Rouge, marked it "Legal Mail," and the return address on the envelope was the address belonging to Loyd. Angola personnel returned the envelope to Loyd without opening it, believing it to be an attorney-client, privileged communication. The defendant stipulated that he wrote the document.

[41] The defendant likely sought out Loyd's assistance for several reasons. First, he was an inmate counsel and might be considered a more credible witness than other inmates. Second, Loyd did not give a statement to investigators in the days following the murder, due to injuries sustained in the tactical team takeover, and therefore Loyd could not be confronted with a prior conflicting account. Loyd did provide some testimony, however, at the 2008 evidentiary hearings on the motions to suppress uninvolved inmate and co-defendant statements.

officer brutality.[42]  In addition, the defendant called Durham's former fiancée, Carmen Fielder, who testified that Durham's autopsy and the media accounts of Durham's death were inconsistent; she further testified that she was surprised when:  Angola cremated Durham's body, without consent, while Durham's father was deciding whether to seek a second autopsy; that the paperwork related to Durham's cremation appeared to be backdated; and that Angola personnel would not tell her who ordered the cremation.

The defendant's former defense counsel, Burton Guidry, was called to testify regarding the photographs taken on January 6, 2000 of the defendant's injuries, allegedly incurred on the evening of the attempted escape and murder, and regarding his (Mr. Guidry's) role in Durham's wrongful death suit, which prompted his dismissal as a member of the defendant's initially-appointed defense team because of the likelihood of conflict.

The defendant's last witness was Jeff Scozzafava, a stipulated expert in crime scene investigation and reconstruction and bloodstain pattern interpretation. Mr. Scozzafava disagreed with what he characterized as Col. Scanlan's

---

[42] Inmate Wimberly claimed that he was kicked in the face, lost two teeth, received medical treatment, and ultimately received a settlement in a federal lawsuit.  Inmate Daniels claimed that he was hit and kicked in the education building, that he was hit on the bus, that he was beaten and abused at Camp C, and that he received a settlement in a federal lawsuit; he also recognized the defendant as one of the inmates running up and down the education building hallway with Carley, Mathis, Durham, and Edge.  Former inmate Miller stated that he was not beaten, that he did not see anyone beaten, and that he did not participate in the federal lawsuit.  Former inmate Johns testified that he was beaten repeatedly throughout the night of the attempted escape and murder and that he received a settlement in a federal lawsuit; he also claimed - inconsistently with all versions proffered by the defendant - that the defendant was with him in Classroom One the entire night until Carley removed Sgt. Walker at shank-point.  Inmate Lowe told the defendant during his testimony, "I got attacked from something you-guys were trying to pull-off, brother . . . . I'm really getting upset right now.  I'm just being honest with you . . . . Because I had mad love for Capt. Knapps.  I wouldn't have never done the man that way."  Inmate Lowe also informed the jury that Capt. Knapps would occasionally play with the inmate band and had previously given inmate Lanerie a guitar; he also stated that he saw the defendant and two other white inmates retrieve items from an unlocked file cabinet in the band room at some point, and he heard Brown inform the band members, "We done took over the building.  I got Knapp [sic] in the bathroom . . . . I knocked his pu**y a** out."  Inmate Wardlaw stated that he was beaten and kicked during the initial tactical team entry into the education building, and he was hit a few times on the walkway to the bus.  Inmate Clofer claimed that he was hit on the walkway and that he received a settlement in the federal lawsuit; he also claimed that he saw the defendant get punched and kicked near the bus.

31

overreaching conclusions because: (1) Mr. Lane and Mr. Vara failed to process the crime scene and collect evidence properly, and Col. Scanlan failed to account for the lack of crime scene preservation and chain of custody issues with respect to various evidence collected from the scene; and (2) Col. Scanlan interpreted some bloodstain patterns incorrectly (i.e., there could have been no arterial spurt, as testified to by Col. Scanlan, because the autopsy did not indicate any artery had been compromised). Mr. Scozzafava did not, however, present an alternative theory of the crime, and he admitted that none of his criticisms altered the findings regarding the defendant's bloody left shoeprint on the officers' restroom floor, between the drain and the stall, or that Capt. Knapps' blood was on the defendant's hands, shoes, and clothing at the time of processing or otherwise linked to him. Mr. Scozzafava also admitted that the location of the defendant's footprint did not support the version of events last claimed by the defendant, in his covert letter and questionnaire to inmate Loyd (in which the defendant admitted he was present in the restroom and claimed he had to "duck walk" with Capt. Knapps' head on his leg while Brown pulled them into the restroom), or any other version. Mr. Scozzafava further admitted that Col. Scanlan's interpretation of the tiny blood spatter on the grey sweatshirt found in Classroom One, which was linked to the defendant as a habitual wearer, as impact evidence of the defendant's direct and active involvement in Capt. Knapps' murder was as plausible a theory as an alternative theory.

Following the State's closing argument, in which it stressed Capt. Knapps' blood on the defendant's clothing, shoes, and hands, and the defendant's role in the attempted aggravated escape and aggravated kidnappings of Lt. Chaney and Sgt. Walker, as well as his surrender and attempts to alter his version of events to account for evidence against him as he learned of it, the defendant elected to give a

lengthy closing argument. Therein, the defendant gave another detailed version of events, in which he asserted and/or conceded, *inter alia*, the following:

- The defendant knew of the escape plan days before December 28, 1999, and agreed to participate even though he knew Brown was a large man recruited to overpower targeted officers and at least some of the others had various weapons;
- The defendant was in the hallway with other involved inmates when Capt. Knapps entered the building, and Durham punched Capt. Knapps as Capt. Knapps exited the officers' restroom;
- Because Capt. Knapps was resisting the inmates' efforts to handcuff him, Edge tried to hit Capt. Knapps with one of the mallets as the defendant, Cooper, Carley, and Brown ran toward them. Carley grabbed the mallet, Capt. Knapps tried to handcuff himself to Carley, and Carley began hitting Capt. Knapps with the defendant standing next to Carley, attempting to stop the beating (and by implication, subjecting the defendant's sweatshirt to possible cast-off bloodstain patterns);
- Capt. Knapps yelled, "Help me, Help me," while grabbing hold of the defendant's legs, and Durham attempted to fight the defendant off of Carley;
- Brown intervened and pulled Capt. Knapps into the restroom, jerking Capt. Knapps off of the defendant's legs but allowing Capt. Knapps to grab the defendant's sweatshirt;[43]
- The defendant went further into the restroom than previously admitted because Durham entered behind him with a knife and then the defendant exited the restroom, leaving the other five inmates in the restroom with Capt. Knapps;
- The defendant discarded his denim jacket and sweatshirt in the inmates' restroom when his efforts to remove Capt. Knapps' blood proved unsuccessful, and he proceeded to Classroom One;
- With respect to events related to Sgt. Walker, the defendant claimed inconsistently that it "[n]ever crossed [his] mind [Carley] was going to hurt her" as Carley held a long, bloody, ice pick-like shank to her throat while moving her from Classroom One to the cell block bundle room and instructing her to speak on the telephone with Angola personnel; the defendant also claimed that he stayed with Sgt. Walker the entire time to protect her;
- The defendant could not release Sgt. Walker as she requested because Mathis was guarding the exit door with a knife;
- The defendant encouraged the others to surrender and told them to ask to speak with the FBI or the Attorney General, if they did not want to negotiate with Angola personnel;
- Durham, along with Brown and Carley, threatened to decapitate everyone when Warden Cain refused to let the involved inmates talk to other state and federal negotiators;
- The defendant spoke briefly with Col. Stewart on the telephone and identified himself by name;

---

[43] The defendant denied ever using the term "duck walk," even though he used it in his letter and questionnaire to Loyd.

- It was Carley, and not the defendant, who encouraged the involved inmates to change their clothing, as the defendant had already changed his shirt and jacket;
- When Warden Cain and others started talking to the involved inmates through the door, the defendant became very nervous and feared dying so he wrote the note to his mother and placed it Sgt. Walker's pocket;
- The defendant walked past Warden Cain and the amnesty note without signing it, and numerous Angola records reflect that Angola personnel routinely misspell his name J-E-F-F-E-R-Y, which is consistent with the note;
- "As soon as I saw what they did with Capt. Knapps, I was no longer part of it."
- "If Capt. Knapps wouldn't have struggled so hard, Capt. Knapps would be alive."
- "Am I guilty of trying to leave? Yeah. Stupid. That's an escape though. Am I guilty of what happened in that hallway? Yeah, because I was out in the hallway. Shouldn't have happened."
- With respect to his left shoe print in the officers' restroom, the defendant admitted:
  - "Look, this is the print they showed you all. All right. Was it my shoe? It was. Not denying it. All right. I'll admit that."
  - At that time, "[Capt. Knapps] is bleeding. He has been bleeding. Bleeding out in the hallway, his head, his hands, his shoulder, all this stuff."
  - "So, if I step back at the time somewhere when Captain Knapps is at my feet and I've got a heel print there, I'm not going to deny that's how it got there, but I did leave. I walked out."
  - "If I had been in there [after the significant struggle reflected by the blood all over the restroom and when Capt. Knapps received the fatal blows], you would find much more than one single footprint."[44]

During its rebuttal argument, the State stressed the defendant's efforts to manipulate his version of the story to account for: the evidence against him; the testimony of the experts that the volume of blood in the restroom, efforts to revive Capt. Knapps, and the inmates' control of the crime scene for nearly two hours likely destroyed or obscured other relevant evidence; and the competency of Mr. Lane and Mr. Vara's evidence collection efforts in the crime scene given to them.

---

[44] Photographs of the crime scene reveal additional partial shoe prints consistent with the pattern on the soles of the defendant's shoes. The State apparently chose to focus on the clearest print, which identified the brand of the defendant's shoe as well as a notch Angola personnel place on the shoes of inmates.

After closing arguments and during the jurors' lunch break, the trial court was informed that the daughter of juror Teresa Keating was in a hospital intensive care unit following a medical emergency, and he spoke briefly with the juror in the presence of counsel, before releasing and replacing her with one of the alternate jurors.

Thereafter, the trial court instructed the jury and separated the remaining three alternates, and the jury commenced guilt phase deliberations at 1:40 p.m. on May 15, 2011. At 3:22 p.m., the jury requested to hear the instructions on first degree murder and principals again and then deliberations were resumed at 3:29 p.m. Eighteen minutes later, the jury returned with a unanimous verdict of guilty as charged, and, on the request of the defense, the trial court polled each juror, who affirmed his or her vote of guilty.

The penalty phase of the defendant's trial commenced on May 16, 2011. The defendant waived his right to self-representation and stipulated to his identity as the person charged with, and convicted of, the 1984 first degree murder of Andrew Cheswick.[45] After brief opening statements by the State and the defense,[46] Capt. Knapps' sister, Christine Whitstine, testified that her brother was one of eleven children, that he had two teenage children, and that he cared for the young

---

[45] We note that this court set aside the defendant's prior death sentence, for the first degree murder of Andrew Cheswick, finding that the State's discussion of appellate review during the penalty phase opening statements "so denigrated the responsibility of the jury as to deprive the defendant of a fair determination of sentence." **State v. Clark**, 492 So.2d 862, 870-72 (La. 1986). The trial evidence, in the Cheswick murder case, established that on October 18, 1984, the defendant entered Studebaker's Lounge, his former place of employment, at 10:00 a.m., when another lounge employee, the victim Andrew Cheswick, was verifying cash register tapes and preparing bank deposit forms. The defendant remained there after four sales representatives left the lounge. At 11:00 a.m. a Wells Fargo employee discovered the victim, with three gunshot wounds to the head; over $2,600.00 was missing from the safe and cash drawers. During his initial interview with police, the defendant handed over two bank deposit slips, totaling $2,635.50. During monitored jailhouse communications, the defendant admitted to his girlfriend, "I did it." He also told his father, "I am ninety-nine percent sure they got me." As in the instant case, the defendant made several attempts to manipulate evidence and to present exculpatory testimony via other inmates.

[46] With respect to opening statements, defense counsel conceded that the State had sufficient proof of each of the four asserted statutory aggravating circumstances set forth in LSA-C.Cr.P. art. 905.4(A).

autistic child of his fiancée before he died. Capt. Knapps' mother, twin brother, and fiancée passed away between the time of Capt. Knapps' murder and the defendant's trial.

Ms. Whitstine further testified that the family's relationship with Angola commenced in 1954, when their father began working there, and Capt. Knapps' mother, seven of the eleven siblings, including Ms. Whitstine, and other extended family members also worked there. Ms. Whitstine stated that the entire family was last together on Christmas Eve, just days before the murder, and she identified persons in five photographs of Capt. Knapps with family members and his fiancée. She explained the family routinely got together on weekends, and Capt. Knapps was "the entertainer" in the family, playing the guitar and singing.

Capt. Knapps' brother-in-law and music partner, Shannon Herring, also testified. He identified several non-testifying family members in the courtroom and informed the jury of Capt. Knapps' musical passion and talent, playing two to three times per week, including at family get-togethers. He described Capt. Knapps as "the focal point" of family events because of his musical contributions. The jury observed an edited two-and-one-half minute video of Capt. Knapps at a family function.

The State also called Dr. Michael Welner, a stipulated expert in forensic psychiatry.[47] Dr. Welner testified that he based his opinions about the defendant on numerous records (including: evidence and testimony related to the defendant's prior conviction; evidence and testimony from the Capt. Knapps' murder investigation and proceedings; the defendant's prison records, including disciplinary, psychological, medical, and pharmacy records; transcripts of over a year of telephone calls between the defendant, his mother, and others; and prior

---

[47] The trial court previously heard argument on the defendant's motion to exclude evidence of future dangerousness and denied it.

36

statements by the defendant's friends and family); however, Dr. Welner did not interview the defendant. Dr. Welner evaluated the defendant against the PCL-R psychopathy checklist and determined that the defendant is not a psychopath. Dr. Welner also considered where the defendant fell on the nine levels of risk set forth in the Violence Risk Assessment Guide, and he found the defendant scored at level four (with level nine as the highest risk of violence). Dr. Welner further assessed the defendant on the HCR-20 (a twenty-item tool for assessing history, clinical, and risk factors) and determined that the defendant was notable for his history of previous violence, employment instability, negative attitudes in custody, and exposure to destabilizing influences, stress, and unmanageability in the context of maximum security custody or secure custody in the past.

Dr. Welner viewed the defendant's middle age and avoidance of lethal violence over the intervening eleven years since the Knapps murder as positives, but noted both of these factors also applied to the defendant before Capt. Knapps' murder on December 28, 1999.[48] Dr. Welner also cited as positive prognostic factors that the defendant: was not in a gang, had good impulse control, had no history of physically preying on other inmates, had a "very supportive" and loving family, was "quite educated" with "many different skills," and had no history of substance abuse, psychotic illness, or head trauma. Again, all of these positive factors were also present prior to the murder of Capt. Knapps.

On the negative side, Dr. Welner emphasized that the defendant killed in 1984, and he killed again in the instant 1999 murder in a maximum security setting. Dr. Welner also noted that the defendant had a history of scheming to the point of outlandishness, secreting weapons, circumventing natural boundaries and obstacles established to keep others safe, and "getting very angry when he doesn't

_____

[48] Defendant was in his late thirties at the time of the murder, and he was fifty years old at the time of trial.

get his way when something means a lot to him." Dr. Welner pointed out that all of these negative behavior patterns were present the night of Capt. Knapps' murder, and he opinioned that they were likely to be repeated under the conditions of the defendant's confinement. Dr. Welner described how a situation in which the defendant felt frustrated and powerless, combined with an opportunity to use his creativity while engaged in a group of scheming peers, increased the defendant's risk of violence even in a secure setting.

On cross-examination, Dr. Welner expressed concern, even if the defendant remains confined under the most restrictive conditions at Angola, because he found the defendant to be an "usually resourceful individual" "so savant in the culture of concealment and hidden movement, that to an unclear degree [the defendant] is unusually able to navigate restrictions so they are not as restrictive depending on what he wants." Dr. Welner went on to describe, in general terms, instances in the defendant's Angola records that supported his opinion that the defendant would "find ways to make things happen" because he is "clever" and "persistent" even under the most restrictive conditions. Thereafter, the State rested.

The defendant first called Larry Clark, then chairman of the pardon board and no relation to the defendant, to testify regarding the procedure by which, and unlikelihood of, the governor's exercise of the pardon power in a first degree murder case. Several friends and family also testified on the defendant's behalf.

Sherry Richard, the wife of the defendant's long-time friend Lance Richard, testified that the defendant would come to their home, enjoying game nights and occasionally staying with them, and visited them in the hospital on the day their third child was born right before he was arrested in 1984 for Andrew Cheswick's murder. Ms. Richard said the defendant has maintained his relationship with the Richard family since then, calling collect from time to time.

Lance Richard testified he and the defendant became best friends at Morgan City High School, often hunting and fishing together, doing "crazy things" (like trespassing on "Judge Robinson's land"), and working together at a regional restaurant in high school and later at fencing and trucking companies. Mr. Richard characterized their relationship as "very close," "[p]robably just like a brother"; he expressed continuing disbelief in the defendant's involvement in the two murders of which he had been convicted.

The defendant's older brother, Christopher Clark, testified about various aspects of the Clark family life. When the defendant was eight, their father, Talmadge "Sonny" Clark, was convicted of armed robbery so their mother, Edie Guy, had to raise the four kids (brothers Christopher, Jeffrey, Tom, and daughter Tracy) alone. Before that time, Christopher recalled Sonny drank and beat him and the defendant's mother like they were "his punching bag." Eventually, Christopher and Sonny reconciled and would go visit the defendant frequently at Angola, until Christopher got arrested in 1999 and served five years on a drug charge, Sonny died in 2006, and Christopher started traveling more frequently for work. The defendant used to call Christopher collect regularly, but Christopher cancelled his landline when he started traveling. One of Christopher's two sons maintained a relationship with the defendant, and Christopher stated that he was open to his six grandchildren knowing the defendant when they were older.

The defendant's mother, Edie Guy, also testified and provided additional information regarding the defendant's family history and upbringing. After discussing her own parents and her courtship with the defendant's father, she described their quick marriage and having four children in six years, while the defendant's father attended LSU on a golf scholarship and worked part-time at night at Sears; she worked when she could at a local department store. Both sets of grandparents assisted financially. Ms. Guy testified:

As you can see by my two sons, they never miss[ed] meals. They were well fed. But it was hard. It was a struggle. And I don't mind saying Sonny began to drink and Sonny was fantastic sober, was a wonderful father, a lot of fun to be around. But when he took that first drink, that was it. He became an ogre.

The young family moved somewhat frequently with Sonny drinking nightly and "literally beating the crap out of [her]." She testified that at some point Sonny committed armed robbery at a Baton Rouge bank, and law enforcement arrested him at the family home, removing him in shackles in front of the children while she was away at work. Sonny was sentenced to eight years in Angola, and he served four years.

Ms. Guy testified that she left Baton Rouge, with the children, for a job in Morgan City when Sonny got out on parole. However, while on parole, Sonny committed another armed robbery at the same bank. Ms. Guy did not mention Sonny's second sentence, but obviously he was out of prison by the time he and Christopher began visiting the defendant at Angola in 1985.

Ms. Guy described the defendant's brother Christopher as the "hellion" child, so she sent him to live with her mother, described as a 4'7" Cajun marine drill sergeant. Ms. Guy stated that the defendant had "a mind of his own," but was more "manageable" for a single mother working long hours. After graduating high school, Ms. Guy related that the defendant joined the Army and worked intermittently in Morgan City until his arrest in 1984.

With respect to the defendant's reaction to Sonny's criminal behavior, Ms. Guy testified:

Now, I will tell you this. In Morgan City, Jeffrey never really wanted to accept the fact that his father was a criminal or had robbed the bank. I mean, it just wasn't something he wanted to live with. And we had many discussions about that. But living in Morgan City, like I said, I worked all day long. I would come home after 5:00 o'clock, 5:30, made sure they had their homework done and cooked supper, little television, and everybody went to bed. But the one thing about one particular afternoon, I came in from work and Jeffrey was sitting on the sofa by himself. The other kids weren't there. And I saw him

sitting with this box on his lap. I said what is that? And he said, this is - I think this is stuff from dad. Okay. Well, I walked over and looked at it, started lifting out stuff . . . . [Under the boys' seasonal clothing and coats] is a jacket, a wig, and a gun . . . . He said, mom, is this what I think it is. I said, yep, it is. It's what the FBI has been looking for against your dad . . . . And he pleaded with me, do not call the FBI, do not turn this stuff over because he knew it would be the final nail in the FBI's case . . . . And for the longest time, Jeffrey wouldn't forgive me for that. Even though he did not have a real close relationship with his dad at the time, he just would not forgive me for giving this stuff up.

Ms. Guy expressed her sorrow for Andrew Cheswick's mother, offered her condolences to Capt. Knapps' family, described how each member of the defendant's family has supported and maintained contact with the defendant in their own way over the years of his incarceration, and identified the ways in which she believed the defendant could contribute to others if the jury voted for a life sentence (e.g., the defendant earned his paralegal degree with straight A's and apparently helped the family by offering advice as to legal issues).

The defendant also called Deputy Warden Vannoy to discuss the conditions of the defendant's incarceration since Capt. Knapps' murder. Initially, the defendant was on restricted lockdown in a one-man cell for twenty-three hours per day, with one hour to shower and visit with other inmates housed on the same tier, and three hours per week in a pen in the exercise yard. At some point, the defendant managed to get transferred to Hunt Correctional Center, and he moved from lockdown to a working cell block. When Warden Vannoy became aware of this transfer, he informed his superior and had the defendant returned to Angola's restricted lockdown, where he will likely remain for as long as he is at Angola. On cross-examination, Warden Vannoy stated that the defendant will continue to be able to write and visit with his family members and friends while on lockdown. He also described how informing Capt. Knapps' mother of her son's death was the hardest thing he has ever done.

Following closing arguments and the trial court's charge, the jury deliberated for what is listed on the trial transcript as "a short break" and unanimously returned a verdict sentencing the defendant to death for the murder of Captain Knapps.

In accordance with the jury's verdict, on May 23, 2011, the trial court sentenced the defendant to death. On August 12, 2011 the trial court heard arguments on the defendant's motion for reconsideration of sentence, in which he claimed that the trial court had discretion to set aside the jury's death sentence and that the death sentence was unconstitutional based on evolving standards of decency. The motion for reconsideration of the sentence was denied.

On appeal, the defendant makes thirty-seven assignments of error. After a thorough review, we find no reversible error in the defendant's conviction and sentence.

## LAW AND ANALYSIS

### Guilt Phase Issues

Insufficient Proof of Specific Intent

In his first assignment of error, the defendant argues that the State failed to present sufficient evidence of his specific intent to kill or inflict great bodily harm as required by R.S. 14:30(A)(1) and (2). In reviewing the sufficiency of the evidence to support a conviction, the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt. **State v. Captville**, 448 So.2d 676, 678 (La. 1984) (citing **Jackson v. Virginia**, 443 U.S. 307, 316-19, 99 S.Ct. 2781, 2787-89, 61 L.Ed.2d 560 (1979) ("[N]o person shall be made to suffer the onus of a criminal conviction except upon sufficient proof - defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every

element of the offense . . . . [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.").[49]  See also LSA-C.Cr.P. art. 821(B) ("A post verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in a light most favorable to the state, does not reasonably permit a finding of guilty.").

Specific criminal intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."  LSA-R.S. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the defendant's actions and the circumstances of the transaction.  **State v. Broaden**, 99-2124, p. 18 (La. 2/21/01), 780 So.2d 349, 362, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001); **State v. Cousan**, 94-2503, p. 13 (La. 11/25/96), 684 So.2d 382, 390.  Specific intent may be formed in an instant.  **State v. Wright**, 01-0322, p. 11 (La. 12/4/02), 834 So.2d 974, 984, cert. denied, 540 U.S. 833, 124 S.Ct. 82, 157 L.Ed.2d 62 (2003); **State v. Cousan**, 94-2503 at p. 13, 684 So.2d at 390.  Assuming every fact to be proved that the evidence tends to prove, circumstantial evidence must "exclude every reasonable hypothesis of innocence."  LSA-R.S. 15:438.

The defendant argues that the State's evidence was insufficient because "not one witness saw [him] attacking Capt. Knapps" or "saw a weapon in [his] hands at any time."  In addition, he claims "so much blood was spilled and spread to so

---

[49] To prove the defendant was a principal to first degree murder, the State had to show that he had the specific intent to kill or inflict great bodily harm while engaged in the perpetration or attempted perpetration of an aggravated kidnapping or aggravated escape or that the victim was a peace officer engaged in the performance of his lawful duties, pursuant to LSA-R.S. 14:30(A)(1)-(2).  See also LSA-R.S. 14:24 ("All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.").

many places by so many people that making a reliable determination as to how the blood got where it got is beyond the capacity of any rational juror."

As an initial matter, the defendant's arguments ignore: the testimony of inmate Shockley (to whom the defendant admitted to participating in the attack and hitting Capt. Knapps in the head with the mallet); the testimony of inmate Taylor (who saw the defendant in the hallway with what appeared to be blood on his grey sweatshirt, pants, and hands and holding what appeared to be a weapon in his hands); and the testimony of Col. Scanlan (whose testimony revealed the defendant's active and dynamic participation in the crime, based on the defendant's transfer lift shoeprints found in the officer's restroom, where Capt. Knapps lost substantial amounts of blood, as well as on the blood spatter pattern on the grey sweatshirt linked to defendant, as the habitual wearer).

It is well-settled that appellate courts will not review the trier of fact's credibility determinations. See **State v. Mussall**, 523 So.2d 1305, 1311 (La. 1988) (holding that, based on the precepts announced in **Jackson v. Virginia**, a reviewing court should not substitute its judgment for the trier of fact's "*rational* credibility calls" or as to "what the verdict should be"; however, "the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt"); **State v. Corkern**, 03-1393, p. 3 (La. App. 1 Cir. 9/17/04), 897 So.2d 57, 60, writ denied, 04-2627 (La. 2/18/05), 896 So.2d 29 ("The reviewing court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt."). See also LSA-Const. Art. V, Sec. 10(B) ("In criminal cases its appellate jurisdiction extends only to questions of law."). The jury's decision to accept or reject a witness's testimony is given great deference. See **State v. Tate**, 01-1658, p. 6 (La. 5/20/03), 851 So.2d 921, 929, cert. denied, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004) ("The trier of fact makes credibility determinations and may, within the bounds of rationality,

accept or reject the testimony of any witness; thus, a reviewing court may impinge upon the fact finder's discretion 'only to the extent necessary to guarantee the fundamental protection of due process of law.'") (citing **State v. Mussall**, 523 So.2d at 1310). In the instant case, the jury determined that the testimony of the State's witnesses was more credible than the self-serving statements of the defendant and his witnesses.

In addition, despite the defendant's efforts to provide alternative explanations for the evidence tying him to Capt. Knapps' murder and to participation in the attempted aggravated escape and aggravated kidnappings, no reasonable hypothesis of innocence was presented in this case. With respect to specific intent alone, the defendant admitted from the beginning that the escape plan included armed and physically-imposing inmates targeting specific correctional officers to achieve the planned escape. On implementation, when the plan failed to be successful, the defendant and the other involved inmates clearly abandoned whatever notions they may have had about executing the escape plan without injuring or killing the hostages. Viewed in a light most favorable to the prosecution, the physical evidence showed, *inter alia*, that: (1) Capt. Knapps' blood was on every outer layer of clothing tied to the defendant, on layers of clothing underneath as saturation stains, and on the defendant's hands and shoes; and (2) the defendant was present in the officers' restroom when Capt. Knapps had suffered at least great bodily harm, if not the fatal blows to his head, as evidenced by the defendant's bloody lift transfer shoeprints. This evidence combined with the defendant's post-murder behavior, in continuing to direct the evolving plan and negotiations with Angola personnel, which included observing without the slightest objection his accomplices' repeated threats to Sgt. Walker with the bloody ice pick-like shank, provide ample support that a rational jury could have found that the defendant possessed the requisite intent to kill or to inflict great bodily

harm beyond a reasonable doubt. In addition, despite the defendant's periodic claim that the involved inmates never intended to hurt anyone, he admitted in his letter to Warden Vannoy that the involved inmates discussed killing Lt. Ross as part of the planned escape and, in fact, killed Capt. Knapps because they could not locate Lt. Ross (and Capt. Knapps refused to tell them where Lt. Ross was), apparently thinking that killing a state prison guard would somehow facilitate their transfer to federal prison.

The jurors could reasonably have considered this additional evidence of the defendant's intent to kill or inflict great bodily harm. Moreover, the jury may have found credible the testimony of inmate Shockley, regarding the jailhouse confession made by the defendant in which he stated that he was the one who hit Capt. Knapps in the head with the mallet in the restroom (in effect inflicting the fatal blows), while Durham stabbed Capt. Knapps in the chest.[50]

Thus, direct and circumstantial evidence linked the defendant to the first degree murder of Capt. Knapps, and the totality of the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince beyond a reasonable doubt the jury, who obviously resolved issues of credibility against the defendant, that the defendant had formed the requisite specific intent to take the life of Capt. Knapps. This assignment of error is without merit.

"Minor Role" Renders Death Penalty Unconstitutional

In his second assignment of error, the defendant argues that his "minor participation" in Capt. Knapps' murder renders imposition of the death penalty against him unconstitutional, in violation of the Sixth and Eight Amendments of

---

[50] As indicated hereinafter, the autopsy revealed that the involved inmates inflicted numerous potentially fatal wounds to Capt. Knapps. In addition to the fatal mallet blows to his head, Capt. Knapps was also stabbed in the head, chest, and spleen, as well cut on the throat, narrowly missing his carotid artery and jugular vein.

the U.S. Constitution. The defendant asserts that the jurors were never required to determine that the defendant "both killed and intended to kill Capt. Knapps."

This court summarized the most relevant Eighth Amendment jurisprudence in **State v. Anthony**, 98-0406 (La. 04/11/00), 776 So.2d 376, cert. denied, 531 U.S. 934, 121 S.Ct. 320, 148 L.Ed.2d 258 (2000):

> Under **Enmund v. Florida**, [458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982)], an aider and abettor may not receive the death penalty for felony murder, *if he does not himself kill, attempt to kill, or intend to kill*. **Enmund**, 458 U.S. at 797, 102 S.Ct. at 3376 (emphasis added). However, the United States Supreme Court modified the **Enmund** decision slightly in **Tison v. Arizona**, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987). In **Tison**, the Court found that the Eighth Amendment does not prohibit the death penalty in the case of a defendant who participates in a felony, which results in murder, if the defendant's participation is "major" and "the defendant has a mental element of reckless indifference." **Tison**, 481 U.S. at 158, 107 S.Ct. at 1688.

**Id.**, 98-0406, pp. 13-14, 776 So.2d at 386.[51]

As discussed hereinabove, regarding the sufficiency of the evidence as to the defendant's specific intent to kill or inflict great bodily harm, sufficient evidence was presented to the jury from which the jury clearly concluded that neither the degree of the defendant's participation nor mental state at the time of the attempted escape and murder of Capt. Knapps would exempt him from imposition of the death penalty.

The physical evidence of the defendant's active and direct participation in the crime (e.g., blood spatter on his sweatshirt and other clothing as well as his

---

[51] In **State v. Anthony**, all three perpetrators to a restaurant robbery/murder brought handguns and potatoes, which they placed on each gun's barrel as a crude silencer. **Id.**, 98-0406 at pp. 3-5, 776 So.2d at 380-81. The planning exhibited in bringing such a device to the restaurant robbery strongly suggested that each of the gunmen anticipated using his weapon. Even though Philip Anthony claimed on appeal that he was not the shooter, one of the victims survived to testify that the last person he saw before the shots rang out in the walk-in cooler was defendant, who was holding a gun with a potato on the end. Moreover, the State's circumstantial evidence demonstrated that of the three perpetrators, the defendant's shoes were the most heavily encrusted with potato particles. Accordingly, the court ruled that "even without establishing that the defendant was the triggerman, his conviction is valid because he was involved in a felony-murder and he intended, from the outset, to kill these victims." **Id.**, 98-0406, pp. 13-14, 776 So.2d at 386.

blood soaked pants, and bloodstained jacket, shoes, and hands), dynamic presence at the murder scene (e.g., blood transfer shoe prints in the restroom), detailed knowledge regarding what took place in that restroom (e.g., defendant's account set forth in the October 17, 2001 letter to Warden Vannoy), and jailhouse confession to participating in the attack and bludgeoning of Capt. Knapps in the head with one of the mallets, *inter alia*, provide substantial support that his participation was in fact major. In addition, even under one of the defendant's many versions, his behavior throughout the ordeal more than adequately reflects reckless indifference.

The defendant also introduces a new argument on appeal, challenging the adequacy of the jury instructions, which included a reference to specific intent to inflict great bodily harm as set forth in LSA-R.S. 14:30(A)(1), in light of **Enmund**. However, the defendant did not raise this objection below and therefore may not assign it as error, as stated in LSA-C.Cr.P. art. 801, which provides in pertinent part: "A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefor shall be stated at the time of objection. The court shall give the party an opportunity to make the objection out of the presence of the jury." Moreover, the argument ignores **Tison**'s modification to **Enmund**, and, regardless, intent to inflict great bodily harm appears to be a more culpable mental state than reckless indifference. In addition, contrary to the defendant's assertion, a review of the jury instructions does not reveal that the trial court incorrectly defined the crime. This assignment is without merit.

Evolving Standards of Decency

The defendant argues in his third assignment of error that developments since the Supreme Court's **Tison** decision suggest that the Court may soon revisit

the **Enmund** standard of permitting imposition of the death penalty only for those who kill, attempt to kill, or intend to kill. Although the defendant correctly points out that the Supreme Court has removed certain categories of death penalty eligible offenders and offenses over time, the thrust of his argument is not that this court should deem the death penalty unconstitutional per se, but rather it should do so in this defendant's case based on his allegedly limited role. Thus, his argument merely reworks his "minor role" argument, asserted in his second assignment of error. This assigned error is without merit.

Inconsistent Theories Against Co-Defendants

In the defendant's fourth assignment of error he argues that: (1) the State highlighted different evidence and called different witnesses at each co-defendant's trial; and (2) the State's crime scene reconstruction expert Col. Scanlan testified that Capt. Knapps was murdered in the officers' restroom, and Col. Scanlan did not observe sufficient evidence, collected by Mr. Lane and Mr. Vara from the crime scene, to opine at the defendant's trial whether the involved inmates initially attacked Capt. Knapps in the hallway, while he testified during the co-defendants' trials that the attack likely started in the hallway. Although the defendant withdrew his adoption of his co-defendant's motion on this issue in the trial court,[52] we address the arguments raised on appeal in light of the potential due process concerns.

As a general matter, due process forbids the State from employing inconsistent and irreconcilable theories to secure convictions against individuals

---

[52] We note that the defendant adopted co-defendant Mathis' Motion #47, entitled "Motion to Bar Inherently Inconsistent Prosecutions." On April 28, 2006 the trial court held oral argument on the motion and deferred ruling on it until such time as an objection could be made at trial. The trial court declared that the motion was "moot" and that it would "defer any action on that to a point in time during the course of the trial, before the trial, or after the trial, to be raised by a contemporaneous objection," or the trial court indicated that the matter could be raised post-trial, by written motion. However, on May 21, 2010, the defendant withdrew his adoption of this motion by stating, "As to [Motion #] 47, the motion to bar inherently inconsistent prosecutions, this has been withdrawn by the defense as it relates to Mr. Clark since it is not relevant to him since he is the initial defendant of the five defendants to be tried."

for the same offenses arising from the same event. **State v. Dressner**, 08-1366, p. 19 (La. 7/6/10), 45 So.3d 127, 140, cert. denied, 562 U.S. 1271, 131 S.Ct. 1605, 179 L.Ed.2d 500 (2011) (citing **Smith v. Groose**, 205 F.3d 1045, 1048-49 (8th Cir. 2000), cert. denied sub nom. **Gammon v. Smith**, 531 U.S. 985, 121 S.Ct. 441, 148 L.Ed.2d 446 (2000) (wherein convictions of murder-robbery accomplices were obtained at separate trials, through diametrically opposed testimony from a third participant, and such manipulation of evidence were held to have rendered the trial(s) fundamentally unfair, requiring reversal)). See also **State v. Scott**, 04-1312, p. 79-83 (La. 1/19/06), 921 So.2d 904, 956-58, cert. denied, 549 U.S. 858, 127 S.Ct. 137, 166 L.Ed.2d 100 (2006), overruled in part on other grounds by **State v. Dunn**, 07-0878 (La. 1/25/08), 974 So.2d 658. Cf. **Nichols v. Scott**, 69 F.3d 1255, 1268-72 (5th Cir. 1995), cert. denied sub nom **Nichols v. Johnson**, 518 U.S. 1022, 116 S.Ct. 2559, 135 L.Ed.2d 1076 (1996) (holding that a defendant's guilty plea does not preclude prosecution of a co-defendant when it could not be determined whose gun caused the fatal wound).

This court has stated that, in a situation in which the State has adopted fundamentally inconsistent positions in co-perpetrators' separate trials, basic fairness may require the trial court to permit the defendant to expose the inconsistencies. **State v. Dressner**, 08-1366 at pp. 19-20, 45 So.3d at 140 (citing **State v. Lavalais**, 95-0320, p. 13 (La. 11/25/96), 685 So.2d 1048, 1056, cert. denied, 522 U.S. 825, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997); **State v. Wingo**, 457 So.2d 1159, 1166 (La. 1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 322 (1985)). Thus, absent discovery of significant new evidence, the State cannot offer inconsistent theories or facts regarding the same crime in seeking to convict co-defendants at separate trials. **State v. Dressner**, 08-1366 at p. 20, 45 So.3d at 140 (citing **Thompson v. Calderon**, 120 F.3d 1045, 1058 (9th Cir. 1997)).

In assessing an "inconsistent theories" claim, this court has generally distinguished the use of *mutually exclusive theories* from *selective emphasis on evidence* relating to the culpability of the defendant at trial. **State v. Dressner**, 08-1366 at p. 20, 45 So.3d at 140; **State v. Wingo**, 457 So.2d at 1166. This court explored the distinction in **State v. Scott**, supra, a case in which three men robbed a bank while armed with weapons and fatally wounded two tellers. **State v. Scott**, 04-1312 at pp. 2-4, 921 So.2d at 913-14. The **Scott** defendant was convicted of first degree murder and sentenced to death. **Id.**, 04-1312 at p. 1, 921 So.2d at 912-13. On appeal, he assigned as error that the State had argued at his trial that he was responsible for the death of both tellers, although the State argued at a co-defendant's trial that the co-defendant was the shooter. **Id.**, 04-1312 at p. 79, 921 So.2d at 956. Finding no due process violation, this court relied on the fact that the prosecutor who tried both Scott and his co-defendant did not argue a division of their culpabilities at either trial. **Id.**, 04-1312 at p. 81, 921 So.2d at 957. Rather, at both trials, the State argued that both the **Scott** defendant and his co-defendant possessed specific intent to kill or inflict great bodily harm, and moreover, this court noted that nothing the State had articulated at the co-defendant's trial exculpated Scott; both Scott and his co-defendant were equally guilty as principals. **Id.** Thus, there was no due process violation because the State's theories of the case were not mutually exclusive. **Id.**, 04-1312 at p. 81-83, 921 So.2d at 958.

This distinction highlights the general consensus that, to violate due process, the inconsistency must exist at the core of a state's cases against the co-defendants. **Smith v. Groose**, 205 F.3d at 1052 ("We do not hold that prosecutors must present precisely the same evidence and theories in trials for different defendants. Rather, we hold only that the use of inherently factually contradictory theories violates the principles of due process."). Several jurisdictions have employed the requirement that the inconsistencies go "to the core" of a state's case. See Brandon Buskey, "If

51

the Convictions Don't Fit, You Must Acquit: Examining the Constitutional Limitations on the State's Pursuit of Inconsistent Criminal Prosecutions," 36 N.Y.U. Rev. L. & Soc. Change 311, 327 (2012); **Sifrit v. State**, 383 Md. 77, 105, 857 A.2d 65, 81 (Md. Ct. App. 2004) ("The theme requiring an inconsistency at the core of the state's case before finding a due process violation runs throughout the majority of cases that have addressed the issue."). It follows that, although a defendant has a right to a fair proceeding before an impartial factfinder based on reliable evidence, he does not have a right to prevent the prosecution from arguing a justifiable inference from a complete evidentiary record, even if the prosecutor has argued for a different inference from the then-complete evidentiary record in another trial. **Stumpf v. Robinson**, 722 F.3d 739, 751 (6th Cir. 2013).

Applying this framework and even considering the instant defendant's reference to portions of the trial transcripts from the prosecutions of co-perpetrators Carley, Edge, and Brown, we conclude that nothing argued by the defendant, as having been presented in a co-defendant's trial, appears in any way inconsistent with the evidence presented at his trial. For example (and assuming the defendant's references are accurate), the State's presentation of evidence at Carley's trial, establishing that Carley was involved in planning the escape before the defendant became involved, was seen wielding a bloody ice pick-like shank, and made numerous inculpatory statements was entirely consistent with the evidence adduced at the defendant's trial. Likewise, evidence of Edge's early involvement in the escape plan and possession of a mallet found to have Capt. Knapps' blood on it was presented at the trials of both Edge and the defendant. With respect to Brown, witnesses at both trials testified Brown had a mallet in his possession at some point. Apparently, an unidentified witness may have testified at Brown's trial that Brown said, "Go get [Carley] off the phone," to the defendant

at some point, but that evidence is neither inconsistent with anything presented at the defendant's trial nor related to a core issue.

As to the defendant's complaint about the State's theory, regarding the location of the attack and murder of Capt. Knapps, from the beginning the State's theory of the crime, as set forth in its opening statement at the defendant's trial, was that Capt. Knapps was attacked *in the hallway* and dragged into the security officers' restroom, where the inmates bludgeoned and stabbed him to death. Whether the State's crime scene reconstruction expert Col. Scanlan could point to evidence to support the initial attack-in-the-hallway aspect of that theory, nothing about Col. Scanlan's testimony at the defendant's trial is contradictory to that theory or even a core issue despite the defendant's arguments to the contrary. Col. Scanlan admitted on cross-examination that the initial attack could have taken place in the hallway near the doorway to the officers' restroom but the crime scene evidence, as collected by Mr. Lane and Mr. Vara hours after the murder, revealed slight evidence of that aspect of the State's theory. That one or more of the defendant's various attempts to explain the physical evidence against him may have relied heavily on his assertion of an initial attack on Capt. Knapps in the hallway and subsequent dragging and/or "duck walking" with Capt. Knapps somehow clinging to his pants and sweatshirt with sufficient strength to pull the defendant into the restroom, does not render the precise location of the initial attack, or the State's theory related thereto, a core issue in the case. Under the circumstances here, whether the involved inmates initially attacked Capt. Knapps in the hallway, the doorway, or just inside the officers' restroom does not appear to be an issue of core relevance sufficient to disturb the defendant's conviction, particularly when he expressly abandoned the issue below.

<u>Exclusion of Certain Witness Statements</u>

The defendant complains in his fifth assignment of error that the trial court erred in excluding testimony from Major Holden regarding information obtained during the initial interviews from two uninvolved inmates who were unable to testify at defendant's trial.[53]

Both the Sixth Amendment of the United States Constitution and Art. I, §16 of the Louisiana Constitution ensure a defendant the right to present a defense and, as found in **Chambers v. Mississippi**, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973), few rights are more fundamental. Moreover, all relevant evidence necessary to the defense must be presented for full adjudication of the case and, in some circumstances, including statements that may not fall under any statutorily recognized exception to the hearsay rule. See **State v. Vigee**, 518 So.2d 501, 503-05 (La. 1988). See **State v. Van Winkle**, 94-0947, pp. 4-6 (La. 6/30/95), 658 So.2d 198, 201-02 (holding that the exclusion of hearsay evidence suggesting that the defendant's roommate killed the victim was reversible error); **State v. Gremillion**, 542 So.2d 1074, 1078 (La. 1989) ("While the statement does not fit into any of the recognized exceptions to the hearsay rule, it should have, nevertheless, been admitted into evidence due to its reliability and trustworthy nature."). In **Chambers v. Mississippi**, the Supreme Court reasoned that when constitutional rights, directly affecting ascertainment of guilt are implicated, even well-established evidentiary rules may not be mechanistically applied to subvert the ends of justice.[54] **Chambers v. Mississippi**, 410 U.S. at 302, 93 S.Ct. at 1049.

---

[53] The referenced inmates were Henry Hadwin, who died in 2000, and Donald Williamson, who was unavailable to testify at trial for unknown reasons.

[54] The **Chambers** Court stated:

> Few rights are more fundamental than that of an accused to present witnesses in his own defense . . . . In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. Although perhaps no rule of evidence has been more

At trial, the following exchange took place during Maj. Holden's cross-examination:

> [Defendant]: Do you recognize that document?[55]
>
> [Holden]: Yes.
>
> [Defendant]: Do you recall if you were the one to prepare that document?
>
> [Holden]: Yes.
>
> [The Court]: Let's get it marked. It's a 5 now or whatever you want to put on it.
>
> [Defendant]: I think it's D-5.
>
> \* \* \*
>
> [Defendant]: If you would, please turn to Page 5.
>
> \* \* \*
>
> [Defendant]: Where I have it marked on the paragraph.
>
> [Holden]: Here.
>
> [Defendant]: Please read that to yourself and refresh yourself.
>
> [Holden]: Okay.
>
> [Defendant]: Based on that, were you informed that Robert Carley and --
>
> [Holden]: Yes.
>
> [State]: Objection. It calls for a hearsay response. Unless that witness is here to testify, Your Honor, it's hearsay.
>
> [The Court]: I understand your objection. Ask the question and don't answer it unless I tell you you can.
>
> [Holden]: Yes, sir.
>
> [The Court]: Ask your question.
>
> [Defendant]: Based on the information given in your interviews, do you have reason to believe that Robert Carley ever struck Captain Knapps with a mallet?

respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

[55] Presumably, the defendant was referring to a report prepared by Maj. Holden, summarizing his investigations in 1999. Although marked as D-5, it was not offered or admitted into evidence. The defendant attached a portion of it to his appellate brief. The report does state that the uninvolved inmate Hadwin observed Durham and Carley attacking Capt. Knapps in the hallway and then saw Brown drag Capt. Knapps into the officers' restroom as the defendant suggests. With respect to the uninvolved inmate Williamson's statement, however, the report does not provide that Williamson observed the defendant fighting with Durham and Carley in the hallway as the defendant claims; rather, it states, "[Williamson] said he heard someone say that Jeffrey Clark, Joel Durham, and Robert Carley was fighting." It also states, "[Williamson] later remembered that when he went to the bathroom he heard [the defendant] ask Robert Carley, "Why did you have to hit him so hard?" Carley replied, "I had to stab him to shut him up." In addition, it provides that Edge informed investigators that he and the defendant had the two mallets. Also, it indicated that Mathis said the defendant had the half pair of scissors when they took Lt. Chaney hostage.

| [The Court]: | Objection is sustained. You don't have to answer it. |
| [Defendant]: | Turn to page 5 and look at the second paragraph, second part. |
| [Holden]: | Okay. |
| [Defendant]: | Based on your interview, do you have information that Jeffrey Clark was fighting with Joel Durham or Robert Carley in the hallway? |
| [State]: | Judge, same objection. |
| [The Court]: | Same ruling. It's sustained. You don't have to answer it. |
| [Defendant]: | No more questions, Your Honor. |
| [The Court]: | You're done with the witness, Mr. Clark? |
| [Defendant]: | I am, Your Honor.[56] |

Although the defendant raised no contemporaneous objection or other indication that this testimony was key to his defense, the defendant now argues that the trial court's exclusion of the hearsay evidence interfered with his fundamental right to present a defense. Because the defendant raised no such argument in the district court, he is not entitled to assert the matter here. See LSA-C.Cr.P. art. 841(A) ("An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor."); LSA-C.E. art. 103 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [w]hen the ruling is one admitting evidence, a timely objection or motion to admonish the jury to limit or disregard appears of record, stating the specific ground of objection . . . ."); **State v. Taylor**, 93-2201, pp. 4-7 (La. 2/28/96), 669 So.2d 364, 367-69 ("[T]he contemporaneous objection rule contained in La.Code Crim.P. art. 841(A) and La.Code Evid. art. 103, does not frustrate the goal of efficiency. Instead, it is

---

[56] In addition, the defense objected on hearsay grounds to Maj. Holden's testimony, during the State's direct examination, about what another inmate told him in the investigation, and the objection was sustained.

specifically designed to promote judicial efficiency by preventing a defendant from gambling for a favorable verdict and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings."), cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996).

Moreover, aside from whether the inmate statements to investigators are of a reliable and trustworthy nature, the more important aspect of the testimony, which the defendant sought to elicit from Maj. Holden (that the defendant was fighting with Durham and Carley in the hallway and purportedly trying to interfere with the attack on Capt. Knapps), is not supported by the information in Maj. Holden's report (indicating that the defendant, Durham, and Carley were in the hallway fighting but did not state with whom or imply they were fighting with each other, as the defendant suggests). Furthermore, such testimony appears to be double or triple hearsay, as Williamson told investigators that he heard an unidentified person say the inmates were in the hallway fighting. This assignment of error is without merit.

Removal of Appointed Counsel Burton Guidry

The defendant asserts in his sixth assignment of error that the removal of one of his initially appointed defense counsel, Burton Guidry, over his objection, violated his federal and state rights to counsel.[57]

---

[57] On April 20, 2000 the defendant filed, pro se, an objection to the removal of Mr. Guidry, claiming that he had sent a letter to the trial court on March 16, 2000, seeking reappointment of Mr. Guidry and asserting a waiver of any potential conflicts. The defendant argued that the continued appointment of his other defense counsel, Bert Garraway, was insufficient because Mr. Garraway lacked the funds to conduct the type of investigation that Mr. Guidry had been undertaking. Apparently, the defendant no longer asserts this argument, which made little sense in light of the fact that the State had paid for nearly all aspects of the defense, including the fees and expenses of counsel, investigators, and experts. In addition, as the State points out, Mr. Guidry did not appear on the list of counsel certified to work on capital cases at the time the grand jury returned the indictment in 2004, and therefore was not eligible to represent the defendant post-indictment even without the conflict of interest-related issues. Instead, the defendant now complains that the trial court erred in failing to hold an evidentiary hearing prior to Mr. Guidry's removal and in failing to explore alternatives to removal. The defendant raised neither of these issues below, and therefore they are not properly preserved for appeal. See LSA-

Under federal and state law, criminal defendants with *retained* counsel have a right to both effective assistance of counsel and counsel of choice, whereas defendants with *appointed* counsel only have the right to effective representation ("a criminal defendant is not entitled to choose his appointed private counsel or the appointed public defender"). **State v. Reeves**, 06-2419, p. 39-47 (La. 5/5/09), 11 So.3d 1031, 1058-62, cert. denied, 558 U.S. 1031, 130 S.Ct. 637, 175 L.Ed.2d 490 (2009). Moreover, neither the federal nor state constitutions provide a criminal defendant represented by *appointed* counsel with a "right to maintain a particular attorney-client relationship in the absence of a right to counsel of choice." **Id.**, 06-2419 at p. 53, 11 So.3d at 1066.

In accordance with the dictates of the United States Constitution Amendment VI and XIV, as well as Louisiana Constitution Article I, Section 13, a criminal defendant's right to effective assistance of counsel includes a right to conflict-free counsel. **State v. Franklin**, 400 So.2d 616, 620 (La. 1981). In **State v. Cisco**, 01-2732, pp. 21-22 (La. 12/3/03), 861 So.2d 118, 132-33, cert. denied, 541 U.S. 1005, 124 S.Ct. 2023, 158 L.Ed.2d 522 (2004), this court made clear:

> We stress the importance of the trial judge's protecting the defendant's Sixth Amendment rights, even if a defendant expresses a desire to proceed with conflicted counsel. Because courts "possess an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that the legal proceedings appear fair to all that observe them[,]" **Wheat v. United States**, 486 U.S. 153, 160, 108 S.Ct. 1692, 1698, 100 L.Ed.2d 140 (1988), the defendant's ability to waive certain conflicts is not unfettered. **Id.** For example, in **United States v. Fulton**, 5 F.3d 605, 612 (2d Cir. 1993), the court stated, "When a lawyer's conflict, actual or potential, may result in inadequate representation of a defendant or jeopardize the federal court's institutional interest in the rendition of a just verdict, a trial judge has discretion to disqualify an attorney or

---

C.Cr.P. art. 841(A); LSA-C.E. art. 103; **State v. Taylor**, 93-2201 at pp. 4-7, 669 So.2d at 367-69, supra. Moreover, the defendant cites no support for his contention that he was entitled to the continued appointment of counsel when a substantial likelihood of conflict existed. The defendant's reliance on **State v. Bell**, 04-1183, pp. 7-10 (La. App. 3 Cir. 03/02/05), 896 So.2d 1236, 1241-43, is misplaced. There, the court of appeal determined that the trial court did not err in finding that the public defender's representation of the victim's father in a separate class action case was too remote and in appointing another attorney to assist the public defender in the criminal case in cross-examination of the victim's father should he be called to testify. **Id.**

decline a proffer of waiver." Nonetheless, a trial court ruling on potential conflicts when raised pretrial is entitled to broad discretion, regardless of whether the court permits or refuses enrollment of potentially conflicted counsel after a valid waiver. **Wheat**, 486 U.S. at 164, 108 S.Ct. at 1700. [Footnote omitted.]

In the instant case, the record reflects that the trial court appointed Mr. Guidry and Bert Garraway to represent the defendant shortly after the arrest warrant issued.[58] Mr. Guidry was removed three months later, on March 13, 2000, because Mr. Guidry chose to undertake the representation of the heirs of Joel Durham, the involved inmate who was shot and killed during Sgt. Walker's rescue. In ordering the removal of Mr. Guidry, the trial court stated that there was a "substantial likelihood that a conflict of interest will exist." Thus, despite the defendant's unsupported suggestion that Angola personnel somehow orchestrated the removal of Mr. Guidry because Mr. Guidry was effectively representing him, the defendant had no constitutional right to choose his appointed counsel, maintain an attorney-client relationship with appointed counsel, or waive an actual conflict.[59] With respect to the conflict, Mr. Guidry's representation of Durham's

---

[58] The defendant's characterization of Mr. Guidry's representation is misleading. As an initial matter, Mr. Guidry filed only the first three of the initial preliminary motions, each filed January 5, 2000, without the appearance of co-counsel, Mr. Garraway. Although the record includes neither the initial order of appointment, nor a relevant minute entry, the defendant and his appeal counsel have averred that the trial court appointed Garraway and Guidry on January 4 or 5, 2000.

[59] As a general rule, Louisiana courts have held that an attorney laboring under an actual conflict of interest cannot render effective legal assistance to the defendant whom he is representing. **State v. Cisco**, 01-2732 at p. 17, 861 So.2d at 129. An actual conflict of interest has been defined, as follows:

> If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict exists. The interest of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to the other client.

**Id.**, 01-2732 at p. 18, 861 So.2d at 130 (quoting **Zuck v. Alabama**, 588 F.2d 436 (5th Cir. 1979), <u>cert. denied</u>, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979)). The issue of conflicting loyalties may arise in several different contexts and includes when "'an attorney runs into a conflict because he or she is required to cross-examine a witness who is testifying against the defendant and who was or is a client of the attorney.'" **State v. Cisco**, 01-2732 at p. 17, 861 So.2d at 129 (quoting **State v. Tart**, 93-0772, p. 19 (La. 2/9/96), 672 So.2d 116, 125, <u>cert. denied</u>, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996)). Given that the degree of participation and culpability of the five co-defendants and Joel Durham has remained a primary focus of these cases for nearly two decades, it is not difficult to envision numerous scenarios wherein Mr. Guidry's strategic choices might be improperly influenced by his representation of

heirs in a civil case involved the exact same series of events at issue in the defendant's criminal case. Given the defendant's defense from the beginning was that others, including Durham, were more responsible for the events of December 28, 1999, than the defendant, that defense was substantially at odds with the version of events Mr. Guidry would likely advocate on behalf of Durham's heirs.

In addition, the defendant's right to effective representation was not compromised. The more experienced Mr. Garraway remained on the defendant's case until his untimely death in November 2005. Moreover, even though the defendant chose to represent himself with the assistance of his appointed counsel during certain aspects of his trial, he repeatedly praised his subsequently appointed attorneys and noted that if he had the money to hire anyone, he would hire them without any mention of the now-lauded Mr. Guidry.[60] This assignment of error is without merit.

## Faretta Waiver

In his seventh assignment of error, the defendant argues that his decision to represent himself during certain portions of his trial, while knowingly and intelligently made, was involuntary due to his "attorneys' unilateral decision to concede [his] guilt of first degree murder over [his] objection." The record shows that the factual basis of this argument is false.

_____

the Durham heirs, to the detriment of the defendant's criminal defense, or at some point face cross-examination of the defendant in the Durham civil trial. Even though the Durham wrongful death action terminated with the death of Joel Durham's last surviving heir at some later date, the appropriateness of the trial court's earlier removal of Mr. Guidry was not thereby undermined.

[60] During the **Faretta** colloquy preceding his second trial, the defendant praised his appointed counsel, stating, "For the record, I would like to say, first off, that it's never been a question of my attorneys' competency or their representation on my behalf. They're excellent attorneys and very good at what they do." In the sealed portion of the **Faretta** colloquy, the defendant stated, "I know how good my attorneys are. If I had a million dollars, they would be the first ones I would go to." Likewise, in March 2008, the defendant sought to withdraw from his previously granted hybrid representation with appointed attorneys D'Amico and Lotwick, stating that he was satisfied with the job they were doing and finding them "very competent."

Based on defense counsel's opening statement in the defendant's first trial for the murder of Capt. Knapps, which resulted in a mistrial, to which the defendant referred during the **Faretta** colloquy, his counsels' plan was to concede only that he was involved in the attempted aggravated escape, a fact wholly supported by the testimony of numerous inmates and correctional officers and defendant's own actions and statements before, and following, efforts to secure the Camp D education building. During the first trial, defense counsel stated:

> Let me tell you right now, ladies and gentlemen, because I'm not here to try to fool you or mislead you in any way. Evidence is going to be presented that will prove that Jeffrey Clark was involved in the aggravated - in the attempted aggravated escape. I'm not here to tell you any different, but I want you to know the truth.
>
> But what the evidence isn't going to show is that Jeffrey Clark was involved in the death, the first-degree murder death, of Captain Knapps. He did not have specific intent to kill or commit great bodily harm. He did not know that whoever killed Captain Knapps had that specific intent to kill or create great bodily harm.
>
> * * *
>
> The evidence is going to show that he did not have specific intent to kill or commit great bodily harm; therefore, he is not guilty of first-degree murder.

Indeed, the defendant's own explanation for seeking to represent himself on specific aspects of the trial (in questioning the fact witnesses during the guilt phase), as stated during the extensive **Faretta** colloquies between the defendant and the trial court, does not support the argument now presented.[61] In addition, the defendant explained during his opening statement that the reason he invoked his right to participate in his representation was "because it [was] important to [him] that you ladies and gentlemen of the jury get an opportunity to gauge the type of

_____

[61] In the sealed portion of the **Faretta** colloquy, the defendant explained that he did not have a conflict with his counsel, but rather a difference in opinion regarding the proper way of presenting the case. He explained that he would "much prefer the death penalty" over counsels' approach of building jury trust by admitting participation in the attempted aggravated escape, thereby rendering a second degree murder conviction and life sentence more likely, because he would have more assistance with his appeal and post-conviction efforts and therefore, in his view, a greater chance to have his conviction overturned.

person [he is] . . . better if [he] talk[s] and look[s] at [them], rather than if [he] just sit[s] mute at defense counsel [table]."

As a general matter, an acknowledgment of some degree of culpability may form part of sound defense strategy.  See, e.g., **State v. Brooks**, 505 So.2d 714, 724 (La. 1987) (trial counsel's strategy in acknowledging the defendant bore some culpability, in being in the company of the murderer at the scene of the crime, did not constitute ineffective assistance), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987); **State v. Holmes**, 95-0208, pp. 7-8 (La. App. 4 Cir. 2/29/96), 670 So.2d 573, 577-78.  See also **State v. McCoy**, 14-1449, 2016 WL 6506004 (La. 10/19/16), ___ So.3d ___.

In addition, the defendant does not challenge the adequacy of the trial court's compliance with **Faretta v. California**, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), ensuring the defendant's decision to represent himself, during certain aspects of the trial, was clear and unequivocal.[62]  Nor could he reasonably

---

[62] Both the Louisiana and federal constitutions guarantee a criminal defendant's right to assistance of counsel.  **Gideon v. Wainwright**, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); **State v. Brooks**, 452 So.2d 149, 155 (La. 1984).  Nevertheless, an accused may elect to waive the right to counsel and represent himself.  The assertion of the right to self-representation must be clear and unequivocal.  **Faretta**, 422 U.S. at 835, 95 S.Ct. at 2541; **State v. Hegwood**, 345 So.2d 1179, 1181-82 (La. 1977).  The relinquishment of counsel must be knowing and intelligent. **Johnson v. Zerbst**, 304 U.S. 458, 464-65, 58 S.Ct. 1019, 1023, 82 L.Ed.2d 1461 (1938); **State v. Strain**, 585 So.2d 540, 542-43 (La. 1991).  The Supreme Court has expressly declined to "prescribe . . . any formula or script to be read to a defendant who states that he elects to proceed without counsel."  **Iowa v. Tovar**, 541 U.S. 77, 88, 124 S.Ct. 1379, 1387, 158 L.Ed.2d 209 (2004).  However, the accused "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open."  **Faretta**, 422 U.S. at 835, 95 S.Ct. at 2541 (internal quotation marks and citation omitted).  See also **United States v. Davis**, 269 F.3d 514, 518-19 (5th Cir. 2001) (noting that, although the court "has consistently required . . . **Faretta** warnings," there is "no sacrosanct litany for warning defendants against waiving the right to counsel," and district courts must exercise discretion "[d]epending on the circumstances of the individual case").  In addressing the issue of standby counsel, this court has held that "[h]ybrid representation in which a defendant acts in tandem with counsel in questioning witnesses or in presenting closing argument does not implicate **Faretta**."  **State v. Mathieu**, 10-2421, pp. 7-8 (La. 7/1/11), 68 So.3d 1015, 1019 (citing **United States v. Cromer**, 389 F.3d 662, 683 (6th Cir. 2004); **United States v. Leggett**, 81 F.3d 220, 222 (D.C. Cir. 1996)).  However, this court has cautioned that "to the extent that hybrid representation in which defendant and counsel 'act, in effect, as co-counsel, with each speaking for the defense during different phases of the trial,' results partially in pro se representation, 'allowing it without a proper **Faretta** inquiry can create constitutional difficulties.'"  **State v. Mathieu**, 10-2421 at p. 8, 68 So.3d at 1019 (quoting 3 LaFave, Criminal Procedure, § 11.5(g), pp. 765-67).

do so, as the record reflects over thirty pages of discussion regarding the defendant's capacity, knowledge, and ability to comply with courtroom, evidentiary, and criminal procedure, with his attorneys' assistance, understanding of the dangers and disadvantages of self-representation, and the voluntary nature of his request.[63] Following this colloquy, which took place just before the commencement of the **Witherspoon**[64] *voir dire*, the trial court granted the defendant's request to act as co-counsel to represent himself with his attorneys' assistance, as to the questioning of fact witnesses for the State and defense, with the understanding that his attorneys would handle all expert witnesses and, if necessary, all aspects of the penalty phase, as defendant requested. The following day, the trial court held another conference, in chambers, to determine if the defendant should be appointed lead counsel and to clarify the scope of his attorneys' role regarding *voir dire*, opening statements, and the like, during which the defendant repeatedly confirmed his desire to pursue his alternative approach, represent himself, and act as lead counsel with his attorneys' assistance. The trial court determined it appropriate to appoint the defendant lead counsel, reminded him of the perils of his decision, and warned him that the court would not permit his appointed attorneys to participate in anything illegal or unethical. Thus, even assuming that the defendant's hybrid representation implicates **Faretta**, this assignment of error is without merit.

---

[63] The defendant was fifty years old with some college education, has a paralegal diploma, experience assisting other inmates with legal issues, and his own experience with capital cases gleaned from his unrelated first degree murder trial, appeal, and post-conviction practice.

[64] **Witherspoon v. State of Illinois**, 391 U.S. 510, 521-23, 88 S.Ct. 1770, 1776-77, 20 L.Ed.2d 776 (1968) ("[A] State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death. Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected.") (footnotes omitted).

Recording and Monitoring of Jailhouse Calls

The defendant asserts, in his eighth assignment of error, several arguments related to the recording and monitoring of jailhouse telephone calls by prison officials, contending that a defendant's right to counsel includes the right to confidential communication with his attorney; the defendant asserted that the trial court should have held a hearing to determine whether improper monitoring of his communications with counsel may have prejudiced his defense and/or tainted the proceeding.

The issue arose when discussions on the record, during a hearing held March 31, 2011, revealed that prosecutors had inadvertently received CDs containing recordings of two telephone calls initiated by the defendant to his attorneys on the inmate telephone system at Angola.[65] The State informed defense counsel and the trial court immediately of the situation, confirmed that the prosecutors did not listen to the two recordings, and placed copies of the recordings in the record under seal. The State also informed the trial court of its institution of "clean team" procedures, utilized by some federal district courts, whereby it hired a former federal prosecutor to manage secondary screening of any inmate call recordings provided to the "Angola 5" prosecutors to ensure they did not inadvertently receive attorney-client privileged communications. The State confirmed repeatedly it had no desire to listen to, or use, the potentially privileged calls. The defendant's counsel listened to the two recordings and confirmed that neither contained any attorney-client privileged information. No request for an evidentiary hearing,

---

[65] Prosecutors routinely received recordings of the defendant's telephone calls with his mother and others with whom he did not have an attorney-client relationship for some period of time before trial; copies were provided to the defendant in discovery. The defendant has implied that the State's expert in forensic psychiatry, Dr. Michael Welner, who testified regarding the defendant's character and propensities during the penalty phase, listened to the two inadvertently provided attorney-client calls; however, there is no support for that implication in the record. With respect to telephone calls, Dr. Welner testified, "I reviewed transcripts of well over a year of telephone conversations between Jeffrey Clark and his mother or Jeffrey Clark and people he was trying to solicit legal business from with a business that he had set up in custody in which he was providing legal services."

pursuant to **Kastigar v. United States**, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), or for an order to Angola personnel to cease recording calls placed on the inmate telephone system was made.

Nonetheless, on April 27, 2011, the defendant filed, pro se, a motion entitled "Motion to Recuse 'Angola 5' Prosecution Team," arguing that the pre-trial removal of the prosecutors was required, given their exposure to the defendant's and the other co-defendants' attorney-client privileged telephone calls and the continued sanctioning of the recording and monitoring of prison telephone system calls by Angola personnel, as well as the defendant's newly filed federal suit against the prosecution team members. The trial court held a contradictory hearing, during which defendant called no witnesses and relied solely on his brief and oral argument; the motion was denied.

Post-trial, the defendant adopted co-defendant Brown's motion to bar Angola personnel from recording and monitoring calls made on the inmate telephone system. On September 18, 2012 the trial court held a full evidentiary hearing on the matter, during which Angola personnel explained that, although they were in the process of converting to a new system and third-party vendor, there were three means at that time by which inmates could communicate verbally with counsel: in person, via the inmate telephone system, or on the secure landline. Access to the secure landline was available by appointment, on request (but not on demand), and those calls do not appear to have been recorded. Calls initiated by inmates on the inmate telephone system were made in an area where signs were posted cautioning inmates that all calls, save for "properly placed legal calls," could be recorded and/or monitored.[66] A similar warning was on the individual inmate phone list form (on which the inmate could identify certain

---

[66] The posted warning stated in English and Spanish, "This telephone has been electronically programmed to monitor and/or record telephone calls. By using this telephone, you consent to the monitoring and/or recording of your conversation except for properly placed legal calls."

numbers as attorney telephone numbers, which were tagged for exclusion from monitoring).[67] While Angola personnel made clear that they recorded all calls made on that system, the tagging procedure ensured attorney-client calls were not monitored when an inmate had listed the number for exclusion. If an attorney-client call was inadvertently untagged, the monitoring employee would stop the recording as soon as a call recipient identified itself as a "law office," and the monitor would tag the call so that others could not access it. Recorded statements were also played during the course of every call made on the inmate telephone system; one such recorded statement informed the inmate (but apparently not the recipient), "This call is subject to recording and monitoring." Another recording stated, "All calls are subject to monitoring and recording"; however, there was no testimony about the circumstances of when, or to whom, the message would be played during a call. The State also confirmed that it was no longer requesting recordings of inmate calls for the Angola 5. The trial court denied that part of co-defendant Brown's motion that sought to bar the recordings of all calls by Brown and the defendant prospectively, but granted the request to identify any attorney-client calls already turned over to the prosecution, inadvertently, as to Brown.

The defendant's appellate counsel also filed a motion related to the inmate call recordings on October 9, 2012, entitled "Motion for Hearing on Violation of Right to Counsel," complaining about alleged violations of the defendant's right to counsel through the pretrial and post-trial recording of his calls (based on information learned in the September 18, 2012 hearing) and demanding a **Kastigar** hearing. The trial court set the matter for evidentiary hearing, but the matter did not proceed because defense counsel withdrew the motion, subject to preservation

---

[67] The warning on the form stated, "I understand telephone calls in housing areas are subject to be monitored and/or recorded with the exception of properly placed calls to any identified attorney."

of the defendant's prior objections to the rulings on his pro se and adoption of co-defendant motions.

With the historical context in mind, we conclude that the defendant's current arguments on the issue have no merit. The trial court did not err in failing to bar the recording of the defendant's calls to counsel on the inmate telephone system before trial, because the defendant did not seek that relief (he only sought to recuse the prosecution team) until post-trial when he joined co-defendant Brown's motion. See LSA-C.Cr.P. art. 841(A) ("An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."); **State v. Taylor**, 93-2201 at pp. 4-7, 669 So.2d at 367-69. Further, the trial court did not err in failing to hold a **Kastigar** hearing on defense counsel's post-trial motion because counsel withdrew it on the scheduled hearing date. In addition, given the security measures necessary in a facility such as Angola, the various warnings about recording and/or monitoring calls on the inmate telephone system, the avenues available to inmates to avoid monitoring on that system (by identifying the attorney phone numbers for tagging) and to avoid recording/monitoring altogether by communicating with counsel in another manner (via the by-appointment secure landline designated for calls to counsel, in person, or by letter marked "legal mail"), the defendant bears some responsibility for the recording/monitoring of his attorney-client calls. Finally, of the two inadvertently produced recordings of attorney-client calls, defense counsel confirmed on the record these recordings contained no attorney-client privileged communications, and the prosecutors stated they did not listen to them. Therefore, this assignment is without merit.

Alleged Correctional Officer Brutality

The defendant alleges in his ninth assignment of error that the trial court erred in denying his motion to quash the indictment or, alternatively, to suppress

67

the inmates' statements, including his own, based on allegations of correctional officer brutality.[68]

We first reject the defendant's assertion that he is entitled to seek the suppression of the statements made by other inmates. A person adversely affected by an incriminating statement of another, unlawfully obtained under the United States Fifth or Sixth Amendments or LSA-Const. Art. I, § 16, has no standing to assert its invalidity. **State v. Burdgess**, 434 So.2d 1062, 1064-65 (La. 1983); **State v. Byrd**, 568 So.2d 554, 562-63 (La. 1990); **State v. Singleton**, 376 So.2d 143, 144-45 (La. 1979). See also **State v. Tart**, 93-0772, pp. 25-26 (La. 2/9/96), 672 So.2d 116, 143-44 (appendix), cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996). "This principle has been applied where, as in this case, one co-defendant or co-conspirator seeks to suppress evidence incriminating him that was obtained from a coparticipant in crime without proper compliance with the procedural requirements of **Miranda** [**v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)] or otherwise in violation of that party's Fifth or Sixth Amendment rights." **State v. Burdgess**, 434 So.2d at 1064.

This court, however, expressly "reserve[d] judgment on the question of whether gross police misconduct against third parties in the overly zealous pursuit of criminal convictions might lead to limited standing." **Id.**, 434 So.2d at 1065 (citing **United States v. Fredericks**, 586 F.2d 470, 481 (5th Cir. 1978), cert. denied, 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979)) (finding no justification for suppressing the defendant's statement, allegedly prompted by his co-defendant's illegally obtained confession wherein the conduct of the police in

---

[68] Defendant adopted co-defendant Mathis's Motion #36, entitled, "Motion to Quash Indictment Due to Outrageous Misconduct by State Agents Including a Vicious Pattern of Violence and Maltreatment Aimed at the Defendants and Other Inmates and for an Evidentiary Hearing; Alternatively, Motion to Suppress as Involuntary any Evidence from Inmate Witnesses and for Evidentiary Hearing." The defendant also filed his own "Supplemental Motion to Suppress Custodial Statements of Defendant," and a post-hearing "Memorandum in Support of Motion to Suppress."

the taking of a co-defendant's statement was "a far cry from the sort of third-degree physical or psychological coercion that might prompt [a court] to disregard altogether the societal interest in law enforcement by excluding the highly probative testimony of a nondefendant"). See also **State v. Rhodes**, 04-0207, pp. 5-6 (La. App. 5 Cir. 4/31/04), 881 So.2d 1263, 1266 (refusing to consider assigned error regarding suppression of a co-defendant's identification of a defendant, wrongly obtained without the presence of co-defendant's counsel, because that wrongdoing was not "the type of conduct that warrants granting limited standing to the adversely affected third-party"), writ denied sub nom. **State ex rel. Rhodes v. State**, 04-2773 (La. 6/24/05), 904 So.2d 727.

Here, the trial court held a lengthy evidentiary hearing[69] and stated its reasons for judgment, denying the motion in open court on October 1, 2008, to wit:

> That brings us to Motion 36 . . . . The Court is prepared to rule on this motion today which I'll note for the record that it was adopted by all of the defense teams. We have taken extensive testimony in connection with that motion, and I think we've taken testimony from forty something witnesses at least.
> The hearing held before this Court was unprecedented in the State of Louisiana and was prompted by the allegations in this motion. The allegations being so grave that, if true, they would be possible grounds for exclusion of all or a part of any testimony given by a third party nondefendant witness. The allegations specifically were directed to alleged torture, cruelty, abuse, inhuman treatment and so on. In making a decision to have this hearing, the Court relied on the Louisiana Supreme Court's reservations expressed in [**State v. Burdgess**] about possible limited standing and the Court's reference to a Fifth Circuit Federal case, [**United States v. Fredericks**], which discussed gross police misconduct against third parties as being grounds to exclude the testimony of a nondefendant witness, which otherwise the defense would not have standing to contest that testimony. And there are no cases in the State of Louisiana that this Court has been able to find, and, obviously, I don't think the defense teams [of ten capital-qualified attorneys] has found any, or you would have pointed them out, which grants standing other than the very

---

[69] The evidentiary hearing on Motion #36 took place April 14-18, 2008. The trial court then held evidentiary hearings on the co-defendants' individual motions to suppress their respective statements. The defendant's evidentiary hearing on his motion to suppress took place May 2-3, June 30, and July 1, 2008. The trial court, therefore, heard evidence regarding all then-pending allegations of governmental misconduct related to inmate statements before ruling on the suppression motions.

limited reference I made earlier . . . .  In any event, this Court's decision to proceed in this case with such a hearing was upheld by the Louisiana Supreme Court.[70] In connection therewith, testimony was taken from, I believe, something in excess of forty witnesses consisting of inmates, prison authorities, former prison employees, medical personnel, and would-be experts on torture.  Before the Supreme Court's decision in **Miranda** and currently the courts have always been concerned about the truthfulness of a statement or confession and whether or not something happened, or were there particular circumstances unique to the case or statement which would have a bearing on the truthfulness of the statement.  And before **Miranda** and through date, courts have been particularly concerned with whether the state authorities, the police, or in this instance corrections employees, did some act, torture, threats, et cetera, which would result in an untruthful or forced statement.  **Miranda** added to the law back in the sixties, I believe, or late sixties or middle sixties such that it's now necessary that you advise defendants or anyone - which is the posture the police have taken now - practically anyone, receives advice about their constitutional rights.  You delve into the understanding of the constitutional rights, find out whether or not the potential witness wishes to waive constitutional rights and so on.  However, the courts still look at confessions or statements in view of the original position of the courts over the years.  Did something happen which would make the statement untruthful or was it extracted by such horrible means that you just shouldn't use the statement at all.  In this case the Court is convinced well beyond a reasonable doubt that the witnesses in question were advised of their constitutional rights and knowingly and intelligently waived same and elected to give a statement.  Having said that the Court still must examine the first principle - first and long standing principle of law relating to whether or not the authorities did something which would call into question the truthfulness of the statements which the defendants seek to suppress.  In deciding this question, the Court has to take into account the credibility of the witnesses and the circumstances surrounding the statements.  From the outset the defendants urge the Court to accept a pattern of misconduct by prison authorities which would, in this Court's view, amount to a vast institutional conspiracy to abuse inmates and then maintain an institutionalwide cover-up of such abuse. The Court cannot accept this view or theory for the following reasons:  Starting with the very top and Warden Cain, when the tact[ical] team members first entered the [dorm bundle] room . . . to secure a hostage release [of Sgt. Walker], one defendant was shot and killed[, inmate Durham,] and another defendant, [inmate] Mathis, who is now on trial, was shot.  At that point Warden Cain could have simply said, Let Mathis bleed to death, or could have directed or asked the officer to shoot him again to make sure he's dead.  Instead Warden Cain directed that immediate medical aid be given, and, in fact, due to the circumstances surrounding the entire event and what was known to Warden Cain and the tact[ical] team at that point, this

---

[70] See **State v. Mathis**, 08-0778 (La. 4/11/08), 978 So.2d 334 (denying writs and a stay on the State's application to halt an evidentiary hearing on Motion #36 set to commence April 14, 2008, wherein the defendants subpoenaed seventy-six witnesses, including twenty-five inmates and eighteen correctional officers).

Court believes that Mathis received aid from the medical team before Captain Knapps, the officer allegedly killed by the defendants in this case . . . . We have had a hearing on a Motion to Suppress concerning Mr. Mathis' later statement. In the first round of witnesses, the forty something I heard . . . I did not hear any evidence that indicated that Mr. Mathis had so much as a scratch or abrasion beyond the obvious damage caused to his person by the gunshot [sustained during Sgt. Walker's rescue]. So if there was some type of institutional cover[-]up or conspiracy, it certainly didn't come from the top, or it would not appear to have come from the top to this Court, because of the way Mr. Mathis was treated. Secondly, there's absolutely no written trail of medical evidence to support the many claims of the inmates that they were abused, tortured, threatened, hit, pushed, shoved and so on. Next, the claims of the abuse allegedly suffered by the inmates so perfectly crystalized when claimed money damages in a [federal] civil suit came into play that this Court's take on the testimony as a whole that it was cookie cutter perfect, and any inmate's testimony could have been substituted for another.[71] This Court has grave concerns about the truthfulness of depositions given in connection with the federal lawsuit where nondefendant inmates, based on legal advice, refused to testify about certain aspects of the case while others couldn't recall certain aspects of this case despite a seemingly steel trap memory about the alleged abuse and their injuries. Next, many of the inmates testified that they were not abused, didn't see any abuse, or falsified claims of abuse to obtain money damages. There were at least three of the inmates that we know were injured, and the reason

---

[71] Generally, the uninvolved inmates testified that Angola personnel hit, kicked, and punched inmates in the initial efforts to re-take control of the various rooms in the education building. Inmates were searched for weapons, placed in flexicuffs, and made to kneel with their ankles crossed or cuffed and foreheads or noses against a wall in the classrooms. The inmates were then moved out into the hallway of the education building and placed in the same position, where some inmates claimed Angola personnel continued to hit with batons, punch, kick, and threaten them for several hours awaiting crime lab and investigator processing of the scene and inmates. Some inmates testified that they were not permitted to use the restroom during this time and were punished if they relieved themselves anyway. At least one inmate testified a correctional officer threatened inmates with a riot baton in a sexual manner in the hallway, another inmate stated he heard someone say "kill them all" as the tactical team stormed the building, and a third inmate claimed crime lab personnel conducted a body cavity search during processing. Based on the testimony of inmates and Angola personnel alike, the use of force in the initial re-taking of control appears to have been most aggressive in the band practice room, where some of the inmates prevented the immediate entry of tactical team members with a barricade blocking the band practice room door, and in the law library, where at least one inmate was not already on the floor with his hands on his head and failed to respond timely to a command to get in that position. These two rooms were across the hallway from the officers' restroom, where Capt. Knapps' body remained before medical personnel moved it into the hallway. Several inmates testified that the beatings and threats continued in the hallway, on the walkway from the education building to a transport bus, on the transport bus, and at Camp C, where the uninvolved inmates were housed the night of the murder. There, some inmates claimed they were made to sleep naked in cells, without blankets, mattresses, or toilet paper and with no heat though the windows were open to the thirty-degree night air, until morning when, at the shift change, an officer corrected the situation. Most of the inmates who provided such testimony received $7,000 as part of a no-admission-of-fault settlement in the federal suit. Other inmates testified they observed use of force only when an inmate failed to comply with a command or not at all, and most inmates appeared to understand the necessity of treating all inmates in the building as suspects initially. Some inmates testified that several Angola personnel were upset with the uninvolved inmates for failing to assist Capt. Knapps.

why we say we know that is because the inmates talked about it and the guards also talked about it. There were violent takedowns in two of the classrooms. The first classroom on what I would refer to as the right hand end of the building when an inmate wouldn't follow a directive to, I think, get down on the floor. Then there was another classroom further down the hall where there was still a hostage in that room, and that hostage, I believe, was covered up by a sheet or blanket and there was again a problem with an inmate following a directive, and there was a violent takedown of that inmate which would certainly account for any injuries discussed relative to those . . . inmates. A third inmate was one of the defendants who has filed a Motion to Suppress and claims to have been injured and the medical evidence relative to this inmate backs up what he has to say. The major testified about that and says, well, when he got into the hall, the inmate assumed a fighting position and in response to that he delivered a pretty good blow to the inmate's face or forehead area.[72] Almost without exception the inmates testified that even if they were beaten, it had no bearing on their statements which were true and were not related to State misconduct. There was no testimony that the beatings and abuse, even if true, were designed to extract a statement or information from the potential witness, and if any conclusion can be drawn from that, it would have to be that, if true, that some officers were emotional and anything that they may have done were gratuitous responses to the death of one of their own. But, again, I have to go back and state that the inmates universally testified that whatever they said, whatever the guards might have done, didn't have any bearing on what they had to say.

Additionally, the inmates['] testimony, if true, presented the Court with a most amazing statistical anomaly that I believe, with one partial exception, all of the inmates claiming injuries were wrongfully convicted and innocent of the crimes resulting in their incarceration at Angola. While the Court recognizes the possibility that there may be, out of the fifty-two hundred or so inmates at Angola, a very small percentage who are actually innocent and were wrongfully convicted, it defies imagination and the laws of probability that such a large

---

[72] The trial court appears to be referring to the following instances:

- Inmate Alvin Loyd suffered a broken jaw and lost ten teeth during tactical team efforts to take control of the law library, and he claimed he was injured when someone kicked him while he was handcuffed on the floor; Lt. Troy Poret testified he employed a tactical takedown maneuver (i.e., a grab of the back of the neck and a knee strike to the face) on Loyd and pushed inmate Gregory Wimberly back onto the floor when he was moving around; Warden Jimmy Johnson testified he saw Lt. Poret use a straight-arm takedown method on Loyd because Loyd was being combative, and he saw Loyd's face and body hit a desk going down, but he did not observe a knee-strike from his vantage in the hallway;

- Inmate Kenneth Edwards was sent to the infirmary with a bloody eye and nose from the use of force in retaking control of the band practice room, which he claims included kicking, punching, and hitting him with a shotgun to the back of the head; and Gregory Wimberly was sent to the infirmary with a bloody ear and lip, and he claims that he eventually lost at least two teeth from kicks to the face by an Officer Nettles, who did not testify; and

- Co-defendant/inmate Edge stated that Warden David Bonnette broke his own hand while punching Edge in the face in the hallway when Edge refused to comply with another officer's commands, instead assuming a boxing stance; both Warden Bonnette and Edge went to the infirmary.

percentage of those wrongfully convicted would be those that showed up in this Court claiming abuse and injury. As an aside to the credibility issue, I can't help but mention the testimony of inmate Robert Cooper who exhibited the astounding and almost superhuman ability to change from fact to fiction in the same sentence. While I view him as the most prolific liar I've ever heard on the witness stand, I would have to say that he was also the least successful.

Another factor relating to the credibility issue involves the independent witnesses, and I'm referring to those witnesses with no [ongoing] ties to corrections or the sheriff's office. No jobs at stake. No promotions at stake. No demotions at stake or any other factors that may have influenced their testimony. Specifically, former sheriff's office investigator Ivy Cutrer, now retired, testified he has no dog in this hunt to put it in common terms. Warren Melancon, who is now retired or working elsewhere, he has nothing to gain or lose by his testimony. Security officer David Ross now working elsewhere, and Ross was fired from Angola for, I believe if I recall correctly, a marijuana issue. He certainly has nothing to gain or lose from Angola at this point. Former security captain Jeff Hewes now working elsewhere. Dr. Robert Barnes who's now practicing medicine, I believe, in Alabama. All these are persons that I would consider to be independent witnesses wh[o] would have no reason to show any bias, interest, or corruption in their testimony. I think they were all truthful, and all of these witnesses simply didn't support the version of events put forward by the many inmates that this Court heard.

Finally, I don't think it's appropriate for the defense teams to try to put the Court in a box and say, well, we want you to exclude all of these statements and so on because they were not true. They were beaten out of these people, but we want you to suspend that request for a few minutes just long enough to find that they were telling the truth about abuse so you could say that everything that they said was false and that takes the Court around in a circle. That's just another reason why this Court has some concerns about this.

Finally, when this case comes to trial, I don't know everything that can be known about this case and what the defense teams plan to do or what the prosecution plans to do, but I don't see any reason based on the facts and circumstances of this case to exclude testimony of any of these witnesses addressed in this motion. They will be subject to cross-examination. In my humble view, after having heard all these witnesses, I would have to say that probably the best conclusion that can be drawn from it is the prosecution proceeds at its own risk. The defense proceeds at its own risk because you just don't know what you're going to get from the witness stand from any of these folks that testified before the Court. For all these reasons, the Court will deny Motion No. 36.

Rather than address, in his brief to this court, in a meaningful way any aspect of the trial court's extensive ruling on the defendants' motion to suppress the uninvolved inmate statements, the defendant argues inapplicable caselaw (i.e., regarding outrageous governmental conduct, wherein the government was involved

73

in the commission of the offense or acted outrageously in obtaining inculpatory evidence from the accused), and the defendant attempts to bolster the uninvolved inmates' credibility by claiming that "[e]ach inmate who testified presented a consistent and detailed explanation of what occurred," which the trial court acknowledged and expressly rejected. Neither of these arguments provide a tenable basis sufficient for this court to reach, in this case, the issue left open in **State v. Burdgess** (i.e., whether a defendant has standing to seek suppression of uninvolved witness statements on allegations of gross governmental misconduct in obtaining those statements); nor do the defendant's arguments on this point identify any error in the trial court's ruling. We find no error in the trial court's conclusion that, although members of the tactical team used force against uncooperative inmates in regaining control of the education building, that force was not used for the purpose of obtaining, or resulted in, coerced statements by inmates.

With respect to the defendant's motion to suppress his own statements, he argues that he presented overwhelming evidence that he was beaten, and he asserts that the State failed to carry its heavy burden of proving beyond a reasonable doubt the voluntariness of defendant's confession, pursuant to **State v. Franklin**, 381 So.2d 826, 828 (La. 1980). The defendant's evidence consisted of the testimony of four inmates, who claimed they heard or saw several unidentified correctional officers beating the defendant near the transport bus in the early morning hours of December 29, 1999; the testimony of the defendant's former appointed counsel, Burton Guidry, who observed severe bruising on defendant's legs on January 6, 2000 (which appear in photographs taken of said bruising by Mr. Guidry that same day).[73]

---

[73] Inmate Brian Johns testified that he saw four or five guards beating the defendant on his back, sides, and legs with riot sticks near the front of the bus and on the walkway and heard the defendant screaming and hollering. Inmate John Daniels testified that he heard guards beating

The State's evidence included the following:

- Testimony of an EMT who saw the defendant on January 4, 2000, regarding his request for penicillin for an infection in a cut to his lower right shin; there were no complaints or evidence of beatings;
- Testimony of Angola, WFPSO, and State Trooper investigators, who took the defendant's December 29, 1999 and January 3, 2000 statements, regarding the fact that the defendant did not complain of beating or otherwise show any sign of injury or discomfort;
- Testimony of the bus driver, who had transported the uninvolved inmates to Camp C, but who recalled no incident regarding the defendant, other than the defendant's spontaneous statements during transport to Camp J that he planned to turn State's evidence;
- Testimony of numerous Angola personnel, responsible for escorting the defendant to investigators, that the defendant was not forced, threatened, beaten, or promised anything by themselves or anyone else;
- Testimony and medical records related to an incident in June 1988 in which the defendant obtained and left battery acid on his left little finger for a sufficient period of time to cause a third-degree burn and expose the bone, such that amputation was required, in response to his displeasure over a work-related assignment at Angola, as well as the fact there was no indication in the defendant's records that he had complained of any bruising to medical personnel during sick calls on January 4, 6, 12, 18, or 20, 2000 or on February 8, 2000, although a notation in a February 21, 2000 medical report mentions that the defendant's thigh contusions were no longer bothering him;
- Testimony of an expert in forensic pathology that his wound and pattern injury interpretation of the January 6, 2000 photographs of the defendant's wounds: (1) were not consistent with riot baton injuries, which leave railroad track-like marks; (2) were "much fresher" and had not been sustained eight or nine days before as claimed by the defendant; and (3) were not compatible with the beatings described by inmate witnesses because there were no injuries to any area other than the defendant's thighs and there were no defensive wounds, such as cuff-related marks on his wrists; this expert also observed that the defendant's self-inflicted battery acid injury demonstrated the defendant's high tolerance for pain and creativity as to self-mutilation and he also observed that the physical characteristics

the defendant with sticks and screaming outside the bus. Inmate Earl Lowe testified that he saw several guards beating the defendant with sticks on the walkway from the bus to the education building. Inmate Tyrone Clofer testified that he saw six to eight guards kicking, punching, and beating the defendant with sticks in a manner "worse than a Rodney King beating" for approximately ten minutes, stopping when they got tired. Mr. Guidry testified that the defendant's mother informed him of the defendant's injuries on January 5, 2000, and he took the photographs the following day; he did not know how the defendant became injured or whether the bruising was self-inflicted.

of the defendant's prison cell provided him with an opportunity to self-inflict the bruising;

- Evidence and stipulated testimony related to the physical characteristics of the prison cell, in which the defendant was housed from December 29, 1999 to January 4, 2000 and regarding the means by which the defendant could have inflicted the injuries on himself;

- Testimony of an expert in correctional investigation and proper use of force in correctional settings, opining that the nature of the defendant's bruising was not consistent with injuries inflicted by a riot baton or by beatings by correctional officers, in general, because of the pattern of bruising on the defendant was confined to the defendant's front, back, side, and inner thighs.

Based on this evidence, the trial court denied the defendant's motion to suppress, giving reasons as follows:

Clark seeks to suppress several statements but not as a result of any misconduct or failure by officials receiving the statements. Rather, Clark claims that he received beatings and mistreatment by Angola security officers so severe that his frame of mind was such that he could not or would not resist any requests by interrogators for a confession or statement. As the suppression hearing unfolded, the Court was repulsed by photographs showing signs of severe abuse to Clark which, if inflicted by security or law enforcement, would leave no doubt whatever in the Court's mind that any statement or confession given in close time proximity to the beatings should and would be suppressed, Clark being in the state of mind that he would not feel free to not tell the officers anything that they wanted to hear for fear of retaliation. However, as the hearing progressed several questions arose which, in the mind of the Court, did not support the version of security abuse advanced by Clark. First, Clark's self-serving attempt to make a deal with Warden Vannoy in his voluntary letter in October 2001 explaining what happened in a fashion calculated to minimize his involvement; two, Clark's self-mutilation to serve his own ends. The Court is referring directly to the battery acid incident. Three, there is no contemporaneous medical testimony which supported Clark's photo evidence of injuries before statements were taken. Four, there was no testimony that the Court heard from any inmate or security officer in proximity to the time of the statement or even shortly after the statement such as, well, I saw all these signs of beatings and abuse as Clark was walking to the shower and so on and so forth. Five, the photographic evidence of abuse to the inner portion of Clark's legs do not appear to the Court to have been something that could have happened in the manner advanced by Clark. Six, the so-called guard baton beatings did not fit or match the wound or bruise patterns examined by the doctor that testified. And . . . testimony from state police and sheriff's deputies contemporaneous with Clark's questioning which revealed no complaints from Clark or signs of discomfort . . . . And, finally, and most recently, correspondence from Clark which came up in the course of a

supplemental hearing held by the Court on motion of the State to reopen the suppression hearing prior to a ruling, correspondence from Clark indicating further attempts by Clark and Clark's willingness to manipulate the system to further his own ends including his civil lawsuit. The most logical conclusion to be drawn from all of this is that the injuries photographically depicted were self-inflicted and self-serving to better Clark's position in his civil lawsuit and this criminal proceeding. The Motion to Suppress is denied as to the December 29, 1999 statement and the January 3, 2000 statement . . . .

The defendant challenges this ruling, arguing that the trial court failed to consider the testimony of the four inmates who claimed to have witnessed unidentified correctional officers abusing the defendant near the transport bus and that the State failed to call the correctional officers involved to testify. Neither argument is persuasive since: (1) the trial court previously determined that the four inmate witnesses lacked credibility when it ruled on Motion #36[74] and noted that the defendant's efforts to secure favorable, though false, testimony from at least one other witness; and (2) the record does not identify any particular correctional officer(s) who allegedly abused the defendant near the transport bus. More importantly, the nature of the injuries reflected in the photographs taken on January 6, 2000, and the testimony of two experts regarding inconsistencies between those injuries and the timing and method of abuse claimed by the defendant and the four inmate witnesses, as well as the defendant's history of self-mutilation and witness manipulation to obtain his objectives provide ample support for the trial court's determination and refusal to suppress the defendant's December 29, 1999 and January 3, 2000 statements.

Furthermore, the defendant presents no argument regarding the basis on which the trial court should have quashed the indictment in relation to this assignment of error, nor did the defendant present any argument before the trial

---

[74] Inmates Jones, Daniels, Lowe, and Clofer, who each testified that they saw or heard officers abusing the defendant, near the transport bus, were among the group of inmates that the trial court did not find credible in ruling on Motion #36, due to, *inter alia*, the lack of medical evidence of injury and because of the incentive to allege damages in the federal civil lawsuit.

court in support of that portion of his motion that sought to quash the indictment; therefore, we find it unnecessary to address this unsupported portion of the defendant's ninth assignment of error.

We conclude that this assignment is without merit.

Suppression of Defendant's Letter to Warden Vannoy

In his tenth assignment of error, the defendant argues that the trial court erred in admitting his October 17, 2001 letter to Warden Vannoy and Warden Vannoy's testimony related the letter, claiming that: (1) the letter was the product of a custodial interrogation conducted in violation of **Miranda**; and (2) the letter constitutes a statement "made in the course of . . . plea discussions with an attorney for or other representative of the prosecuting authority" and should not have been admitted in violation of LSA-C.E. art. 410(A)(3).[75]

As the trial court correctly observed, the defendant's motion and subsequent memorandum in support thereof sought suppression of the defendant's December 29, 1999 and January 3, 2000 statements only. The trial court further observed contemporaneously with ruling on that motion that it would not "suppress [any] spontaneous utterance" and found the letter (and several other statements by defendant) to be "freely and voluntarily self-generated." Defense counsel asked the trial court to "note [his] objection" to the suppression rulings and, at trial, objected to the introduction of the letter "subject to previous motions." Indeed, the defendant identifies no portion of the record in which he presented the arguments raised here to the district court orally or by written motion. Thus, the defendant did not preserve this issue for review on appeal. See LSA-C.Cr.P. art. 841, supra;

---

[75] Article 410 provides, in pertinent part: "Except as otherwise provided in this Article, evidence of the following is not, in any civil or criminal proceeding, admissible against the party who made the plea or was a participant in the plea discussions: . . . (3) Any statement made in the course of any court proceeding concerning either of the foregoing pleas, or any plea discussions with an attorney for or other representative of the prosecuting authority regarding either of the foregoing pleas . . . ."

**State v. Taylor**, 93-2201 at p. 7, 669 So.2d at 369 ("This Court's scope of review in capital cases will be limited to alleged errors occurring during the guilt phase that are contemporaneously objected to, and alleged errors occurring during the sentencing phase, whether objected to or not.").[76]

Excessive and Gruesome Photographs

In his eleventh assignment of error, the defendant claims that the trial court erred in permitting introduction of nine autopsy photographs of the victim because they were "excessive and gruesome."[77]

Under LSA-C.E. art. 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Photographs are generally admissible if they illustrate any fact, shed any light upon

_____

[76] Moreover, even were the issue properly raised, no basis appears in the record for exclusion of the October 17, 2001 letter or related testimony. Warden Vannoy testified that the defendant raised the issue of his willingness to testify in exchange for certain demanded concessions when Warden Vannoy was making his prison rounds on October 16, 2001. Warden Vannoy informed the defendant that he had no authority to negotiate anything and that he would not discuss anything on the tier in front of other inmates, but that he would pass on whatever the defendant wanted to communicate to the appropriate authority. The following day Warden Vannoy received the thirteen-page letter from the defendant via Angola mail, and he gave it to Angola legal counsel Bruce Dodd. Thus, the October 17, 2001 letter was not the result of a "custodial interrogation," triggering **Miranda** concerns, because the defendant was not being interrogated or even questioned; the defendant initiated the communication, decided on his own what to write in the subsequent letter, and appears to have remained in his own cell, among the other prisoners on his tier, during all relevant events. Further, at that time, the defendant was in prison serving a life sentence on an unrelated first degree murder conviction, and he had not been indicted for Capt. Knapps' murder. See, e.g. **Howes v. Fields**, __ U.S. __, ___, 132 S.Ct. 1181, 1189-92, 182 L.Ed.2d 17 (2012) (discussing the relevant considerations for what constitutes "custodial interrogation" in a prison context and observing that "imprisonment [on an unrelated conviction] alone is not enough to create a custodial situation within the meaning of **Miranda**"). In addition, Warden Vannoy was not "an attorney for or other representative of the prosecuting authority," as required by LSA-C.E. art. 410, a fact explicitly acknowledged by the defendant in the October 17, 2001 letter, which stated, in pertinent part: "Here is my offer, since you, nor other prison officials, have no authority to act or make any deal on behalf of the DA." Regardless, "[a] trial court's finding as to the free and voluntary nature of a statement carries great weight and will not be disturbed unless the evidence fails to support the court's determination," and we conclude that the evidence presented in this case supports the trial court's ruling. **State v. Holmes**, 06-2988, p. 34 (La. 12/2/08), 5 So.3d 42, 68, cert. denied, 558 U.S. 932, 130 S. Ct. 70, 175 L. Ed. 2d 233 (2009).

[77] The defendant adopted co-defendant Mathis's Motion #69, entitled "Motion to Exclude or Limit the Introduction of Gruesome or Prejudicial Photographs and Bloody Evidence." On July 2, 2008 the trial court deferred ruling until the individual trials of the co-defendants because resolution would depend on the specific photographs the State sought to introduce based on the agreement of counsel. On October 26, 2010 the trial court denied the motion subject to the individual co-defendants' rights to raise an objection at trial if warranted.

an issue in the case, or are relevant to describe the person, thing, or place depicted. **State v. Jackson**, 30,473, p. 15 (La. App. 2 Cir. 5/13/98), 714 So.2d 87, 96, <u>writ denied</u>, 98-1778 (La. 11/6/98), 727 So.2d 444.  Even when the cause of death is not at issue, "[t]he state is entitled to the moral force of its evidence and postmortem photographs of murder victims are admissible to prove *corpus delicti*, to corroborate other evidence establishing cause of death, location, placement of wounds, as well as to provide positive identification of the victim."  **State v. Letulier**, 97-1360, pp. 18 (La. 7/8/98), 750 So.2d 784, 795; **State v. Robertson**, 97-0177, p. 29 (La. 3/4/98), 712 So.2d 8, 32, <u>cert. denied</u>, 525 U.S. 882, 119 S. Ct. 190, 142 L. Ed. 2d 155 (1998).  The cumulative nature of photographic evidence does not render it inadmissible if it corroborates the testimony of witnesses on essential matters.  **State v. Lane**, 414 So.2d 1223, 1227 (La. 1982); **State v. Miles**, 402 So.2d 644, 647 (La. 1981).  Thus, photographic evidence will be admitted unless it is so gruesome as to overwhelm the jurors' reason and lead them to convict the defendant without sufficient evidence (i.e., when the prejudicial effect of the photographs substantially outweighs their probative value).  **State v. Broaden**, 99-2124, p. 23 (La. 2/21/01), 780 So.2d 349, 364; **State v. Perry**, 502 So.2d 543, 558-59 (La. 1986)).  Moreover, it is well-settled that a trial court's ruling with respect to the admissibility of allegedly gruesome photographs will not be overturned unless it is clear that the prejudicial effect of the evidence its probative outweighs value.  **State v. Maxie**, 93-2158, p. 11 n.8 (La. 4/10/95), 653 So.2d 526, 532 n.8.  The trial court has considerable discretion in the admission of photographs, and its ruling will not be disturbed in the absence of an abuse of that discretion.  **State v. Gallow**, 338 So.2d 920, 923 (La. 1976); **State v. Watson**, 449 So.2d 1321, 1326 (La. 1984).

In the instant case, the trial court permitted the State to introduce a limited set of photographs, taken by crime scene investigator Pat Lane, of the victim at the

autopsy for the purpose of corroborating the testimony of forensic pathologist Dr. Suarez, and the defendant objected to the introduction of nine of the photographs.[78] Given the State's burden of showing that the defendant had the specific intent to kill or to inflict great bodily harm in support of the first degree murder charge and the highly relevant nature of each of the nine photographs in the limited set to demonstrate the extent and placement of Capt. Knapps' injuries and his cause and manner of death, the trial court did not abuse its discretion in admitting the limited set of photographs. This assigned error is without merit.

Failure to Hold **Daubert** Hearing

In his twelfth assignment of error, the defendant complains that the trial court erred in failing to hold a **Daubert** hearing regarding expert testimony of crime scene reconstruction and bloodstain pattern analysis and the admission of said testimony.[79]

Under the standards set out in **Daubert v. Merrell Dow Pharmaceuticals, Inc.**, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which this court explicitly adopted in **State v. Foret**, 628 So.2d 1116, 1121-22 (La. 1993) (also finding LSA-C.E. art. 702 "virtually identical to its source provision in the Federal Rules of Evidence . . . [Rule] 702"), the trial court is required to perform a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." **Daubert**, 509 U.S. at 589, 113 S.Ct. at 2795. In performing this function, a trial court must have considerable leeway in deciding, in a particular case, how to go about determining whether particular

---

[78] In selecting this limited set, the State culled an additional thirty-three photographs of the victim, which it filed into the record but did not show to the jury. None of the photographs in the limited set appear to be so gruesome as to overwhelm the jury, particularly when compared to the photographs the State elected to exclude.

[79] The defendant adopted co-defendant Mathis' Motion #33, entitled "Motion for a **Daubert** hearing to Determine Admissibility of Expert Testimony by Jefferson Parish Crime Lab Technicians in the area of Crime Scene Reconstruction and Bloodstain Pattern Analysis."

expert testimony is reliable. **Kumho Tire Company, Ltd., v. Carmichael**, 526 U.S. 137, 152, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999). While **Daubert** specifically addressed scientific evidence, **Kumho** made clear that the trial court's essential gatekeeping function applies to all expert testimony, including opinion evidence based solely on special training or experience. **Kumho**, 526 U.S. at 148-49, 119 S.Ct. at 1174-75. Ultimately, "the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" **Id.**, 526 U.S. at 149, 119 S.Ct. at 1175 (quoting **Daubert**, 509 U.S. at 592, 113 S.Ct. at 2796). Whether **Daubert**'s specific factors are, or are not, reasonable measures of reliability is a matter that the trial judge has broad latitude to determine, and a decision to admit or exclude is reviewed on an abuse of discretion standard. **Id.**, 526 U.S. at 153, 119 S.Ct. at 1176; **State v. Edwards**, 97-1797, p. 24-25 (La. 7/22/99), 750 So.2d 893, 908-09.

In this case, the pretrial motion requesting a **Daubert** hearing regarding crime scene reconstruction and bloodstain pattern analysis pertained only to Col. Scanlan of the Jefferson Parish Crime Lab and did not apply to Mr. Lane of the State Police Crime Lab, such that the defendant's current argument regarding Mr. Lane warrants no review. See LSA-C.Cr.P. art. 841(A); LSA-C.E. art. 103; **State v. Taylor**, 93-2201 at pp. 4-7, 669 So.2d at 367-69, supra.

On June 30, 2008 the trial court heard oral argument and denied the motion because: (1) defense counsel admitted crime scene reconstruction and bloodstain pattern analysis had been recognized and accepted sciences in this state and nationwide for many years; (2) the trial court had already authorized each of the five co-defendants to hire his own expert in those fields, and each defendant had access to the relevant evidence and reports on which the State intended to rely; and (3) the parties could challenge the qualifications and methodologies of each expert at trial and discrepancies in the experts' methods and findings could be explored on

cross-examination. At trial, the defendant stipulated Col. Scanlan and Mr. Lane were experts in the fields of crime scene investigation, crime scene reconstruction, and bloodstain pattern analysis, cross-examined both of them thoroughly, and called his own expert in those fields to challenge the methods and findings of the State's experts. In addition, when the State sought to elicit inappropriate testimony from its experts (i.e., outside of the scope of the fields of expertise), the trial court sustained defendant's numerous objections. Indeed, although the defendant challenges the admissibility of certain testimony of Col. Scanlan and Mr. Lane, he points to no instance in which the trial court denied any contemporaneously-raised objection. In light of the foregoing, the trial court did not abuse its discretion in denying the defendant's motion for a **Daubert** hearing, and the defendant points to no erroneous denial of a contemporaneous objection during trial regarding the testimony of those experts.

Unreasonable Pre-Indictment Delay

The defendant argues that the pre-indictment delay of over four years, between the December 28, 1999 murder and March 15, 2004 indictment, was unreasonable and violated the Fifth Amendment's Due Process Clause and La. Const. Art. I, § 16. The defendant therefore claims that the trial court erred in denying his co-defendants' motions to quash the indictment on this basis, which claimed they had been prejudiced by the delay, because of the deaths of unidentified "important defense witnesses," as well as because of lost or destroyed evidence, including the personnel files of Capt. Knapps and Sgt. Walker.[80]

Louisiana Code of Criminal Procedure Article 571 provides that there is no time limitation on the institution of prosecution for a crime punishable by death or life imprisonment. Nonetheless, this court has held pre-indictment delays may

---

[80] The defendant adopted co-defendant Mathis' Motion #45, entitled "Motion to Quash Indictment Due to Inexcusable and Prejudicial Delay."

violate due process and "'[t]he proper approach in determining whether an accused has been denied due process of law preindictment through a or pre-arrest delay is to measure the government's justifications for the delay against the degree of prejudice suffered by the accused.'" **State v. Schrader**, 518 So.2d 1024, 1028 (La. 1988) (quoting **State v. Malvo**, 357 So.2d 1084, 1087 (La. 1978)).

At the close of the evidentiary hearing on the co-defendants' motion to quash, the trial court observed that no evidence regarding the deaths of any inmate witnesses had been introduced, nor had any evidence of prejudice been shown regarding the allegedly missing personnel files, and the court held that the State's reasons for delay were legitimate. Several former prosecutors testified that: (1) the case was complex, with voluminous DNA evidence and other crime scene analysis required by various investigative entities and, thus, the case was not yet ripe for prosecution from an evidentiary standpoint for some period of time; (2) they did not want to politicize the indictments during the 2002-2003 election cycle, once the bulk of the evidence had been analyzed; and (3) all defendants were already serving life sentences for unrelated murders.

Although the defendant now argues prejudice from the deaths of inmates Henry Hadwin and Norman Brown, in February 2000 and January 2004, respectively, he cites no portion of the record indicating any attempt to introduce evidence on this topic to the trial court. In addition, nothing in the portions of the record, cited by the defendant, related to the allegedly missing personnel files, establishes any prejudice, and whatever prejudice may have been suffered[81]

_____

[81] Nothing in the record, supplements, or attachments indicates the personnel files of Capt. Knapps and Sgt. Walker would have revealed any performance issues. In addition, Warden Cain testified he believed Capt. Knapps was an "excellent employee," and he or Warden Vannoy would have been aware of any complaints filed against Capt. Knapps by inmates. Moreover, Warden Cain stated that personnel files are also maintained in Baton Rouge, but he was not aware of whether the contents of the files were duplicative of the personnel files maintained at Angola. In any event, the trial court ordered the State to produce copies of the personnel files for Capt. Knapps and Sgt. Walker maintained in Baton Rouge by the Department of Public Safety and Corrections and Department of Civil Service as well as any logout cards for the relevant files maintained at Angola.

appears to be outweighed by the State's justifications. The trial court did not err in denying the motion to quash the indictment, and the assignment is without merit.

## Penalty Phase Issues

"Future Dangerousness" Evidence

The defendant claims in his fourteenth assignment of error that the trial court erred in permitting Dr. Michael Welner to testify regarding his "future dangerousness." First, the defendant argues "future dangerousness" is not one of the aggravating circumstances set forth in LSA-C.Cr.P. art. 905.4.[82] While true, he ignores LSA-C.Cr.P. art. 905.2(A), which provides that the sentencing hearing shall consider "**the character and propensities of the offender**," as well as other factors, such as the circumstances of the offense and the impact that the crime has had on the victim, family members, friends, and associates. (Emphasis added). Thus, within limits, evidence pertaining to the defendant's character and propensities is entirely proper. See **State v. Allen**, 03-2418, p. 20 (La. 6/29/05), 913 So.2d 788, 803-04, cert. denied, 547 U.S. 1132, 126 S.Ct. 2023, 164 L.Ed.2d 787 (2006) ("The well-settled law of this state entitles the State to introduce evidence of a capital defendant's unrelated convictions at the penalty phase as reflective of his character and propensities.").

In the *guilt* phase of a criminal trial, pursuant to LSA-C.E. art. 404, neither "[e]vidence of a person's character or a trait of his character, such as a moral quality," nor "evidence of other crimes, wrongs, or acts" are admissible to show that "he acted in conformity therewith," with certain limited exceptions. However,

---

[82] In his "Motion to Exclude Testimony of Forensic Psychiatrist Regarding 'Future Dangerousness' of Defendant at Sentencing Hearing," the defendant's entire argument was as follows: "There is no statutory or jurisprudential authority in Louisiana that would permit the State to present testimony, whether in the form of "expert opinion" or otherwise, regarding the alleged 'future dangerousness' of the defendant . . . ." The trial court heard oral argument and denied the motion, apparently agreeing with the State that such evidence pertains to the defendant's character and propensities, citing this court's decision in **State v. Williams**, 07-1407 (La. 10/20/09), 22 So.3d 867, and **State v. Bowie**, 00-3344 (La. 4/3/02), 813 So.3d 377.

the character and propensities of the defendant are at issue in the *penalty* phase of a capital trial, as stated in LSA-C.Cr.P. art. 905.2. **State v. Tucker**, 13-1631, p. 44 (La. 9/1/15), 181 So.3d 590, cert. denied, ___ U.S. ___, 136 S.Ct. 1801, 195 L.Ed.2d 774 (2016); **State v. Sepulvado**, 93-2692 (La. 4/8/96), 672 So.2d 158, 165, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); **State v. Jackson**, 608 So.2d 949, 953 (La. 1992). The usual prohibition against the prosecution's initiation of an inquiry into the defendant's character is simply not applicable in the penalty phase, where the focus on character is one of the statutory means of channeling the jury's sentencing discretion. **Id.** See also **State v. Williams**, 07-1407, pp. 38-42 (La. 10/20/09), 22 So.3d 867, 894-96, cert. denied, 560 U.S. 905, 130 S.Ct. 3278, 176 L.Ed.2d 1184 (2010) (wherein this court found no prosecutorial misconduct or interjection of an arbitrary or prejudicial factor during sentencing when the State referenced the defendant's dangerousness in closing arguments during the guilt and penalty phases after the defendant's own expert characterized him as "extraordinarily dangerous" and a "high risk" to correctional officers, during guilt phase cross-examination, without objection by the defense).

The defendant's reliance on this court's determination in **State v. Busby**, 464 So.2d 262, 267 (La. 1985), sentence vacated on other grounds, 538 So.2d 164 (La. 1988) (holding that the "prosecutor's remarks about the societal costs of a life sentence, misspent tax dollars, future escapes, more killings by defendant, were improper"), to support his contention that no evidence of future dangerousness is ever admissible, is misplaced. Indeed, this court made clear in **State v. Brumfield**, 96-2667, pp. 7-8 (La. 10/20/98), 737 So.2d 660, 665, cert. denied, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999), that such remarks are permissible, provided a factual basis for such remarks exist. See also **State v. Bourque**, 96-0842, pp. 13-14 (La. 7/1/97), 699 So. 2d 1, 10-11, cert. denied, 523 U.S. 1073, 118

86

S.Ct. 1514, 140 L.Ed.2d 667 (1998) (wherein this court held that testimony, regarding an incident in which the defendant used extremely derogatory language toward the victim and her co-worker, was not offered as evidence of other crimes nor was it offered as an inculpatory statement; rather, the testimony went to the character and propensities of the defendant, an area clearly relevant and within the proper scope of a capital sentencing hearing under LSA-C.Cr.P. art. 905.2).

The defendant also suggests to this court that Dr. Welner's testimony should have been excluded based on **Daubert**. However, the defendant did not raise a **Daubert** challenge below and consideration of that issue, absent this court's Rule XXVIII review, is inappropriate. See LSA-C.Cr.P. art. 841; **State v. Wessinger**, 98-1234, pp. 20-21 (La. 5/28/99), 736 So.2d 162, 180-81, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999). Further, the defendant stipulated to Dr. Welner's expertise in forensic psychiatry, and the defendant could have called his own expert in that field at the State's expense.

As discussed hereinabove, Dr. Welner's testimony on direct examination focused on his diagnostic and actuarial risk assessment measures of the defendant, which indicated the defendant was not a psychopath and scored somewhat favorably on the risk assessment measures. Dr. Welner also described what he believed were the circumstances under which it would be more likely for the defendant to become violent based on the circumstances in which the defendant had become violent in the past, and Dr. Welner identified ways in which to minimize the risk of violence by the defendant in the future. Dr. Welner's testimony does not, therefore, appear be rooted in the type of *unstructured* clinical prediction, regarding future dangerousness testimony, criticized most harshly. Moreover, the testimony about which the defendant complains (characterizing defendant as "'savant in the culture of concealment and hidden movement' and 'unique' and 'creative' in his 'persistence'") was elicited by defense counsel on

87

cross-examination, and Dr. Welner identified examples from his review of the defendant's records to illustrate these assessments.

Nor can the defendant rely on his argument that Dr. Welner should not have been permitted to testify because he was not licensed to practice medicine in Louisiana pursuant to LSA-R.S. 37:1284. Since the defendant failed to raise this concern before, or contemporaneously with, Dr. Welner's testimony, he cannot raise it on appeal. See LSA-C.Cr.P. art. 841; **State v. Wessinger**, supra.[83] There is no merit in this assignment of error.

Excessive Victim Impact Evidence

In his fifteenth assignment of error the defendant complains the State improperly presented victim impact evidence during the guilt phase and presented excessive victim impact evidence during the penalty phase.

As to the guilt phase, with the exception of one instance, the defendant raised no contemporaneous objection[84] and, in fact, elicited some of this testimony

---

[83] Having decided the defendant may not rely on this issue since he raised no contemporaneous objection, we nevertheless note, without deciding the issue, that appellate courts have ruled that LSA-R.S. 37:1284 "does not apply to out-of-state doctors who are licensed medical practitioners in their respective states and whose medical examinations were done there." **Boyd v. Allstate Ins. Co.**, 93-0999, pp. 6-7 (La. App. 3 Cir. 5/11/94), 640 So.2d 603, 607, writs denied, 94-1447, 94-1516 (La. 9/23/94), 642 So.2d 1292 (citing **Herbert v. Travelers Indemnity Company**, 239 So.2d 367, 371 (La. App. 4 Cir.), writs refused, 256 La. 1150-51, 241 So.2d 253 (1970)). As explained in **Herbert**:

> The purpose of the statute is to deny unlicensed medical practitioners in Louisiana acceptance as medical experts in our courts. The out-of-state doctors whose depositions have been admitted in evidence in this case have not practiced in this [s]tate. Their examinations of the plaintiff were in their respective states where they are licensed medical practitioners. The statute in question does not relate to them. To hold otherwise would render inadmissible the testimony in this [s]tate of certain experts of world renown attached to the great medical centers in other states. This is not the purpose of the statute.

In addition, we note that the defendant's reliance on **State v. Montgomery**, 499 So.2d 709, 715 (La. App. 3 Cir. 1986), appears to be misplaced as there is no indication the purported medical doctor in that case held a medical license from another state, as is the case with Dr. Welner.

[84] In **State v. Allen**, 03-2418, p.26 (La. 6/29/05), 913 So. 2d 788, 807, writ denied, 547 U.S. 1132, 126 S.Ct. 2023, 164 L.Ed.2d 787 (2006), this court reaffirmed the holding of **State v. Taylor** and **State v. Wessinger**, supra, that "[f]ailure to object contemporaneously waived review of the claimed errors on appeal unless the errors were so grave as to interject an arbitrary factor into the proceedings subject to this Court's Rule 28 review."

from witnesses himself.  In addition, some of the testimony related to Capt. Knapps' employment as a correctional officer, which the State had the burden of proving as an element of the crime charged during the guilt phase.  In the one instance in which the defense objected during the guilt phase, the following exchange occurred:

> [State]:      Mr. Robinson, how would characterize Captain Knapps as a correctional officer?
>
> [Defense]:   Your Honor, I object to the relevance.  I fail to see the relevance of this.
>
> [The Court]: It's overruled.
>
> [Defense]:   Thank you, Judge.
>
> [Robinson]: I can answer?
>
> [State]:      Yes, you can.
>
> [Robinson]: He's fair and by the book.  He's an officer that -- he's just, he just followed the rules.  He's by the book.[85]

Thus, even though defendant raised a contemporaneous objection to one portion of the testimony at issue, at no point did he inform the trial court of the ground about which he now complains (i.e., the defendant now asserts the testimony improper as relating to victim impact evidence during the guilt phase).

Paragraph (C) of LSA-C.Cr.P. art. 841 provides "The necessity for and specificity of evidentiary objections are governed by the Louisiana Code of

---

[85] The other testimony introduced by the State, about which the defendant now complains, was of a similar vein:  Lt. Chaney testified that Capt. Knapps was his boss, with whom he "got along," and Capt. Knapps "went by the rules and regulations"; the testimony of Capt. Knapps' sister, Christine Whitstine, who worked as the Angola tactical team's administrator and who was at Camp D on the night of the murder, was limited during the guilt phase to a statement that Capt. Knapps was one of her ten siblings and to her confirmation that State Exhibit No. 165 was a recent photograph of Capt. Knapps and reflected his appearance before the crime, which was relevant to show the extent of his injuries.  Likewise, the defendant did not contemporaneously object to the State's guilt phase closing arguments in which the prosecutor  thanked the jury for their service on behalf of Capt. Knapps' family and asked for justice for the "twelve-year [Angola] veteran, father, brother, and son."  In addition, based on the definitions set forth in **State v. Bernard**, 608 So.2d 966, 967-68 (La. 1992), discussed hereinafter, "victim impact testimony" has a highly specific meaning which does not apply to the prosecutor's attempt to humanize the victim.

Evidence." Louisiana Code of Evidence Article 103 states, in pertinent part, that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [w]hen the ruling is one admitting evidence, a timely objection or motion to admonish the jury to limit or disregard appears of record, *stating the specific ground of objection* . . . ." (Emphasis added.)

Although the defendant may have contemporaneously objected to one instance of the complained of testimony, he failed to give the specific ground for the objection, contrary to the dictates of LSA-C.Cr.P. art. 841(C) and LSA-C.E. 103. Therefore, he failed to preserve this issue for review. See **State v. Allen,** supra at n.86; **State v. Wessinger**, supra; **State v. Taylor**, supra.

With respect to the penalty phase, in **State v. Bernard**, 608 So.2d 966, 971 (La. 1992), this court held that the State may "introduce a limited amount of general evidence providing identity to the victim and a limited amount of general evidence demonstrating harm to the victim's survivors." Two broad categories of victim-impact evidence may be admitted: (1) information revealing the individuality of the victim; and, (2) information revealing the impact of the crime on the victim's survivors. **State v. Taylor**, 93-2201 at p. 9, 669 So.2d at 370; **State v. Scales**, 93-2003, pp. 13-14 (La. 5/22/95), 655 So.2d 1326, 1335-36; **State v. Martin**, 93-0285, pp. 17-18 (La. 10/17/94), 645 So.2d 190, 200. See also **Payne v. Tennessee**, 561 U.S. 808, 830, 111 S.Ct. 2597, 2611, 115 L.Ed.2d 720 (1991) ("A State may decide also that the jury should see 'a quick glimpse of the life petitioner chose to extinguish,' . . . to remind the jury that the person whose life was taken was a unique human being.") (quoting **Mills v. Maryland**, 486 U.S. 367, 397, 108 S.Ct. 1860, 1876, 100 L.Ed.2d 384 (1988)).

Thus, some evidence depicting the impact of the loss on the victim's survivors is permitted. However, the evidence may not descend into detailed

descriptions of the good qualities of the victim, particularized narrations of the sufferings of the survivors, or what opinions the survivors hold with respect to the crime or the murderer. **State v. Williams**, 96-1023, pp. 21-22 (La. 1/21/98), 708 So.2d 703, 720-21; **State v. Taylor**, 93-2201 at p. 10, 669 So.2d at 370; **State v. Bernard**, 608 So.2d at 972.

In the instant case, none of the testimony appears overly emotional, overly descriptive of the victim's good qualities, or describes particularized suffering his death caused to his friends and family. The entirety of the State's victim impact evidence, in the penalty phase, consisted of the testimony of two family members (comprising less than fifteen pages of transcript, including the identification of family members in five photographs and in the courtroom gallery, and a two-and-one-half-minute video). As such, the State's presentation of evidence was indeed a "quick glimpse" and well within the bounds of **State v. Bernard**. Consequently, this assignment lacks merit.

Improper Closing Argument

The defendant contends in his sixteenth assignment of error that numerous statements by the State, made during the initial and rebuttal arguments at the close of the penalty phase, were improper and introduced an arbitrary factor into the sentencing hearing by arousing the passion and prejudice of the jury. The record reflects, however, that the defendant failed to object contemporaneously to the allegedly improper statements, and therefore, he is not entitled to assign error on this basis. See LSA-C.Cr.P. art. 841; **State v. Allen,** supra at n.86; **State v. Wessinger**, supra; **State v. Taylor**, supra.[86]

---

[86] Rather than object contemporaneously, the defendant raised his complaints about these statements and other issues in his "Motion to Reconsider Death Sentence or in the Alternative to Stay Reconsideration Pending Penalty Determination of More Culpable Defendants." The trial court heard oral argument regarding other aspects of that motion (i.e., evolving standards of decency) on August 12, 2011, and denied the motion. There is no error in that ruling as the defendant's reconsideration motion was not the proper means to challenge these statements, and the trial court had no authority to stray from the jury's determination in a capital case pursuant to

91

Nonetheless, this court is required to determine if "the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors," pursuant to La. Sup. Ct. Rule XXVIII, Sec. (1)(a). Generally, "prosecutors are allowed wide latitude in choosing closing argument tactics." **State v. Frank**, 99-0553, p. 26 (La. 05/22/07), 957 So.2d 724, 741 (citing **State v. Legrand**, 02-1462, p. 16 (La. 12/3/03), 864 So.2d 89, 101). However, as required by LSA-C.Cr.P. art 905.2(A), the focus of the sentencing hearing must be "the circumstances of the offense, the character and propensities of the offender, and the victim, and the impact that the crime has had on the victim, family members, friends, and associates," as well as the aggravating and mitigating circumstances. See LSA-C.Cr.P. arts. 905.3 and 905.4. In addition, LSA-C.Cr.P. art. 774 confines closing argument "to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case" and confines the State's rebuttal argument "to answering the argument of the defendant."

Moreover, this court has "repeatedly held that it is highly improper and prejudicial for a prosecutor to turn his argument to the jury into a plebiscite on crime or to refer to the consequences to society of the jury's verdict." **State v. Smith**, 554 So.2d 676, 684 (La. 1989); **State v. Deboue**, 552 So.2d 355, 364 (La. 1989).

The trial judge, however, has broad discretion in controlling the scope of closing arguments. **State v. Prestridge**, 399 So.2d 564, 580 (La. 1981). This court will not reverse a conviction on the basis of improper closing argument unless it is thoroughly convinced that the remarks influenced the jury and contributed to the

---

LSA-C.Cr.P. art. 905.8 ("The court shall sentence the defendant in accordance with the determination of the jury . . . .").

verdict. **State v. Martin**, 93-0285 at p. 18, 645 So.2d at 200; **State v. Jarman**, 445 So.2d 1184, 1188 (La. 1984).

The portions of the State's initial closing argument in the penalty phase, about which the defendant complains, occurred in the following colloquy:

[State]:      Justice demands this sentence because of what was done and I beg you not to cheapen the loss that the family has suffered by a verdict less than what this case deserves. And if you consider the effects of your actions, the far reaching effects, the whole state of Louisiana is listening to what you do today. You consider the facts that what will the next prisoner think by your actions, what will the next guard think. Just at Angola you have heard testimony that there's over 5,000 inmates and only 1,500 guards. That outnumbering exists every day. And what would they think by something less than the correct verdict in this case. Your actions speak very loudly today. These concepts that I'm talking about under our law are known as retributive justice. It comes from the Roman law of lex talionis. It means that the harm visited should be equal to the punishment. A life for a life, a stripe for a stripe.

The Court:   Ladies and gentlemen of the jury, that is not the law in Louisiana. And I will tell you about the law of Louisiana in a few minutes. I'm sorry to interrupt you, Mr. Hall. But that is not the law in which you operate the case under.

[State]:      Well, the Judge is correct about what the law says. I'm speaking to your sense of justice . . . .

In its rebuttal argument, the State continued to stress the societal consequences of the jury's determination, without objection by the defendant or correction by the trial court:

[State]:      . . . And I'll get back to the Knapps' family in a minute. But what I'd like to do is talk to you about a larger family and that is the family of men and women that wear this uniform. This cut up bloody, I don't want to hold it, uniform that's got the red symbol of this state on the side of it and LSP on the top of it. This is a family as well. This is a family that David Knapps voluntarily became a member of. And it's a family of thousands of people that get up every day and every night and every afternoon and they go to a place to be with people that we don't want around us, that we have convicted and put away. It's people we don't want in our communities. It's people we

93

don't want near our children and those people volunteer, volunteer for government pay to be near people like that every day of their lives. What does it tell that family? What does it tell the family of law enforcement if a man already serving a life sentence murders one of their number and yet just gets another life sentence? You might as well tell that family that every member's life is not worth anything. How many mothers like the mother of Andrew Cheswick do we have? How many Anita Knapps? How many Carolyn Whitstines? How many victims in the wake do we have to have before as a society we say, you, sir, have forfeited your right to live among us.

* * *

Whatever you decide to do, whether it's a death penalty or a life sentence, you and you alone have to be able to walk down the street and see other people that live in your community of Covington or wherever it's from . . . . [Y]ou've got to be able to look at them and know you did the right thing for them because you know you represent them today.

The State's argument regarding the societal implications of the jury's determination across Louisiana may have exceeded what was strictly proper; however, we cannot conclude that an impermissible arbitrary factor that improperly influenced the jury was introduced into this particular proceeding, given the substantial weight of evidence pointing to the propriety of a death penalty verdict in this case. Therefore, we find no merit in this assignment of error.

Polling of the Jury

In his seventeenth assignment of error, the defendant asserts that the trial court erred in failing to impose a life sentence or declare a mistrial after an issue arose with the polling of the jury following its death penalty verdict. After the jury's penalty phase verdict was read, the record reflects that the defendant requested polling of the jurors, and the trial court attempted to poll all jurors before recording the verdict. Apparently, the trial judge mistakenly failed to call on juror Charles Dye to confirm that he affirmatively voted for the verdict rendered, and the

94

trial court discharged the jury from service before discovering the omission. Neither the State nor the defendant raised an objection.

The trial court notified the parties of the issue and called them, and Juror Dye, back to court the following day. The defendant moved for imposition of a life sentence without benefit of parole, probation, or suspension of sentence pursuant to LSA-C.Cr.P. art. 905.8 ("The court shall sentence the defendant in accordance with the determination of the jury. If the jury is unable to unanimously agree on a determination, the court shall impose a sentence of life imprisonment without benefit of probation, parole or suspension of sentence."), arguing the death sentence verdict was not unanimous as required by LSA-C.Cr.P. art. 905.6, or a declaration of a mistrial pursuant to LSA-C.Cr.P. art. 812, both of which the trial court denied.[87]

On May 17, 2011 the trial court swore in and questioned Juror Dye, who confirmed his verdict of the death penalty, the finding of the four aggravating circumstances, and the fact that no one had influenced his testimony in any way. Juror Dye also stated that he believed he had, in fact, been polled regarding his verdict to impose the death penalty, but could not specifically recall. Neither the defendant nor the State asked him any questions, and there were no questions directed to subjects prohibited by LSA-C.E. art. 606(B).[88]

---

[87] The defendant filed a written motion, and therefore no contemporaneous objection to the denial of the motion was required, under LSA-C.Cr.P. art. 841(B) ("The requirement of an objection shall not apply to the court's ruling on any written motion.").

[88] Article 606 provides:

> **A. At the trial.** A member of the jury may not testify as a witness before that jury in the trial of the case in which he is sitting as a juror. If he is called so to testify, the opposing party shall be afforded an opportunity to object out of the presence of the jury.
> **B. Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror,

95

Under these limited circumstances, it appears the trial court's oversight and resulting non-compliance with the polling procedure, set forth in LSA-C.Cr.P. art. 812(1), amounts to harmless error. See **State v. James**, 99-1858, p. 9 (La. App. 3 Cir. 5/3/00), 761 So.2d 125, 131, writ denied, 00-1595 (La. 3/23/01), 787 So.2d 1010 (holding that any error in interrogating a juror, regarding his "no" vote, during written polling of jury, rather than remanding entire panel for further deliberation, was harmless); **State v. Bannister**, 97-0048, pp. 11-12 (La. App. 4 Cir. 1/27/99), 726 So.2d 1135, 1141 (holding that technical non-compliance with LSA-C.Cr.P. art. 812(2), in not sending the jury back for deliberations after confusion in the polling was harmless because there was no suggestion that the confusion influenced the juror to change her vote); **State v. Valenzuela**, 590 So.2d 89, 99 (La. App. 4 Cir. 1991) (holding no substantial prejudice resulted from receipt by the jury members of the poll sheet before deliberations, rather than after the verdict was read in open court); **State v. Williams**, 536 So.2d 773, 777 (La. App. 5 Cir. 1988) (holding that the failure to comply with statutory polling requirements did not prejudice the defendant when polling accurately reflected the verdict of the jury). We conclude that this claim warrants no action.

Composition of the Venire

In his eighteenth assignment of error, the defendant complains that the racial composition of the petit jury venire violated his constitutional rights under the Sixth and Fourteenth Amendments, and the trial court erred in overruling his objection without conducting an evidentiary hearing. The defendant contends that African-Americans were excluded from the jury venire to such an extent as to not be a fair cross section of the community.

and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

The record reflects the following exchange occurred after completion of jury selection and discharge of the remainder of the venire:

> THE DEFENDANT: For purposes of the record, I need to - your Honor, because I have not seen the entire petit jury list chosen for these procedures, I cannot verify actual prejudices at this time. However, based on the fact that, of the roughly 180 jurors on the nine panels examined, only fourteen or fifteen minorities were selected for examination in a parish of roughly 15 percent minority population, I am prepared to object on the record [as to] the Fourteenth Amendment due-process violation in the selection process, discrimination against minorities, and also a Sixth Amendment violation, denied a fair cross section of the community due to purposeful racial discrimination. I would like that on the record.

> THE COURT: If that's an objection, it's overruled.

> THE DEFENDANT: Yes, sir.

This court has long recognized the procedural device for alleging that "the petit jury venire was improperly drawn, selected or constituted" is a motion to quash. LSA-C.Cr.P. art. 532(9); **State v. Edwards**, 406 So.2d 1331, 1347 (La. 1981); **State v. Collins**, 359 So.2d 174, 177 (La. 1978). The defendant did not file a motion to quash on this basis, in accordance with the form or timeliness requirements set forth in LSA-C.Cr.P. arts. 521, 535(C), and 536, and therefore waived his objection. LSA-C.Cr.P. art. 535(D); **Edwards**, 406 So.2d at 1347; **Collins**, 359 So.2d at 177.

Moreover, LSA-C.Cr.P. art. 419(A) provides, "A petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race." The burden of proof rests on the defendant to establish purposeful discrimination in the selection of grand and petit jury venires. **State v. Sheppard**, 350 So.2d 615, 651 (La. 1977) (citations omitted). See also **State v. Lee**, 559 So.2d 1310, 1313 (La. 1990); **State v. Loyd**, 489 So.2d 898, 903 (La. 1986); **State v. Liner**, 397 So.2d 506, 516 (La. 1981); **State v. Manning,** 380 So.2d 54, 57 (La. 1980). The

defendant did not meet that burden, and the trial court did not err in overruling his improperly raised, untimely, and unsupported objection without an evidentiary hearing. This assignment of error is without merit.

Denial of Five of Defendant's Challenges for Cause

The defendant complains in his nineteenth assignment of error that the trial court erred in denying five of his challenges for cause, forcing him to exhaust his peremptory challenges.[89] The defendant claims that prospective jurors Virginia Bossier, Donna Darcangelo, and Suzanne Gilmore should have been removed for cause because they were predisposed to impose the death sentence; and that the responses of Lydia Elliot and Chad Kellis showed substantial bias against the defendant based on his incarceration and/or their relationships to law enforcement officers.

A challenge for cause should be granted even when a prospective juror declares his ability to remain impartial if the juror's responses, as a whole, reveal facts from which bias, prejudice, or inability to render judgment according to law may be reasonably inferred. **State v. Hallal**, 557 So.2d 1388, 1389-90 (La. 1990). Prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant ultimately exhausts his peremptory challenges.[90] **State v. Robertson**, 92-2660, pp. 3-4 (La. 1/14/94), 630 So.2d 1278, 1280 (citing **State v. Ross**, 623 So.2d 643, 644 (La. 1993)). A trial court is vested with broad discretion in ruling on challenges for cause, and its rulings will be reversed only when a review of the *voir dire* record as a whole reveals an abuse of discretion. **State v. Robertson**, 92-2660 at p. 4, 630 So.2d at 1280 (citing **State v. Knighton**, 436

---

[89] Based on the *voir dire* transcript, the defendant appears to have used all of his peremptory challenges. In any event, the State does not argue that the defendant failed to exercise his peremptory challenges in its opposition brief.

[90] Even in capital cases, the defendant must use one of his remaining peremptory challenges to remove the juror, on his way to ultimately exhausting his challenges, to preserve review of the trial court's denial of a cause challenge. See **State v. Campbell**, 06-0286, p. 71 (La. 5/21/08), 983 So.2d 810, 856.

So.2d 1141, 1148 (La. 1983)). A refusal by a trial judge to excuse a prospective juror, on the ground that he is not impartial, is not an abuse of discretion when, after further inquiry or instruction ("rehabilitation"), the potential juror has demonstrated a willingness and ability to decide the case impartially according to the law and the evidence. **State v. Copeland**, 530 So.2d 526, 534 (La. 1988) (citing **State v. Welcome**, 458 So.2d 1235, 1241 (La. 1983)).

In addition, LSA-C.Cr.P. art. 800(A) requires an objection at the time of the ruling, which denies a challenge for cause, in order to preserve the claim for appellate review. Article 800(A) also mandates that the nature of the objection and the grounds therefor be stated at the time of the objection. With respect to that provision, this court has made clear:

> Our law is also settled that an objection need not be raised by incantation. "It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor." C.Cr.P. 841; **State v. Boutte**, 384 So.2d 773 (La. 1980). The requirement that objection be raised contemporaneously is not meant to be inflexible, but is designed "to promote judicial efficiency and to insure fair play." **State v. Lee**, 346 So.2d 682, 684 (La. 1977). Article 800 should not be read to differ in this respect from Article 841.

**State v. Vanderpool**, 493 So.2d 574, 575 (La. 1986).

A review of the *voir dire* record as a whole reveals no abuse of discretion. With respect to Virginia Bossier, the defense sought to challenge her for cause during the **Witherspoon** *voir dire* and lodged no contemporaneous objection to the trial court's denial. Therefore, the defendant is not entitled to assign error to that denial pursuant to LSA-C.Cr.P. art. 800(A). Moreover, although Ms. Bossier indicated on her questionnaire and during *voir dire* that she would always vote for the death penalty, further questioning revealed that she meant that she "would be able to" impose the death penalty and that she was more fairly characterized as a "2" on the State's five-point scale (in favor of death penalty but would impose a

life sentence if circumstances so warranted) "after listening to everybody and how [the State] explained it," because she could consider both a life sentence and the death penalty. Ms. Bossier confirmed she would listen to all of the evidence and that voting for "a life sentence [was] a real possibility for her." Thus, even if the defense had preserved the issue, the record as a whole shows no abuse of discretion by the trial court in denying the challenge.

Likewise, with respect to Ms. Darcangelo, the defense failed to preserve the denial of the challenge for cause during the **Witherspoon** *voir dire* pursuant to the timeliness and content requirements of LSA-C.Cr.P. art. 800(A). In any event, the record on whole shows no abuse of discretion by the trial court in denying that cause challenge. Specifically, Ms. Darcangelo characterized herself as a "2" on the State's five point scale (in favor of death penalty but would impose a life sentence if circumstances so warranted). Ms. Darcangelo explained, but for the requirement to consider all mitigating circumstances, she considered herself a "1," and she changed her prior position after learning about mitigating circumstances and her duty to consider them. Thus, regardless of whether the defendant preserved the issue for appeal, the trial court did not abuse its discretion in denying the defendant's cause challenge because the State successful rehabilitated Ms. Darcangelo during the **Witherspoon** *voir dire*.

During general *voir dire*, the defense challenged Ms. Darcangelo for cause again and arguably preserved some grounds, in compliance with LSA-C.Cr.P. art. 800(A), to wit:

> The Court:  Donna Darcangelo?
> [State]:  Acceptable.
> [Defense]:  We're challenging for cause on various reasons. Do you want me to put on the record why?
> The Court:  I think you better.
> [Defense]:  Your Honor, she has indicated yesterday that she had all kinds of issues and that she was not going to focus on this case. She stated that after [another prospective juror] said the same thing yesterday.

> This morning she said she was angry, that she's angry at Mr. Clark because he keeps staring at her. She, I believe, has violated the Court's order not to talk about this case by discussing in the back with the jurors that he's staring at her and making her mad. And I think that she has clearly established a predisposition as to Mr. Clark, and she's not going to be in any form or fashion unbiased at the start of this case.

The Court: The cause challenge is denied.

[Defense]: To which we would assign error.

The Court: And do you want her now?

[Defense]: Guess we have to get rid of her.

The Court: So you're using a peremptory challenge?

[Defense]: I am now.

Although the defendant's argument during his challenge on the first ground was less than clear, a review of the record indicates it pertained to the burdens of sequestration Ms. Darcangelo stated initially during the **Witherspoon** *voir dire*.[91] The defendant has not argued on appeal this or his second, preserved ground (that the prospective juror was biased against the defendant because he had been staring at her)[92] and therefore has abandoned these issues.

The only arguably preserved ground that the defendant appears to pursue on appeal is based on what he characterized, below, as a "predisposition as to Mr. Clark," which he now labels as a bias against him because of his incarceration and the belief of his guilt. With respect to this ground, Ms. Darcangelo gave the following explanation as to why she believed two other prospective jurors believed

---

[91] Ms. Darcangelo stated sequestration would be a burden because she works for tips, goes to school, and is responsible for feeding a farm full of animals twice a day. Ms. Darcangelo also indicated that she could get a group of people to help her with the animals, such that sequestration at a nice hotel with room service would feel somewhat like a vacation. Neither party sought Ms. Darcangelo's removal due to hardship based on this initial colloquy. When Ms. Darcangelo was asked whether she would pick herself to serve as fair juror willing to listen to all the evidence, she responded in the affirmative provided she did not have to worry about her sequestration-related issues. We cannot conclude that the trial court abused its discretion in denying the challenge for cause on this ground.

[92] During general *voir dire*, Ms. Darcangelo and several other jurors indicated their discomfort with the defendant's presence in the courtroom, during *voir dire*, and participation in the jury selection process, stating, "I've got a real problem with the way he keeps staring us down and it's getting me angry . . . . I just don't like his body language." As soon as the trial court became aware of these sentiments, it made clear that the defendant had the right to be present during the proceedings and to represent himself with the assistance of counsel and, afterwards, neither Ms. Darcangelo nor any other prospective juror expressed any problems in this respect.

that the defendant might be guilty, based on the information set forth in the indictment, and despite the presumption of innocence to which the defendant was entitled:

> [Ms. Darcangelo]: I think that what they are trying to say, this is how he feels. He knows what the law is. What you're supposed to do is based on the law.
>
> [State]: Correct.
>
> [Ms. Darcangelo]: But that's what we feel because of what we know.

Following the State's discussion of the presumption of innocence, direct and circumstantial evidence, and the difference between real life and fictional crime scene analysis, as well as the defense's *voir dire* regarding the presumption of innocence and witness identification issues, during which Ms. Darcangelo participated multiple times, she provided the following responses regarding her beliefs about Angola during a discussion related to determining the credibility of witnesses, including inmate witnesses:

> [State]: Ms. Darcangelo, any thoughts in particular?
>
> [Ms. Darcangelo]: Like it's supposed to be one of the baddest state penitentiaries in the country. And if you go there, it's like a badge of honor among criminals to be sent there.
>
> [State]: Can you tell me what you mean - what was the phrase you used again?
>
> [Ms. Darcangelo]: One of the baddest penitentiaries in the country.
>
> [State]: Yes, ma'am. What do you mean by that?
>
> [Ms. Darcangelo]: Like the worst of the worst go to Angola.
>
> [State]: Now is that - and that's just based on I guess growing up in Louisiana we hear that sort of thing?
>
> [Ms. Darcangelo]: Growing up in New Orleans, yeah.

102

During the **Witherspoon** *voir dire*, Ms. Darcangelo demonstrated that she could distinguish between her personal feelings and the requirements of the law, although she later addressed, generally, common perceptions about inmates at Angola, rather than the defendant specifically, with the understanding that, as a member of the jury, she would have to determine whether any of the inmate witnesses testified credibly. When asked whether she would select herself as a juror willing to listen to all the evidence presented and render a fair decision, she responded, "[Y]es," save for her concerns about the impact of sequestration on her home-life. On the whole, the record shows Ms. Darcangelo to be a candid, plain-spoken, and engaged prospective juror capable of understanding and following the law fairly and impartially, and the trial court did not abuse its discretion in denying the defendant's attempts to remove her for cause.

With respect to Ms. Gilmore, the defense challenged her for cause after the **Witherspoon** *voir dire* and objected contemporaneously to the trial court's denial.[93] Although Ms. Gilmore's responses on her questionnaire and during *voir dire* were inconsistent,[94] she explained she had misunderstood the questionnaire and that she believed her verdict during the penalty phase would depend on the evidence, including mitigating circumstances, such that a life sentence was a possible verdict, and she clarified that she was a "2" on the State's scale with a strong preference for imposing the death penalty.[95] Ms. Gilmore also confirmed her understanding that a guilty verdict did not mean the defendant should be

---

[93] We note, however, the defense did not state the nature of, or grounds for, the objection as required by LSA-C.Cr.P. art. 800(A).

[94] Ms. Gilmore characterized herself as a "1" on the State's five-step scale (always votes for death), and she acknowledged that her questionnaire revealed both that she generally favored the death penalty, but would base her decision on the facts of the case and that she was also generally opposed to the death penalty, but could put her feelings aside if so required by the facts of the case and the law.

[95] However, Ms. Gilmore replied to questioning that it would be fine if the State wanted to consider her a "1.5" on the scale.

sentenced to death and her ability to consider all the evidence introduced in both the guilt and penalty phases in determining whether a life sentence was appropriate. Therefore, the record as a whole shows no abuse of discretion by the trial court in denying the defendant's challenge for cause as to Ms. Gilmore.

The defendant's objections to prospective jurors Ms. Elliot and Mr. Kellis are of a different nature.[96] With respect to Ms. Elliot, the defendant claims she was biased against him due to his prior record, his desire to represent himself, and because she had family members in law enforcement. The following exchange took place when the defendant exercised a challenge for cause against Ms. Elliot:

> The Court: Ms. Elliot?
>
> [State]: Acceptable.
>
> [Defense]: We challenge for cause.
>
> The Court: That's denied.
>
> [Defense]: Let me put on the record, your Honor. She said that there's a prior conviction and self-representation. She clearly said his prior conviction and self-representation would be something she could not set aside and that she would not be able to [be] fair coming into this case. I think that's exactly what she said. So we would certainly challenge her for cause. She said that right at the last.
>
> [State]: Do you need a response, your Honor?
>
> The Court: Yes.
>
> [State]: What she did say, as I recall, was that it would be at the back of her mind. She didn't say she couldn't follow the law. She didn't say she couldn't put it aside. She didn't say she couldn't be fair.

---

[96] We note that the defendant challenged neither Ms. Elliot nor Mr. Kellis during the **Witherspoon** *voir dire*. Ms. Elliot stated that she was a "3" on the State's scale, that she would consider all evidence introduced during the guilt and penalty phase in determining an appropriate sentence, and that she acknowledged she might have an issue imposing the death penalty due to the defendant's role as counsel. Mr. Kellis stated that he considered himself a "2" on the State's scale, that he would consider all mitigating and statutory aggravating circumstances during the penalty phase if necessary, and that he had no problem imposing the death penalty, if warranted, despite the defendant's participation as counsel.

The Court:  Still denied.

[Defense]:  We'll challenge her.

The Court:  That's preempt four . . . .

At no point did the defendant argue in the trial court that Ms. Elliot's unspecified familial relationship to law enforcement officers was a basis for challenging her, and that ground was not properly preserved for review, under LSA-C.Cr.P. art. 800(A).  With respect to the properly preserved grounds, the record during general *voir dire* reveals the following exchange between Ms. Elliot and the prosecution:

> [Ms. Elliot]: I would be fair.  I have issues at home too that I'm worried about, and still in the back of my mind that I know he's got a prior criminal record.  And I know you're not supposed to think about that for this case.  Right?  He's not in Angola for nothing.
>
> [State]: Oh, yes.  And I don't believe that Mr. Clark's attorneys are going to say he doesn't have a prior conviction.
>
> [Ms. Elliot]: That's still in the back of my mind.
>
> [State]: And that's okay because that's part of the whole escape thing.  When you say back of your mind, you're saying, well, because he's got this conviction, because he's got this in his past, he certainly must be guilty now?
>
> [Ms. Elliot]: Sort of.
>
> [State]: All right.  Let's talk about that for just a second.  Okay?  You got that in your mind.  But after you listen to the evidence here, let's assume that the State can't prove specific intent to kill.  We might prove there's a dead guard.  But what if we can't prove specific intent to kill and we can't even prove that Jeffrey Clark was part of the escape?  Are you going to convict him even though we haven't proved our case just because he's got a conviction?
>
> [Ms. Elliot]: No.  Just to me, I've got relatives that are policemen, and I know that people are not in jail usually for nothing.  I'm just saying.

105

[State]: All right.

When the defense questioned Ms. Elliot, the following exchange took place:

[Ms. Elliot]: Prior record and representing himself just -

[Defense]: That causes you a problem?

[Ms. Elliot]: Uh-huh.

[Defense]: Does it cause you a problem on the guilty phase? It must if it causes - I mean - and I appreciate that. And I've got to tell you -

[Ms. Elliot]: I'm normally a fair person. It just does.

[Defense]: Well, and I understand that. And if that's going to cause you a problem in being able to set that aside, we need know that, because I don't want this - if you make the jury and you sit on it, then later you say, I really shouldn't have been on that jury; and whatever the outcome was, it's going to cause you problems, you know? So I appreciate that. You think that these would? You would not be able to set those aside?

[Ms. Elliot]: Honestly, no.

Following this exchange, as discussed hereinabove, the trial court and defense counsel corrected the misconception of several jurors, including Ms. Elliot, about the defendant's right to be present during all aspects of the trial and to represent himself. Following that correction, defense counsel specifically asked the jurors if anyone continued to have a problem with the defendant representing himself in the courtroom, and none of the previously mistaken jurors indicated that they continued to have a problem or could not follow the law. Therefore, based on the record as whole as it applies to this prospective juror and because the defendant's generically-referenced prior conviction was necessarily part of the elements of the perpetration or attempted perpetration of an aggravated escape, and thus a proper consideration, the trial court did not abuse its discretion in denying the defendant's cause challenge against Ms. Elliot on these grounds.

106

With respect to Mr. Kellis, the defendant lodged no objection to the trial court's denial of his challenge for cause, and therefore the issue was not preserved for appeal, pursuant to LSA-C.Cr.P. art. 800(A). Regardless, based on the record as a whole, the trial court did not abuse its discretion in denying the challenge because Mr. Kellis confirmed his ability to serve as an impartial and fair juror despite his relationships to several correctional officers. Specifically, the following exchange took place between Mr. Kellis and the prosecution during general *voir dire*:

[State]:          . . . How about you, Mr. Kellis?

[Mr. Kellis]: I would pick . . . myself [as a juror].

[State]:          Why is that?

[Mr. Kellis]: My dad retired 30 years as a captain in corrections. And I see this as, if something were to happen to him, I would want the jury to hear everything, not be ruled by everything. However, I would be open-minded and go my way.

[State]:          No[t] to scare the bejesus out of the defense, but you're fair to listening to the evidence; right?

[Mr. Kellis]: You know, my dad always told us that there were people in prison that should be there and there's people that shouldn't be there and that everybody makes mistakes and, you know, you're entitled to your mistakes. You've got to live with it. So I would be fair to anything that you guys bring forward.

[State]:          Okay. And if I don't prove my case beyond a reasonable doubt, you're going to vote not guilty?

[Mr. Kellis]: That's right.

The defense followed up this line of questioning as follows:

[Defense]:   . . . Mr. Kellis, your dad was a captain in corrections for 30 years; is that correct?

[Mr. Kellis]: Yes, sir.

[Defense]:   And you also have an uncle that's a detective?

[Mr. Kellis]: Yes, sir. I have an uncle that's a detective with Washington Parish Sheriff's Office Department, and I also have another uncle that works in corrections on the chase team.

[Defense]: On what?

[Mr. Kellis]: On the chase team.

[Defense]: Okay. Where in the Department of Corrections do they work?

[Mr. Kellis]: I believe now it's called BB "Sixty" Rayburn out in Angie. My dad retired.

[Defense]: He was in Angie also?

[Mr. Kellis]: Yes, sir.

[Defense]: What was it called before?

[Mr. Kellis]: Washington Correctional Institute, WCI.

[Defense]: Okay. I've been there years ago. And actually it was a very nice facility years ago. I don't know how it is recently. But would the fact that your dad was in corrections and you've got an uncle in correction, and this is involving allegations that a correctional officer was killed, do you think that's going to cause you any problems or any bias in any way?

[Mr. Kellis]: I don't think so.

[Defense]: Okay, you think you could put it aside? You feel confident you could put that aside and give both sides a fair trial?

[Mr. Kellis]: Yes, sir.

[Defense]: Because after all, assuming a corrections officer was killed -

The Court: Let's move on. He said it. Let's move on.

The defense asked no additional questions of Mr. Kellis and now argues that the trial court refused to permit additional questioning. Nevertheless, as the trial court did on several other occasions during *voir dire*, the trial court properly did not permit questioning too closely related to the facts of the case. The trial court in

108

no way prevented, as the defendant now claims, either side from questioning Mr. Kellis about potential bias or prejudice attributable to his relationships with law enforcement, including his ability to fairly assess the credibility of law enforcement and inmate witnesses.[97] Based on the foregoing, this assignment of error is without merit.

Improper Granting of the State's Challenges for Cause

The defendant divides his twentieth assignment of error into four parts; we first discuss Parts (A) and (B), contending that with respect to the State's challenges for cause, the trial court granted challenges as to fourteen jurors, improperly removing these jurors.

The basis of exclusion under LSA-C.Cr.P. art. 798(2), which incorporates the standard of **Witherspoon v. Illinois**, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d. 776 (1968), as clarified by **Wainwright v. Witt**, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), was that the juror's views would prevent him from making an impartial decision as to the defendant's guilt in accordance with his instructions and his oath. **Witherspoon** dictates that a capital defendant's rights under the Sixth and Fourteenth Amendments to an impartial jury prohibits the exclusion of prospective jurors "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." **Witherspoon**, 391 U.S. at 522, 88 S.Ct. at 1777. Moreover, notwithstanding LSA-C.Cr.P. art. 800(B) (which states that a defendant cannot

---

[97] It is well-settled that a juror's relationship to a law enforcement officer is not, of itself, grounds for a challenge for cause. **State v. Dorsey**, 10-0216, p. 39 (La. 9/7/11), 74 So. 3d 603, 631, cert. denied, ___ U.S. ___, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012); **State v. Manning**, 03-1982, p. 32 (La. 10/19/04), 885 So.2d 1044, 1078, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 1746, 161 L.Ed.2d 612 (2005). Rather, the question presented is whether the prospective juror could assess the credibility of each witness independent of his or her relationship with members of law enforcement. **Id.** Even in cases in which the prospective juror has close ties to law enforcement personnel, subsequent questioning by the State or the trial judge may rehabilitate the juror's initial responses. **Id.** A challenge for cause should only be granted when the juror's responses as a whole reveal facts from which bias, prejudice, or inability to render a fair judgment may be reasonably inferred. **State v. Dorsey**, 10-0216 at p. 39, 74 So.3d at 631; **State v. Kang**, 02-2812, p. 5 (La. 10/21/03), 859 So.2d 649, 653.

complain of an erroneous grant of a challenge for cause to the State "unless the effect of such a ruling is the exercise by the State of more peremptory challenges than it is entitled to by law"), the Supreme Court has consistently held it is reversible error, not subject to harmless-error analysis, when a trial court erroneously excludes a potential juror who is **Witherspoon**-eligible, despite the fact that the State could have used a peremptory challenge to strike the potential juror. **Gray v. Mississippi**, 481 U.S. 648, 664, 107 S.Ct. 2045, 2054, 95 L.Ed.2d 622 (1987); **Davis v. Georgia**, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976); **State v. Craig**, 95-2499 (La. 5/20/97), 699 So.2d 865 (appendix).

To determine the correctness of rulings on cause challenges, a review of the prospective juror's *voir dire* as a whole must be undertaken. **State v. Lee**, 93-2810, p. 9 (La. 5/23/94), 637 So.2d 102, 108 (also providing that the trial judge is afforded great discretion in determining whether cause has been shown to justify removal of a prospective juror); **State v. Hall**, 616 So.2d 664, 669 (La. 1993); **State v. Williams**, 457 So.2d 610, 613 (La. 1984).

Herein, the defendant failed to lodge an objection to each one of the fourteen identified exclusions based on the State's challenges for cause and therefore has not preserved the issue for appeal.[98]   See LSA-C.Cr.P. art. 841(A); **State v. Taylor**, 93-2201 at pp. 4-7, 669 So.2d at 367-69.  With respect to potential jurors Drs. Robert Segura and Marielisa Sedrish, the record reflects that defense counsel confirmed on the record that there was no objection to the removal of these prospective jurors, both of whom made clear that they would not consider imposing the death penalty under any circumstance.  Likewise, Dr. William Kirchain rated himself a "6" on the State's five-point scale, adding that "anyone involved in the death penalty is committing an act of evil."  The defense also raised

---

[98] Moreover, the defendant, as lead counsel, confirmed at the end of each day of the **Witherspoon** and general *voir dire*, his agreement with the day's proceedings and how his appointed co-counsel handled matters.

no objection to Dr. Kirchain's removal for cause. Prospective jurors Sena Fletcher, Andrew Dunk, Daniel Kennedy, Herling Ford, Annie Cardwell, Geraldine LeSaicherre, and Melva Blohm were equally unequivocal in their opposition to the death penalty and were removed without objection, based on LSA-C.Cr.P. art. 798(2).[99] In addition, the responses of prospective jurors Bradley Wagner, Lisa Johnson, and Lester Baudoin indicate that they were properly excused because their attitudes about the death penalty prevented or substantially impaired them from making an impartial decision as a juror based on the oath and instructions.[100] Finally, prospective juror John Bosarge was properly excluded based on his responses during general *voir dire* concerning his ability to process and retain information, pursuant to LSA-C.Cr.P. art. 787 (permitting the trial court to "disqualify a prospective petit juror from service . . . when for any reason doubt exists as to the competency of the prospective juror to serve in the case").[101] These assignments of error are without merit.

---

[99] Each rated themselves a "5" on the State's five-point scale, meaning they would always vote for imposing a life sentence on first degree murder. For example, Sena Fletcher stated she "could not impose the death penalty" because she believes no "man has the right to take another man's life," and she was removed with the consent of the defense. Andrew Dunk stated he was a "5" and would not impose the death penalty on Adolf Hitler, stating his belief that "God is the . . . only being that knows what's the right situation for someone to die in." The defense raised no objection to Mr. Dunk's removal for cause. Daniel Kennedy and Herling Ford confirmed they were "5s" on the scale and stated there was no individual in history against whom they would impose the death penalty. There was no objection to Mr. Kennedy's and Mr. Ford's removal for cause during the **Witherspoon** *voir dire* by the defense. Annie Cardwell's demeanor in rating herself a "5" on the five-point scale was so firm that defense counsel stated he would not ask her any questions or try to get her to change her position because her answers were "very clear;" the record showed no objection to her removal for cause. Likewise, Geraldine LeSaicherre and Melva Blohm maintained that their opposition to the death penalty could not be changed, and they were removed, without objection from the defense, during the **Witherspoon** *voir dire*.

[100] Prospective jurors Wagner, Johnson, and Baudoin also rated themselves "5s" on the State's five-point scale. Mr. Wagner stated several times that he was a "5" and noted, however, that he could conceive of considering the death penalty only "out of personal rage" "if something happened to his wife [or a] relative very, very close to [him]." Mr. Wagner was removed based on LSA-C.Cr.P. art. 798 without objection. Ms. Johnson indicated that she might be "4" on the State's scale for serial killers or mass murders like Derrick Todd Lee, Hitler, or Stalin, but remained a "5" when the crime involves one individual murdering another adult. The defense raised no objection to Ms. Johnson's removal, based on LSA-C.Cr.P. art. 798. Mr. Baudoin consistently stated he was personally opposed to the death penalty, and he did not believe he could participate on the jury as required.

[101] Mr. Bosarge responded that he would not pick himself as a juror because he would have a

Removal of Potential Jurors Based on Religious Beliefs

As to Part (C) of the defendant's twentieth assignment of error, the defendant claims prospective jurors Sena Fletcher, Andrew Dunk, Bradley Wagner, and Lisa Johnson were unconstitutionally excluded based on their religious beliefs. However, the defendant did not raise this issue in the trial court and is therefore precluded from assigning it as an error on appeal. See LSA-C.Cr.P. art. 841(A); **State v. Taylor**, 93-2201 at pp. 4-7, 669 So.2d at 367-69.

In any event, as discussed hereinabove, a prospective juror whose views would either lead him to vote automatically against the death penalty or would substantially impair his or her ability to follow the instructions of the trial court and consider a sentence of death is not qualified to sit on the jury panel in a capital case. **Wainwright v. Witt**, 469 U.S. at 424, 105 S.Ct.at 852. See also LSA-C.Cr.P. art. 798(2). Exclusion of such jurors, when their views stem from religious beliefs, does not constitute discrimination in violation of LSA-Const. Art. I, § 3. **State v. Sanders**, 93-0001, p. 20 (La. 11/30/94), 648 So.2d 1272, 1288 ("[T]he 'single attitude' of opposition to the death penalty 'does not represent the kind of . . . religious . . . characteristic that underlies those groups that have been recognized as being distinctive.'") (quoting **State v. Lowenfield**, 495 So.2d 1245, 1254 (La. 1985)). See also **State v. Robertson**, 97-0177 at pp. 19-21, 712 So.2d at 25-26. As discussed herein, in viewing the entirety of these prospective jurors' *voir dire* responses, it is clear that the State challenged these jurors based on their aversion to capital punishment, and religious discrimination played no part in jury selection in this case. **State v. Lucky**, 96-1687 (La. 4/13/99), 755 So.2d 845 (appendix); **State v. Sanders**, 93-0001 at p. 20, 648 So.2d at 1288.

---

hard time focusing on evidence and testimony in a lengthy trial due to the way he processes information, and he would have a difficult time keeping up with the volume of information.

112

<u>Constitutionality of LSA-C.Cr.P. art. 798(2)</u>

Part (D) of the defendant's twentieth assignment of error asserts that juror qualification pursuant to LSA-C.Cr.P. art. 798(2)[102] (codifying **Witherspoon** as clarified by **Witt**) violates the Sixth and Fourteenth Amendments. The defendant posits that the Supreme Court's more recent jurisprudence regarding the Sixth Amendment (**Ring v. Arizona**, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (reversing **Walton v. Arizona**, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d. 511 (1990)) and **Crawford v. Washington**, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (reversing **Ohio v. Roberts**, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)) indicates a shift in how the Supreme Court would construe the provisions of Article 798(2), rendering it, and presumably **Witherspoon** and **Witt**, invalid. The defendant also argues, even assuming **Witt** remains valid, the standard set forth therein and codified by the provisions of Article 798(2) should not apply in this State because Louisiana's sentencing scheme does not *require* imposition of the death penalty under any circumstance.

The defendant raised the first argument below by adopting co-defendant Mathis's Motion #61, entitled "Motion to Bar Death Qualification of Jurors and to

---

[102] Article 798 provides:

> It is good cause for challenge on the part of the state, but not on the part of the defendant, that:
> (1) The juror is biased against the enforcement of the statute charged to have been violated, or is of the fixed opinion that the statute is invalid or unconstitutional;
> (2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it known:
> (a) That he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him;
> (b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath; or
> (c) That his attitude toward the death penalty would prevent him from making an impartial decision as to the defendant's guilt; or
> (3) The juror would not convict upon circumstantial evidence.

Hold Article 798 of the Code of Criminal Procedure Unconstitutional."[103]   After

stating that counsel would submit the matter on briefs during a pretrial hearing,

held April 28, 2006, defense counsel argued as follows:

> [Defense]:   .  .  .  The  argument  is  simply  that  it's
> unconstitutional to purge the jury of people who
> are morally opposed to the death penalty.
>
> [State]:   And the Louisiana Supreme Court has addressed
> this, Your Honor.  The Louisiana Supreme Court
> has, in fact, stated that 798.2 which embodies the
> **Witt**  standard,  "The  proper  standard  for
> determining  when  a  prospective  juror  may  be
> excluded . . ." is constitutional.  Therefore, it's
> already been submitted to a higher court, and we
> ask this Court to deny defenses' motion.

The trial court denied the motion.  Thus, the defendant's first argument is

properly preserved for appeal.  See LSA-C.Cr.P. art. 841(B).  The defendant's

second argument, however, does not appear to have been raised below by written

motion or otherwise and therefore is not properly before this court.  See LSA-

C.Cr.P. art. 841(A); **State v. Taylor**, 93-2201 at pp. 4-7, 669 So.2d at 367-69.

In **Lockhart v. McCree**, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137

(1986), the Supreme Court held that the Constitution does not prohibit excluding

potential jurors under **Witherspoon** or that "death qualification" resulted in a more

conviction-prone jury.  Likewise, this court has repeatedly rejected the claim that

the **Witherspoon** qualification process results in a death-prone jury.  **State v.**

**Robertson**, 97-0177 at pp. 19-21, 712 So.2d at 25-26; **State v. Lindsey**, 543 So.2d

886, 896 (La. 1989); **State v. Brown**, 514 So.2d 99, 103-04 (La. 1987); **State v.**

**Bates**, 495 So.2d 1262, 1272 (La. 1986); **State v. Ford**, 489 So.2d 1250, 1259 (La.

1986); **State v. Ward**, 483 So.2d 578, 582-83 (La. 1986); **State v. Jones**, 474

So.2d 919, 927-28 (La. 1985); **State v. James**, 431 So.2d 399, 402 (La. 1983).

We find no merit in this assignment of error.

---

[103] The defendant expressly adopted this motion.

In his twenty-first through twenty-fifth assignments of error, the defendant alleges numerous improprieties related to the conduct of certain jurors and one of the security details from St. Tammany Parish Sheriff's Office ("STPSO"), which handled non-courthouse-related sequestration, and related to various rulings of the trial court on the defendant's initial and supplemental motions for new trial based on the alleged improprieties.

During sequestration of the jurors in West Feliciana Parish,[104] alternate juror A.A.'s then-boyfriend and subsequent husband, M.M., began threatening to harm himself if A.A. did not return home right away. The trial court was notified of the situation on the first or second day of trial, spoke briefly with Ms. A.A. about the matter off the record and outside the presence of defendant and counsel, allowed her to call Mr. M.M., in the presence of a deputy, and permitted her to continue serving as an alternate juror after she stated things were under control. Nonetheless, Mr. M.M. continued to threaten to harm himself and to call the emergency cellphone maintained by STPSO deputies charged with handling out-of-court security for the sequestered jurors.[105] Mr. M.M.'s threats to himself evolved into threats to remove Ms. A.A. physically from West Feliciana Parish, such that STPSO and West Feliciana Parish Sheriff's Office ("WFPSO") deputies increased security, prepared flyers identifying Mr. M.M. and his vehicles, visited Mr. M.M. at his Mandeville home, and periodically provided assistance to Ms. A.A., who was troubled and distracted to varying degrees by Mr. M.M.'s behavior,

---

[104] Jurors were selected from St. Tammany Parish, pursuant to ruling on a motion to change venue, and they were sequestered during the trial in West Feliciana Parish, where the trial was held.

[105] "A jury is sequestered by being kept together in the charge of an officer of the court so as to be secluded from outside communication . . . ." LSA-C.Cr.P. art. 791(A). "In capital cases, after each juror is sworn he shall be sequestered, unless the state and the defense have jointly moved that the jury not be sequestered." LSA-C.Cr.P. art. 791(B). The purpose of sequestering jurors is to protect them from outside influence and from basing their verdict upon anything other than the evidence developed at the trial. **State v. Marchand**, 362 So.2d 1090, 1092 (La. 1978).

which she attributed to his "health problems" and "new medication." Other jurors, including some who deliberated, were apparently aware of these events to some extent.

Furthermore, a post-trial internal investigation conducted by STPSO, following the filing of a complaint by Mr. M.M. against STPSO Deputy Chris Naquin on March 7, 2012, revealed the fact that an intimate and sustained relationship developed between Ms. A.A. and Deputy Naquin, as a result of their meeting during the defendant's trial, where Deputy Naquin worked as security for the sequestered jury beginning on May 11, 2011 (in the midst of the defendant's trial).[106] Ms. A.A and Deputy Naquin admitted they became involved in an intimate relationship some time after the defendant's trial ended, despite Ms. A.A.'s post-trial marriage to Mr. M.M.

Mr. M.M.'s STPSO complaint appears to have been prompted by Deputy Naquin's criminal complaint filed against Mr. M.M. earlier the same day (March 7, 2012), alleging that Mr. M.M. called Deputy Naquin's home and made threatening remarks because Mr. M.M. believed that Ms. A.A. and Deputy Naquin continued to maintain contact after telling their respective spouses that their affair had ended. Deputy Naquin informed the officer investigating his criminal complaint against Mr. M.M. that he had been speaking with Ms. A.A. (who was married to Mr. M.M. at that time) but their conversations had ceased about a month earlier. Deputy Naquin's written statement was consistent with that account; however, he failed to mention the intimate and sustained nature of his relationship with Ms. A.A., and

---

[106] STPSO deputies began transporting prospective jurors from St. Tammany Parish to West Feliciana Parish on April 28, 2011. Jury selection took place from April 28, 2011 to May 6, 2011. The State and the defense made opening statements on May 7, 2011, and the jurors received guilt phase evidence between May 8, 2011 and May 14, 2011. On May 15, 2011 the jurors heard closing arguments, received instructions, deliberated, and found the defendant guilty as charged. On May 16, 2011 the jurors heard penalty phase testimony, received instructions, deliberated, and sentenced the defendant to death.

his description of the timing of the end of their relationship may have been inaccurate.

The STPSO conducted an internal investigation, interviewing Deputy Naquin, Ms. A.A., and Mr. M.M. and reported the matter to the prosecution team in the defendant's case on March 12, 2012. The STPSO investigation determined that the relationship did not become intimate until after the end of the defendant's trial, but acknowledged that Deputy Naquin's assistance in dealing with Mr. M.M.'s threats during the trial and "compassion [toward Ms. A.A] . . . ultimately fueled [their] relationship." As a result of the investigation, Deputy Naquin lost his status as a Field Training Officer for exhibiting poor judgment, but he did not receive a reprimand because there was no policy violation. The State notified defense counsel on March 23, 2012.

During his interview, Deputy Naquin informed the internal investigator that: the affair did not begin until after the trial; his contact with Ms. A.A. during sequestration included discussions regarding Mr. M.M.'s threatening behavior and general conversations to "keep Ms. A.A. focused on the trial"; and the affair ended in January 2012. Deputy Naquin's written statement included his recollections that: the trial was in February 2011 (though it was actually in May 2011); he and his partner during sequestration duty, Deputy Ryan Terrebonne, spoke with Ms. A.A. about the threats and whether she was "still able to focus on the trial"; and they "would always talk in a group or w[h]ere others could see everything, along with hear everything." Deputy Naquin also included information about a situation during the defendant's trial, which occurred in a restaurant parking lot, during which Ms. A.A. appeared "upset" and had to be "calmed down" because she could not reach Mr. M.M. Deputy Naquin also admitted that: all the jurors exchanged contact information on the last day of trial with the deputies; juror C.D. and alternate juror J.D. contacted him about a month after the trial ended; and Ms. A.A.

reached out to him to discuss the situation with Mr. M.M. at an unspecified point post-trial. Deputy Naquin claimed that he and Ms. A.A. became intimate about three or four months post-trial and that the affair lasted for "about a year or so before [their] spouses found out." Deputy Naquin also stated that the relationship was, and remained, intimate in October 2011 when Ms. A.A. married Mr. M.M.

During her interview, Ms. A.A. informed the investigator that she contacted Deputy Naquin immediately after the trial ended, and their friendship became intimate in late July or early August 2011. In her written statement, Ms. A.A. indicated that: she spoke with only Deputy Naquin, during the trial, about her concerns regarding Mr. M.M.; and "[h]e asked me what I thought of the trial to get my mind off of [M.M.]." Ms. A.A. confirmed that she initiated post-trial contact with Deputy Naquin, and she "started talking to him on the way home from the trial in May." Ms. A.A. stated that she knew they were more than friends toward the end of June 2011, and the relationship did not end until March 2012.

On April 12, 2012 the defendant filed a motion for new trial and requested an evidentiary hearing to determine the circumstances of the Deputy Naquin/Ms. A.A. affair and whether outside information influenced the jury's guilt and penalty phase verdicts. Following this court's remand (**State v. Clark**, 12-0508 (La. 5/16/12) (unpublished motion)), the trial court held a closed and limited evidentiary hearing on October 23, 2012 and August 6, 2013. The defendant sought this court's intervention regarding both the non-public nature of the evidentiary hearing and filings related thereto[107] and his limited ability to

---

[107] See **State v. Clark**, 13-0419 (La. 4/05/13), 110 So.3d 1066 (denying relief on the defendant's claim that the trial court improperly sealed the matter in part to protect the jury pool for the subsequent trial (to be held in October 2013) on the charges against co-defendant Edge). This court's prior consideration of this issue on supervisory review does not bar consideration on appeal. **State v. Fontenot**, 550 So.2d 179 (La. 1989) (per curiam) ("A denial of supervisory review is merely a decision not to exercise the extraordinary powers of supervisory jurisdiction, and it does not bar consideration on the merits of the issue denied supervisory review, when appeal is taken from final judgment . . . . Thus, the ruling denying supervisory writs does not bar reconsideration of the issue on appeal and there reaching a different conclusion as to it.").

investigate, call witnesses, and elicit testimony; writs were denied.[108]

At the evidentiary hearing, commenced October 23, 2012, several STPSO officers testified regarding its internal investigation. Major Sterling Hebert, who led the investigation, testified that he had not seen Deputy Naquin's handwritten note (misstating the nature of his relationship with Ms. A.A., which was provided in support of Deputy Naquin's criminal complaint against Mr. M.M.) or the report prepared by the investigating officer, Deputy Kathy Maki, regarding that complaint. Deputy Maki confirmed that Deputy Naquin did not inform her of the sexual nature of his relationship with Mr. M.M.'s wife.

In addition, STPSO and WFPSO officers testified about the circumstances related to Mr. M.M.'s threats during defendant's trial. Deputy Naquin's partner, Deputy Terrebonne, testified that he and Deputy Naquin replaced Deputies William McIntyre and Jonathon Rogers, who briefed them about the M.M. situation, for the sequestration detail in West Feliciana Parish. When Mr. M.M. threatened to drive to West Feliciana Parish, Deputy Terrebonne informed his superiors and Deputy Naquin.[109] As to the deputies' efforts to calm Ms. A.A., Deputy Terrebonne stated that he was not present during every conversation between Ms. A.A. and Deputy Naquin.

Additional testimony was presented regarding a post-trial incident, which occurred on May 20, 2012, when an unidentified STPSO officer saw M.M. and conducted a traffic stop. A report of what took place was apparently never prepared, but dispatch records provide some evidence of the stop. The implication clearly was that Deputy Naquin had stopped M.M., even though they had

---

[108] See **State v. Clark**, 13-2103 (La. 2/21/14), 133 So.3d 682 (denying relief on the defendant's claim that the trial court improperly limited his ability to subpoena and question witnesses). Nothing bars consideration of this issue on appeal. **State v. Fontenot**, 550 So.2d at 179.

[109] STPSO ran M.M.'s driver's license to obtain a photograph of him, at approximately 4:00 p.m. on May 12, 2011, presumably to be able to identify M.M. if he followed through on his threat to travel to West Feliciana Parish and procure Ms. A.A.'s return to St. Tammany Parish.

competing complaints against each other, and Deputy Naquin's superiors had investigated the event and advised Deputy Naquin to maintain a low profile. Although an alternative explanation was provided, STPSO fired Deputy Naquin less than two weeks after the M.M. traffic stop.[110] Deputy Naquin's personnel records reflect no prior disciplinary issues, several commendations, and a positive performance evaluation on March 2, 2012, just days before the affair with Ms. A.A. came to light.

Before Ms. A.A. took the stand, during the post-trial hearing, the trial judge held a brief conference, in chambers, on the record. The trial judge informed counsel and the defendant that the testimony presented had prompted him (the trial judge) to recall that he had had a brief off-the-record conversation with Ms. A.A. on the first or second day of trial, when Mr. M.M. had threatened to harm himself. The trial judge confirmed that the defendant was not present for that conversation, and no contemporaneous note could be found in the trial court record regarding that conversation. Based on this information, the defendant filed a motion to recuse the trial judge (Judge Winsberg). Another district court judge (Judge Ware) held an evidentiary hearing on December 13, 2012, during which the defendant's trial counsel, Tommy D'Amico, testified consistent with his affidavit that: Judge Winsberg called counsel to the bench, regarding Mr. M.M.'s threats, and asked whether there was any objection to him speaking with alternate juror Ms. A.A.; and Mr. D'Amico consulted with the defendant before informing Judge Winsberg that the defense had no objection. Judge Winsberg's testimony corroborated defense counsel's account, and he deferred to Ms. A.A.'s recollection of their conversation; he also explained that he handled another juror situation (involving

---

[110] The officer who wrote Deputy Naquin's termination report stated that Deputy Naquin was fired for insubordination and leaving his post at a workers' compensation tribunal in order to pick up his children. It is clear from contemporaneous text messages sent during this incident that Deputy Naquin expected to be written up for this behavior, but did not anticipate termination.

juror T.K.'s daughter, who had an emergency hospitalization during the trial) differently because the situation was different. Judge Ware denied the motion to recuse.

Before the hearing on the Deputy Naquin/Ms. A.A. issue could resume, the defendant discovered that Deputy Terrebonne had also entered into a post-trial romantic relationship with another alternate juror from the defendant's trial, J.D., and the defendant filed a supplemental motion for new trial on that basis.[111] The trial court agreed that the defendant could re-call Deputy Terrebonne, but he refused to permit the defendant to call or interview J.D. or any other juror, alternate juror (other than Ms. A.A.), any spouse of an involved deputy, or any WFPSO officer who assisted Deputies Naquin and Terrebonne with out-of-court security during the defendant's trial.

On August 6, 2013 the evidentiary hearing regarding juror/bailiff misconduct resumed. Deputy Terrebonne testified first, and the trial court refused to allow him to answer questions related to his relationship with alternate juror J.D., the demise of his marriage, his resignation from STPSO, or the jurors' consumption of alcohol at the State's expense (discussed hereinafter). Deputy Terrebonne testified that he participated in transporting the jurors and alternate jurors to and from their homes in St. Tammany Parish, but the trial court would not permit him to identify which ones. He also stated that within a week of the trial's end he was communicating with Ms. J.D. and got together with three or four other jurors at different restaurants around St. Tammany Parish. His Facebook account indicated that he was friends with juror C.D. and alternate juror C.L.

Defense counsel asked Deputy Terrebonne few questions about the information in numerous documents ultimately proffered; the proffered documents

---

[111] In addition, several prosecutors handling the Angola 5 cases were Facebook "friends" with juror C.D., despite the trial court's imposition of a strict no-contact order, with respect to the jurors and alternate jurors, when the Deputy Naquin/Ms. A.A. issue arose.

revealed: February 2011 details about his marriage; his April 2011 adoption of a child with his wife; that he filed for divorce in June 2011; that his divorce was finalized in August 2012; he publicly acknowledged being in a relationship with Ms. J.D. in August 2012; he resigned from the STPSO in February 2013; he announced his engagement to Ms. J.D. in April 2013; and he and Ms. J.D. subsequently married.

Deputy Naquin also testified that: Ms. A.A. broke down one evening, during jury sequestration in a restaurant parking lot and he, Deputy Terrebonne, and two or three other jurors tried to console her[112]; some of the deputies would play card games with some of the jurors in the evenings; he and Ms. A.A. began talking on the phone and texting almost immediately after the trial ended; and he, his wife, and children, along with Deputy Terrebonne met with Ms. A.A., Mr. M.M., and Ms. J.D. for dinner at Chili's in Mandeville at some point soon after defendant's trial. With respect to the STPSO internal investigation, Deputy Naquin confirmed that Major Hebert informed him, before instructing him to prepare his typed statement, that a sexual relationship with Ms. A.A. during the defendant's trial would: compel a reversal; impose a huge expense on the State; and possibly result in him being charged with jury tampering. Defense counsel permitted Deputy Naquin to be released before seeking to proffer testimony on topics about which the trial court had sustained State objections.

Ms. A.A. testified that she started discussing her concerns about Mr. M.M. with the other jurors and the deputies on the third or fourth night of trial in the jurors' common room. Ms. A.A. stated that Deputy Naquin was compassionate in

---

[112] Deputy Naquin indicated that, in talking to Ms. A.A. during trial, he and the other deputies were only trying to distract her from thinking about her problems with Mr. M.M., explaining, "We just tried to . . . take her mind away from what she was dealing with . . . .We had to keep her mind set on the matters at hand and not worry about anything else . . . . There was nothing talked about the trial. It was to keep her focused." When Deputy Naquin was asked if they talked about the prosecutors or about "what happened in the court," he replied, "No. That's forbidden."

helping her with the Mr. M.M. situation and in focusing her attention back on the trial. Ms. A.A. also testified that she and Deputy Naquin were alone outside a West Feliciana Parish restaurant towards the end of the trial, and they had their first "real kind of conversation." She claimed, however, that this conversation was not the beginning of a relationship, as friends or otherwise. Ms. A.A. described one instance in which "we talked about [Mr. M.M.] for a little bit, then [Deputy Naquin] switched the subject to the trial, I guess, just to get me focused back on what was going on at the trial," asking her how it was going. When asked during the hearing "What did he tell you about the trial?" Ms. A.A. expressly stated, "He didn't tell me anything about the trial. He just asked, you know, how -- I guess, how it was going." Ms. A.A. stated that sometimes her conversations with Deputy Naquin were in front of other jurors, including C.D. and "John."[113] Ms. A.A. admitted that she contacted Deputy Naquin immediately after the trial, by text message, thanking him for helping her and focusing her on the trial.[114] Ms. A.A. stated that she and Deputy Naquin became intimate by the middle or end of June 2011. Ms. A.A. had no specific recollection of any conversation with Judge Winsberg.

The trial court denied the defendant's requests to call other witnesses and to submit a post-hearing brief, and the court found that the defendant had established "no prima facie case showing that any member of the jury was subjected to any undue influence by any of the deputies." Further, the trial court determined that the conduct of the deputies was "not impermissible type of conduct" and did not "affect[] the outcome of the trial." The trial court explained that the limitations placed on the defendant's ability to present testimony at trial was rooted in its

---

[113] There was no juror named "John." Therefore, as defense counsel suggested without objection during argument, it appears she was referring to alternate juror J.D.

[114] The trial court would not allow the defendant to obtain phone or text message records from anyone.

interpretation of this court's remand as being limited to the Deputy Naquin/Ms. A.A. situation. Nonetheless, the trial court made clear that its ruling also applied to the Deputy Terrebonne/Ms. J.D. relationship.

In objecting to the trial court's ruling, the defendant's stated grounds included those assigned as error here (e.g., the denial of a full hearing on the matter, the denial of the defendant's right to interview and subpoena witnesses and secure documents, and the denial of a right to a public hearing).

Pertinent to this court's review of the instant matter is LSA-C.E. art. 606, which provides in pertinent part:

> **B. Inquiry into validity of verdict or indictment.** Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, *except that a juror may testify on the question whether any outside influence was improperly brought to bear upon any juror, and, in criminal cases only, whether extraneous prejudicial information was improperly brought to the jury's attention*. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes. [Emphasis added.]

Although a defendant is ordinarily foreclosed from inquiry into the basis for a jury's verdict, an exception to this rule exists when there is an unauthorized communication or overt act by a third person that creates an extraneous influence on the jury. **State v. Sinegal**, 393 So.2d 684, 686 (La. 1981). Further, when the statutory prohibition infringes on a defendant's constitutional right to a fair trial, jurors are competent to testify about juror misconduct.[115] **Id.**

---

[115] As the explained by the Supreme Court in **Parker v. Gladden**, 385 U.S. 363, 364, 87 S. Ct. 468, 470, 17 L. Ed. 2d 420 (1966), under the Sixth Amendment, an accused has the right to a "public" trial by an "impartial" jury, during which trial he is "confronted with the witnesses against him"; inherent within these rights is the understanding that the evidence against the defendant must come from the witness stand in the public courtroom and not from "private talk" that reaches the jury by "outside influence."

In a criminal case, any private communication, contact, or tampering directly or indirectly with a juror during a trial *about the matter pending before the jury* is for obvious reasons deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of all the parties. **State v. Marchand**, 362 So.2d 1090, 1092 (La. 1978)). A constitutional due process right of fair trial by jury may be violated, if the trial jurors are subjected to influences by third parties (even including through the attending bailiffs of the State), which causes the jurors' verdict to be influenced by circumstances other than the evidence developed at the trial. See **State v. Marchand**, 362 So.2d at 1092-93 (citing **Turner v. Louisiana**, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1964)).[116]

We note the instant case is most closely analogous to the case of **State v. Bibb**, 626 So.2d 913, 922-25 (La. App. 5 Cir. 1993) (conditionally affirming the convictions and sentences, but remanding for evidentiary hearing on the defendant's motion for new trial to determine whether the inappropriate juror/bailiff conduct took place before the jury found the defendant guilty as charged for the first degree murders of his two children, observing that there would be no prejudicial effect if the conduct took place after the guilty verdict because the jury did not recommend the death penalty), writ denied, 93-3127 (La. 9/16/94), 642 So.2d 188. The subsequent hearing in **Bibb** revealed two inappropriate interactions between the juror and bailiff during trial. The first interaction was a

---

[116] In **State v. Marchand**, this court found reversible (i.e., non-harmless) error, when the deputy sheriff/bailiff improperly communicated to the jurors that defense counsel alone prevented them from obtaining access to the defendant's written confession they had twice requested to review (but which LSA-C.Cr.P. art. 793 prohibits their access to after they have retired to the jury room). **State v. Marchand**, 362 So.2d at 1093. On the jury's second request to review the confession, the jury indicated "they would be in session all night unless they received the confession"; however, when the trial court denied the request and, after being informed by the deputy that the denial was due to defense counsel's opposition, they reached a verdict of guilty within fifteen minutes. **Id.** The promptness with which the jury returned their verdict after the statement was made by the deputy created a strong presumption that the jury was influenced by what was said by the deputy. **Id.**

five to ten-minute conversation on a balcony at the sequestration hotel during which the bailiff comforted the juror who was distressed about the nature of the killings, attempted to focus her attention away from the trial, and may have patted her on the back at the conclusion of the conversation. This interaction took place before the guilt phase verdict, and both the juror and the bailiff testified they did not discuss the case. The second interaction took place in the hotel room of either the juror or the bailiff and involved the two of them playing Nintendo and Monopoly late into the night and ending with a kiss, which another bailiff observed while making rounds to wake the other jurors. This interaction took place between the guilt and penalty phase verdicts. The juror/bailiff relationship lasted two months after the trial ended. Based on the foregoing, the trial court denied the motion for new trial, and the court of appeal affirmed the convictions and sentences. **State v. Bibb**, 97-1040 (La. App. 5 Cir. 6/30/98), 717 So.2d 1276 (table). This court denied writs. **State v. Bibb**, 98-1858 (La. 11/13/98), 730 So.2d 457.

In the case of **State v. Ingram**, 10-2274 (La. 3/25/11), 57 So.3d 299 (per curiam), during a mid-day recess in the defendant's second degree murder trial, a juror armed herself with a baseball bat and invaded the home of a woman she believed was having an affair with her (the juror's) boyfriend and caught them in bed together, and though the juror brandished, she did not use, the baseball bat. However, the juror later discussed the incident with other jurors because of some similarity of the incident to the circumstances for which the defendant was on trial (i.e., the defendant killed his ex-wife after she forced her way into the defendant's home with his new wife to confront the couple and following the ex-wife's physical attack on the defendant's new wife). **State v. Ingram** held that no evidentiary hearing was required to determine the extent to which the juror's actions influenced the verdict because the incident "did not give rise to a

reasonable possibility that the information [the troubled juror] conveyed contributed significantly to the jury's verdict" of manslaughter.  The **State v. Ingram** court explained:

> As a general rule, "[j]urors are not expected to come into the jury box and leave behind all that their human experience has taught them." **Beck v. Alabama**, 447 U.S. 625, 642, 100 S.Ct. 2382, 2392, 65 L.Ed.2d 392 (1980) (internal quotation marks and citation omitted). Individual jurors "bring to their deliberations qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." **McCleskey v. Kemp**, 481 U.S. 279, 311, 107 S.Ct. 1756, 1777, 95 L.Ed.2d 262 (1987) (internal quotation marks and citation omitted).  For the most part, how jurors may draw on their experience in the deliberative process remains shielded from view and therefore largely unknowable.  Louisiana subscribes to the common law rule, incorporated in La.C.E. art. 606(B), that jurors may not impeach their verdict by evidence of their own misconduct.  The rule incorporates important systemic values, including the finality of judgments, and allows only the narrow exceptions for outside influences or extraneous prejudicial information.  See **Tanner v. United States**, 483 U.S. 107, 119, 107 S.Ct. 2739, 2747, 97 L.Ed.2d 90 (1987) (tracing Fed.R.Evid. 606(b), progenitor of La.C.E. art. 606(B), back to its origins in the common law and finding that nothing in the rule appeared inconsistent with the Sixth Amendment guarantee of a fair and impartial jury, observing that "[s]ubstantial policy considerations support the common-law rule against the admission of jury testimony to impeach a verdict.... The Court's holdings *requiring an evidentiary hearing where extrinsic influence or relationships have tainted the deliberations* do not detract from, but rather harmonize with, the weighty government interest in insulating the jury's deliberative process.") . . . . [J]urors generally remain free to share what their experience and knowledge has taught them, even in situations similar to the circumstances of the crime for which they are empaneled, without calling into question the validity of their verdict. See, e.g., **State v. Sanders**, 33,778, pp. 4-5 (La. App. 2 Cir. 10/4/00), 769 So.2d 183, 187.

**State v. Ingram**, 10-2274 at pp. 6-7, 57 So.3d at 302 (emphasis added).[117]

In light of the foregoing, we conclude that the distracting behavior of Mr. M.M. during the defendant's trial was insufficient to introduce inappropriate

---

[117] See also **State v. Duplissey**, 550 So.2d 590, 592-95 (La. 1989) (bailiff's entry into the jury deliberation room and conversations with the jury foreperson, regarding how to get an illiterate juror to vote, were presumptively prejudicial because the conversation concerned the mechanics of deliberating on a verdict and occurred without the authority or knowledge of the court or counsel, and the State did not overcome the presumption); **State v. Copeland**, 419 So.2d 899, 904 (La. 1982) (mid-trial ceremony at which bailiffs awarded jurors with stick-pin handcuffs, like those worn by the bailiffs and symbolic of law enforcement, warranted reversal of first degree murder conviction and death sentence, since the gift-giving "likely did constitute a subtle influence, pro-State, the full extent of which is impossible to ascertain").

outside influences impacting the verdicts, even assuming Ms. A.A. discussed the matter with deliberating jurors and became observably upset in front of them. As in **State v. Ingram**, Ms. A.A.'s personal problems do not appear to have had any reasonable probability of influencing the jury's verdicts to convict the defendant of the first degree murder of Capt. Knapps and to sentence him to death.

We reach a similar conclusion about the behavior of former Deputies Naquin and Terrebonne. The trial court record indicates that the deputies transported the jurors to their sequestration hotel and to local restaurants for meals, and they may have engaged in limited social activities while supervising jurors during meals and at their sequestration hotel.

While in the company of one or more of the twelve jurors deciding the defendant's case Ms. A.A. became upset at times over the problems she was experiencing with Mr. M.M., and on several occasions Deputy Naquin verbally comforted her and attempted to distract her by asking her *what she thought* about the trial proceedings and/or how things were going. However, we note that nothing in the record reflects that Deputy Naquin expressed *his own thoughts* about the proceedings or in any way attempted to influence Ms. A.A.'s opinions. Moreover, there is no indication that these limited conversations, in the presence of one or more of the twelve jurors deciding the defendant's case, was intended to, or in fact did, influence any of the twelve jurors. As it transpired, Ms. A.A. was not called upon to act as a juror in this case, remaining merely available as an alternate; therefore, any of the emotional difficulties that she experienced during the trial did not directly affect the decision-making process of the jury.

A reading of the testimony taken in this case makes it clear that the communications between Ms. A.A. and Deputy Naquin during the defendant's trial were limited to casual comments meant to distract Ms. A.A. from her problems with her boyfriend M.M. and could not be considered "tampering" with a juror

128

"about the matter pending before the jury," pursuant to **State v. Marchand**, supra.[118] Further, this conduct did not constitute "extrinsic influence or relationships [that] have tainted the deliberations," as stated in **State v. Ingram**. Moreover, because we conclude that there was no "outside influence . . . improperly brought to bear upon any juror" in this case, nor was there any "extraneous prejudicial information . . . improperly brought to the jury's attention," the LSA-C.E. art. 606 exceptions to the bar on juror testimony are not applicable in this case; therefore, the trial court did not err in limiting testimony at the hearing on the motion for new trial. Consequently, we find no error in the trial court's denial of a new trial based on these incidents,[119] and we find no merit in the defendant's twenty-first, twenty-second, or twenty-fifth assignments of error.

The defendant complains in his twenty-third assignment of error that the trial court permitted the consumption of alcohol at the State's expense, asserting that the drinking of alcoholic beverages by jurors contravened LSA-R.S. 14:130, which violated his rights to due process, a fair trial, and a reliable sentence.

In discussing the conditions of the sequestration, the following dialogue took place between the trial court and the remaining prospective jurors in the first general *voir dire* panel, with defendant and his co-counsel present:

---

[118] There was no testimony or evidence presented to rebut the consistent testimony of Ms. A.A. and Deputy Naquin that their intimate relationship did not begin until after the defendant's trial had concluded. In fact, the post-trial statement by juror C.D., in an August 26, 2012 Facebook post, seemingly confirmed that fact or, at the least, if the relationship began earlier, the other jurors were not aware of it; the post stated, "Just to let you know also, we lived with these people for 12 days and had no clue about Naquin and [Ms. A.A.]. You just wonder what the f*** people are thinking at times." Likewise, the testimony by Deputy Terrebonne that he did not begin his relationship with J.D. until some time after the defendant's trial concluded was unrebutted. We conclude that there simply was an absence of evidence to indicate that any communication between the deputies and the jurors concerned a "matter pending before the jury" such that prejudice could be presumed pursuant to **State v. Marchand**, supra.

[119] A ruling on a motion for a new trial rests within the sound discretion of the trial judge. **State v. Quimby**, 419 So.2d 951, 960 (La. 1982). In the interest of preserving the finality of judgments, such a motion must be viewed with extreme caution. **State v. Dickerson**, 579 So.2d 472, 484 (La. App. 3 Cir. 1991), writ granted in part on other grounds, 584 So.2d 1140 (La. 1991). See also LSA-C.Cr.P. art. 851(A) ("The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.").

Prospective Juror: What about evening drinks?
The Court:       Yes.
Prospective Juror: Cocktails. Happy hour.
The Court:       Okay. Yes. Well, "happy hour" might not be the right way to say it. But the jury will be permitted after the day's work is over at dinner or slightly before to have two drinks maximum. And that doesn't mean that if you don't have a drink, you can order one and then your pal next to you can have it. Two drinks means two drinks. And everybody has got their own idea of a shot of whiskey. But let's put it on the basis: No more than an ounce and a half of liquor or a glass of wine, two glasses of wine would be all right, two beers. But beyond that, no.

Because the defendant raised no contemporaneous objection to that ruling or to the trial court's issuance of a written order the following day consistent with that ruling (which added that such beverages may only be provided if "all trial proceedings have concluded for the day"), the issue was not preserved for appeal. See LSA-C.Cr.P. art. 841; **State v. Taylor**, 93-2201, pp. 4-7 (La. 2/28/96), 669 So.2d 364, 367-69.

In any event, there is nothing to suggest any juror committed misconduct by violating R.S. 14:130(A)(3), which directs that no juror "shall either use or consume any beverage of low or high alcoholic content ***during the time he is in actual service as juror***." (Emphasis added.) Since the trial court in this case expressly authorized the consumption of alcoholic beverages by jurors only after all trial proceedings had concluded for the day, it cannot be said, and no evidence showed,[120] that any juror was allowed to consume alcoholic beverages "during the time he [was] in actual service as juror."[121] We find no merit in this assignment of error.

---

[120] Receipts appearing in the trial court record for meals which included alcoholic beverages show that alcoholic beverages were being consumed only in the evening and did not indicate that jurors were exceeding the two-drink-per-day limit established by the trial court.

[121] We note that the defendant's reliance on **State v. Smith**, 06-0820, p. 19 (La. App. 1 Cir. 12/28/06), 952 So.2d 1, 13, writ denied, 07-0211 (La. 9/28/07), 964 So.2d 352, to imply that "actual service" includes time when the jury had recessed for the day, is misplaced because

The defendant asserts in his twenty-fourth assignment of error that the trial court's *ex parte* communication with Ms. A.A. on the first or second day of trial, regarding Mr. M.M.'s threats to harm himself, violated LSA-C.Cr.P. art. 831(3) ("[A] defendant charged with a felony shall be present . . . [a]t any subsequent proceedings for the discharge of . . . of a juror . . . .") because the defendant contends the conversation constituted a proceeding to disqualify a juror, and neither the defendant nor his appointed attorney were present for the discussion and the defendant had not waived his presence.

We first point out that no contemporaneous objection to the communication was placed on the record, and thus, arguably the issue has not been preserved for review. LSA-C.Cr.P. art. 841; **Taylor**, supra.

Nevertheless, although it would have been preferable to have some reference to this conversation and defendant's waiver on the record, nothing suggests Judge Winsberg and the defendant's trial counsel testified untruthfully at the evidentiary hearing on the motion to recuse Judge Winsberg, regarding this incident (in which Judge Winsberg called counsel to the bench, informed them of the matter, and spoke briefly with Ms. A.A. in chambers after defense counsel consulted with the defendant (who was also lead counsel at the time) and agreed to the *ex parte* communication to determine whether Ms. A.A. could continue to serve as an alternate juror). Moreover, the record reflects the defendant's presence throughout the trial and his express confirmations on the record at the close of every day of the guilt phase that he agreed with what had transpired. That appellate counsel was

_____

**Smith** involved only allegations that jurors were consuming alcoholic beverages at lunch time before returning to jury service in the afternoon on the second and third days of trial. Regardless, "the controlling test is whether the defendant was denied a fair trial, [such that] if a juror's judgment [was] affected by alcohol during consideration of the case, the verdict would not stand." **Id.**, 06-0820, p. 21, 952 So.2d at 14. See also **Copeland**, 419 So.2d at 907 ("We do not suggest that a sequestered jury may not engage in recreational activities when trial is not in progress or when they are not engaged in deliberations.").

unaware of the conversation and the waiver does not, without more, merit this court's action. This assignment of error is without merit.

## Supplemental Issues

Error Rate in Louisiana Capital Cases

In his twenty-sixth assignment of error, the defendant contests the denial of the motion he adopted, originally filed by his co-defendant Mathis, as Motion #53, entitled, "Motion to Exclude Death as a Possible Punishment in Light of Overwhelming Evidence that Louisiana's Enforcement of Capital Punishment is Infected by an Unacceptable Rate of Error Including an Inability to Protect Innocent Prisoners from being Sentenced to Death," along with a supplement. The trial court denied the motion, as well as a related motion for an evidentiary hearing, and issued reasons for judgment on December 28, 2008. The motion had argued that this court's then-recent exonerations showed that the legal system in this state is plagued with legal error, infested with racism, corrupted by underfunded and incompetent defense counsel and unscrupulous prosecutors, such that a number of innocent prisoners have been condemned to die. In denying the motion, the trial court observed that the State provides procedural safeguards in capital cases, including the appointment of qualified counsel in death penalty cases (in this then-consolidated case, the court appointed ten experienced counsel to represent the co-defendants) and appeal directly to this court, pursuant to LSA-C.Cr.P. art. 905.9 and the guidelines set forth in Supreme Court Rule XXVIII, such that then-recent exonerations by this court demonstrate this state's legal system is successful rather than suffering some fundamental breakdown. On appeal, the defendant merely updates the statistics previously provided and does not argue other aspects of his co-defendant's initial and supplemental motions or, more importantly, in any way address the trial court's reasoning.

132

As Justice Scalia stated in his concurrence in **Kansas v. Marsh**, 548 U.S. 163, 193, 126 S.Ct. 2516, 2535-36, 165 L.Ed.2d 429 (2006) (emphasis in original), exonerations do not come about "through the operation of some outside force to correct the mistakes of our legal system, [but] rather . . . *as a consequence of the functioning of our legal system.*" Moreover, "[c]apital cases are given especially close scrutiny at every level, which is why in most cases many years elapse before the sentence is executed." **Id.**, 548 U.S. at 198, 126 S.Ct. at 2538. Thus, "[r]eversal of an erroneous conviction on appeal or on habeas, or the pardoning of an innocent condemnee through executive clemency, demonstrates not the failure of the system but its success." **Id.**, 548 U.S. at 193, 126 S.Ct. at 2536. This assignment is without merit.

Aggravating Circumstances

In his twenty-seventh, twenty-eighth, thirty-fifth, and thirty-sixth assignments of error, the defendant challenges the aggravating circumstances alleged by the State in various respects, asserting that: the trial court erred in permitting the State to submit duplicative aggravating circumstances; seven of eight aggravating circumstances were invalid as not properly set forth in the indictment; the "especially heinous, atrocious or cruel" aggravating circumstance should have been excluded; and several of the aggravating circumstances alleged were inapplicable and/or unconstitutionally vague.[122]

Defendant ignores the fact that the State amended the aggravating circumstances set forth in its Notice of Intent before submission to the jury and asserted only those circumstances set forth in LSA-C.Cr.P. art. 905.4(A)(1)-(4).[123] Thus, the State's amendment rendered moot his argument that the circumstance set

---

[122] Defendant adopted co-defendant Mathis' Motion #70, entitled "Motion to Bar Submission of Duplicative Aggravating Circumstances to the Jury."

[123] In addition, the jury instructions in the penalty phase listed only the four aggravating circumstances set forth in LSA-C.Cr.P. art. 905.4(A)(1)-(4).

forth in LSA-C.Cr.P. art. 905.4(A)(2) (the victim was a peace officer engaged in his lawful duties) is duplicative of the LSA-C.Cr.P. art. 905.4(A)(9) circumstance (the victim was a correctional officer). For the same reason, the defendant's argument regarding the circumstances set forth in LSA-C.Cr.P. art. 905.4(A)(3) and (6) (regarding a defendant's unrelated murder conviction and imprisonment for an unrelated forcible felony) is also moot, because the State submitted only the LSA-C.Cr.P. art. 905.4(A)(3) circumstance to the jury. Likewise, the defendant's argument regarding the LSA-C.Cr.P. art. 905.4(A)(7) circumstance (the murder was committed in an especially heinous, atrocious, or cruel manner)[124] is also moot because the State did not submit that circumstance to the jury.

The defendant also asserts the aggravating circumstance set forth in LSA-C.Cr.P. art. 905.4(A)(4) ("[t]he offender knowingly created a risk of death or great bodily harm to more than one person") is inapplicable and unconstitutionally vague.[125] The defendant argues that the Supreme Court has recognized this aggravating circumstance may be interpreted and applied in unconstitutionally vague ways and therefore only permits its submission when sufficient narrowing instructions have been developed (citing **Proffitt v. Florida**, 428 U.S. 242, 255, 96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976); **Gregg v. Georgia**, 428 U.S. 153, 200, 96 S.Ct. 2909, 2938, 49 L.Ed.2d. 859 (1976)). In claiming Louisiana has no limiting instruction on this circumstance, the defendant ignores **State v. Welcome**,

---

[124] The defendant adopted co-defendant Mathis' Motion #51, entitled "Motion to Bar Submission of the 'Especially Heinous, Atrocious, or Cruel' Aggravating Circumstances to the Jury." The trial court heard argument on the motion during the April 28, 2006 pretrial hearing and deferred ruling until after hearing evidence of the circumstances of Capt. Knapps' murder at trial. The trial court entertained the motion again before trial and denied it subject to each co-defendant's right to raise an objection at trial if warranted. Nothing in the record suggests that the defendant raised such objection at trial, nor was one warranted given the State's limited submission of aggravating circumstances to the jury, which omitted the aggravating circumstance set forth in LSA-C.Cr.P. art. 905.4(A)(7).

[125] The defendant adopted co-defendant Mathis' Motion #71, entitled "Motion to Strike Inapplicable and/or Unconstitutionally Vague Aggravating Circumstances." The trial court denied the motion on October 26, 2010.

134

458 So.2d at 1244, in which this court provided, "this aggravating circumstance is present in a case, when the defendant through his act of homicide creates a genuine risk of death or great bodily harm to more than one person or when the defendant through a single course of conduct contemplates and causes the death of more than one person."[126]

Regardless, even if the jury's additional finding that the defendant knowingly created a risk of death or great bodily harm to more than one person is somehow defective, that defect does not require reversal of the penalty phase verdict because it did not introduce an arbitrary factor into the proceedings. See **State v. Welcome**, 458 So.2d at 1245 ("where more than one statutory aggravating circumstance is found by the jury, the failure of one circumstance does not so taint the proceedings as to invalidate any other aggravating circumstance found and the sentence of death based thereon"). See also **State v. Thibodeaux**, 98-1673, p. 15 (La. 9/8/99), 750 So.2d 916, 928 (in the context of Rule XXVIII review "the existence of an arbitrary factor requires this court to find an error of such magnitude that it undermines confidence in the jury's sentencing verdict").

Finally, the defendant claims that seven of the eight aggravating circumstances set forth in the State's original Notice of Intent to rely on aggravating circumstances were improperly alleged because they were not presented, or not sufficiently presented, to the grand jury.[127] The defendant's argument continues to ignore the State's amended list of only four aggravating circumstances submitted to the jury, as well as the State's amended indictment.

---

[126] There is no indication that either party requested the Article 905.4(A)(4) limiting instruction during pre-penalty phase motion practice or the charging conference, and it was not included in the trial court's sentencing instructions to the jury. See LSA-C.Cr.P. art. 801(C) ("A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the error.").

[127] The defendant adopted co-defendant Mathis' Motion #72, entitled "Motion to Strike the Seven Aggravating Circumstances Not Properly Alleged in the Indictment." The trial court heard oral argument on the motion and denied it.

More to the point, the defendant's challenge to the sufficiency of the grand jury's indictment on this basis is procedurally barred, as the time for testing the sufficiency of an indictment or bill of information is before trial, by way of a motion to quash or an application for a bill of particulars. **State v. Thibodeaux**, 98-1673 at p. 18, 750 So.2d at 930 (citing **State v. Gainey**, 376 So.2d 1240, 1243 (La. 1979)). See also LSA-C.Cr.P. arts. 484, 521, and 535. A post-verdict attack on the sufficiency of an indictment should be rejected unless the indictment failed to give fair notice of the offense charged or failed to set forth any identifiable offense. **State v. Williams**, 480 So.2d 721, 722, n.1 (La. 1985). See also LSA-C.Cr.P. art. 465, Official Revision Comment (a). Given the defendant's failure to file a motion to quash on this basis,[128] the defendant has arguably waived any claim based on the allegedly defective indictment.

Notwithstanding the procedural bar, the defendant refers to the observation in **Ring v. Arizona**, 536 U.S. at 600, 122 S.Ct. at 2439 (quoting **Jones v. United States**, 526 U.S. 227, 243 n.6, 119 S.Ct. 1215, 1224, 143 L.Ed.2d 311 (1999)), that "'[u]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.'" See also **Apprendi v. New Jersey**, 530 U.S. 466, 490, 120 S.Ct. 2348, 2362-63, 147 L.Ed.2d 435 (2000). However, it has long been recognized that the Fifth Amendment's grand jury requirement is not binding on the states. **Hurtado v. California**, 110 U.S. 516, 538, 4 S.Ct. 111, 28 L.Ed. 232 (1884). See also **Apprendi**, 530 U.S. at 499, 120 S.Ct. at 2368.

---

[128] The defendant adopted co-defendant Mathis' Motion #73, entitled "Motion to Quash Indictment as Facially Invalid." That motion applied to the initial indictment, rather than the amended one, and did not include the arguments set forth on appeal regarding the aggravating circumstances.

Moreover, LSA-C.Cr.P. art. 465 authorizes the use of specific short form indictments in charging certain offenses, including first degree murder, and the constitutionality of the short forms has been consistently upheld by this court. See, e.g. **State v. Draughn**, 05-1825, pp. 61-62 (La. 1/17/07), 950 So.2d 583, 624 (citing **State v. Baylis**, 388 So.2d 713, 718-19 (La. 1980); **State v. Liner**, 373 So.2d 121, 122 (La. 1979)). When short forms are used, a defendant may procure details as to the statutory method by which he committed the offense through a bill of particulars. **State v. Baylis**, 388 So.2d at 719 (citing **State v. Johnson**, 365 So.2d 1267, 1270-71 (La. 1978)); LSA-C.Cr.P. art. 465, Official Revision Comment (a). In addition, nothing in the Louisiana Constitution requires presentation of the aggravating circumstances set forth in LSA-C.Cr.P. art. 905.4 to the grand jury, and this state's capital sentencing scheme, which requires the jury to find at least one statutory aggravating circumstance beyond a reasonable doubt and consideration of any mitigating circumstances before determining the death sentence should be imposed, as set forth in LSA-C.Cr.P. art. 905.3, complies with the applicable requirements of **Ring v. Arizona**, 536 U.S. at 609, 122 S.Ct. at 2443 (wherein it was held that a trial judge may not find an aggravating circumstance necessary for the imposition of the death penalty, when sitting without a jury).

These assigned errors are without merit.

Indictment Challenges

The defendant attacks the indictment, in his twenty-ninth and thirty-second assignments of error, arguing: (1) LSA-C.Cr.P. art. 401(A)(5), which bars unpardoned convicted felons from qualifying for grand or petit jury service, conflicts with Article I, § 20 of the Louisiana Constitution and infects the indictment with discrimination because the LSA-C.Cr.P. art. 401(A)(5) bar disproportionately excludes African-Americans; and (2) the indictment failed to

give him reasonable notice of the charge against him because it was prepared on the short-form indictment and lists aggravated felonies in the disjunctive.[129] Neither assignment of error has merit.

With respect to defendant's first assignment, this court has recognized that the restoration of the full rights of citizenship under Art. I, § 20 restores only the basic rights of citizenship such as the right to vote, work or hold public office, but does not restore privileges and "status of innocence" as an executive pardon under LSA-Const. Art. IV, § 5(E)(1) does. **State v. Adams**, 355 So.2d 917, 922 (La. 1978). Likewise, an automatic pardon for a first felony offender under LSA-Const. Art. IV, § 5(E)(1) while restoring some privileges does not restore the status of innocence to a convict who has merely served out his sentence. **State v. Adams**, 355 So.2d at 922. Moreover, LSA-Const. Art. V, § 33(A) provides: "A citizen of the state who has reached the age of majority is eligible to serve as a juror within the parish in which he is domiciled. The legislature may provide additional qualifications."

The constitutional provisions must be read *in pari materiae*, and the general constitutional principle of Art. I, § 20 is modified by the particular constitutional principle established in Art. V, § 33. Thus, the legislature was well within its constitutional authority in instituting the additional qualifications in LSA-C.Cr.P. art. 401. No conflict is apparent between LSA-C.Cr.P. art. 401(A)(5) and LSA-Const. Art. I, § 20, and thus, the trial court properly denied the defendant's motion to quash the indictment on that ground. Cf. **State v. Jacobs**, 04-1219, p. 12 (La. App. 5 Cir. 5/31/05), 904 So.2d 82, 91 ("Restoration of full rights of citizenship upon release from federal or state supervision under Article I, § 20 does not restore a convict's right to sit on a jury."), writ denied, 05-2072 (La. 4/28/06), 927 So.2d

---

[129] The defendant adopted co-defendant Mathis' Motions #62 and #73, entitled "Motion to Quash Indictment Due to Unconstitutionally of [LSA-.C.Cr.P. art.] 401(A)(5)" and "Motion to Quash Indictment as Facially Invalid," respectively. All co-defendants and the State agreed to submit Motions #62 and #73 on the briefs, and the trial court denied the motions on July 2, 2008.

282. <u>See also</u> **Powers v. Ohio**, 499 U.S. 400, 409, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991) (recognizing the states' ability to prescribe relevant qualifications for jury service and observing "[a]n individual juror does not have a right to sit on any particular petit jury, but he or she does possess the right not to be excluded from one on account of race.").

With respect to the argument regarding whether LSA-C.Cr.P. art. 401(A)(5) impacts African-Americans disproportionally, the defendant cites two online articles, neither of which were presented to the trial court or pertain to the impact of that statutory provision on the citizens of this state or jury service. <u>See</u> **Segura v. Frank**, 93-1271 (La. 1/14/94), 630 So.2d 714, 725 ("appellate courts will not consider issues raised for the first time" in an appellate court). Moreover, the defendant has presented no evidence that any person was excluded from service on either the grand or petit jury in the instant case on this basis.

The defendant also attacks the indictment facially, claiming it failed to provide adequate notice of the crime charged and charged disjunctively. The defendant's adopted motion to quash, filed June 30, 2006, applied to the original indictment, dated March 15, 2004. The State subsequently amended the indictment on February 5, 2010, and the defendant does not appear to have filed a motion to quash the subsequently amended indictment on these or other grounds. In any event, the State appears to have cured, albeit somewhat inartfully, whatever complaints the defendant had regarding the original indictment because it notified the defendant as follows in the amended indictment:

> Committed FIRST DEGREE MURDER in violation of R.S. 14:30 in that he killed Captain David Knapps, and was a principal to said killing, when he had the specific intent to kill and inflict great bodily harm when the said Captain David Knapps, with the Louisiana Department of Corrections, was a peace officer engaged in the performance of his lawful duties, and during the perpetration and attempted perpetration of an aggravated kidnapping, and during the perpetration and attempted perpetration of an aggravated escape . . . .

The defendant did not seek to quash the amended indictment pursuant to LSA-C.Cr.P. arts. 531and 535-36. This assignment of error lacks merit.

Death Penalty Articles Facially Unconstitutional

In his thirtieth and thirty-first assignments of error, the defendant contends that the trial court erred in denying the motion he adopted, originally filed by co-defendant Mathis' as Motion #81, entitled "Motion to Declare the Louisiana Death Penalty Articles Facially Unconstitutional." On December 28, 2008 the trial court denied the motion and issued reasons for judgment. On appeal, the defendant does not address any aspect of the trial court's ruling and therefore has failed to argue this assignment of error. See La. Sup. Ct. Rule X, § 4(3)(d) (requiring "argument of each assignment of error on the facts and the law"); cf. La. Sup. Ct. Rule VII, § 6 (assignments of error made but not briefed are considered abandoned); **State v. Bay**, 529 So.2d 845, 851 (La. 1988). In any event, the trial court did not err in refusing to declare LSA-C.Cr.P. art. 905.2 unconstitutional based on the Supreme Court's decision in **Payne v. Tennessee**, supra. See also **State v. Holmes**, 06-2988, pp.72-73 (La. 12/02/08), 5 So.3d 42, 89-90; **State v. Bernard**, 608 So.2d at 971-72. Nor did the trial court err in observing that this court has already considered the impact of LSA-C.Cr.P. art. 905.5(h) on art. 905.5(b) regarding evidence of mental or emotional disturbance as a mitigating circumstance. **State v. Tart**, 93-0772, pp. 12-14, 672 So.2d at 139-40. Likewise, the trial court correctly determined that this court has rejected the defendant's complaint that the language of LSA-C.Cr.P. art. 905.7, requiring consideration of all mitigating circumstances "offered," places the burden of proof on defendant. See **State v. Wessinger**, 98-1234 at pp. 39-40, 736 So.2d at 193; **State v. Jones**, 474 So.2d at 932.

In addition, the defendant touches on another issue addressed by the trial court in denying Motion #81. As before, the defendant does not challenge the trial court's reasons for judgment or argue the issue in any meaningful way.

Regardless, to the extent the defendant suggests the rule of **Apprendi v. New Jersey**, 530 U.S. at 490, 120 S.Ct. at 2363 ("Other than the fact of a prior conviction, any fact that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt") also applies to the jury's unanimous determination that death is the appropriate punishment, such that it too must be beyond a reasonable doubt, citing **Ring v. Arizona**, supra, he is mistaken. **Ring** requires only that jurors find beyond a reasonable doubt all of the predicate facts that render a defendant eligible for the death sentence, after consideration of the mitigating evidence. **Id.**, 536 U.S. at 609, 122 S.Ct. at 2443. Neither **Ring**, nor Louisiana jurisprudence, requires jurors to reach their ultimate sentencing determination beyond a reasonable doubt. **State v. Koon**, 96-1208, p. 27 (La. 5/20/97), 704 So. 2d 756, 772-73 ("Louisiana is not a weighing state. It does not require capital juries to weigh or balance mitigating against aggravating circumstances, one against the other, according to any particular standard."). This court rejected the same argument in **State v. Anderson**, 06-2987, p. 61 (La. 9/9/08), 996 So.2d 973, 1015. As the trial court recognized, LSA-C.Cr.P. arts. 905.3 and 905.6 comport with these constitutional requirements. In addition, the defendant's claim of trial court error in failing to give what would have been an erroneous instruction is without merit.

Commutation Instruction

The defendant argues, in his thirty-third assignment of error, that LSA-C.Cr.P. art. 905.2(B) violates due process,[130] particularly in the instant case

---

[130] The defendant adopted co-defendant Mathis' Motion #48, entitled "Motion to Declare Unconstitutional [LSA-C.Cr.P. art.] 905.2(B) or for Permission to Call the Governor as a Witness." The trial court heard oral argument and denied the motion on April 28, 2006. Neither the defendant nor the State mention that the defendant subsequently filed another motion regarding the commutation instruction, entitled "Motion to Strike Jury Instruction re Governor's Authority to Commute Sentence," after the jury rendered its guilty verdict. The trial court granted the motion in part and denied it in part, agreeing not to use the specific language set forth in LSA-C.Cr.P. art. 905.2(B), but rather the language set forth in Article IV, § 5 of the Louisiana Constitution as suggested by the defendant. Although this would appear to render moot the defendant's complaint, the record shows the trial court's instruction did not track the language of

141

because "[t]here is no way for the defense to present or rebut evidence about how an unknown future governor will use his or her commutation power."

This court has previously rejected attacks on LSA-C.Cr.P. art. 905.2(B). See **State v. Wessinger**, 98-1234 at pp. 34-35, 736 So.2d at 190. See also **State v. Loyd**, 96-1805 (La. 2/13/97), 689 So.2d 1321, 1331 ("Louisiana's instruction is an even-handed one which accurately informs jurors that a death sentence as well as a life sentence remains subject to executive revision."). The commutation instruction given to the jury, in this case, comports with the language set forth in LSA-C.Cr.P. art. 905.2(B). In addition, the defendant's argument that, under the circumstances of this case, he could present no evidence regarding commutation is belied by the record, which shows the defendant called Larry Clark (no relation), then-Chairman of the Pardon Board, who testified regarding commutation procedures and the rarely practiced nature of executive clemency. Moreover, when asked by the trial court whether there was any objection to the penalty phase charge given to the jury, the defense replied, "No, Your Honor." See LSA-C.Cr.P. art. 841; **Wessinger**, supra. This assignment of error is meritless.

Unanimous Jury Verdict

In his thirty-fourth assignment of error, the defendant argues LSA-C.Cr.P. art. 782(A), which requires unanimous verdicts in capital cases, "creates an unacceptable risk that a sentence of death will be imposed in an arbitrary and capricious manner" to the extent it requires unanimous verdicts for lesser responsive verdicts.[131] This court has previously held:

---

this state's constitutional provision, but rather LSA-C.Cr.P. art. 905.2(B). It does not appear the defense raised any objection regarding this discrepancy on the record, and in any event, the defense confirmed it had no objection to the trial court's charge at the close of the penalty phase.

[131] The defendant adopted co-defendant Mathis' Motion #49, entitled "Motion to Exclude the Possibility of Death Due to Arbitrary and Unconstitutional Statutory Requirement that Any Responsive Verdict Be Unanimous." That motion and the State's opposition do not appear in the record or in the defendant's supplemental attachments; however, the trial court heard oral argument and denied the motion on April 28, 2006.

> Article I, § 17 of the Louisiana Constitution of 1974 provides, as does its statutory counterpart, C.Cr.P. art. 782, that,
>
>> "A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict." . . .
>
> In addition to these express provisions it has been determined that a conviction on a lesser included offense operates as an acquittal on the greater charged offense. C.Cr.P. art. 598; **Green v. United States**, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957). Therefore, in view of the above, it is clear that the vote on the lesser included offense, which acts as an acquittal verdict on the capital charge, must conform to the requirements for a lawful verdict on the greater offense, a unanimous verdict. Any other conclusion would violate the constitutional mandate that "a verdict" in a capital case must be by a unanimous jury.

**State v. Goodley**, 398 So.2d 1068, 1070 (La. 1981) (footnote omitted). Thus, the trial court did not err in rejecting the defendant's argument, and this assignment of error fails on the merits.

Capital Punishment System is Unconstitutional Pursuant to **Bush v. Gore**

In his thirty-seventh assignment of error the defendant contends that the ruling in **Bush v. Gore**, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (in which the Supreme Court held that due process requires the states to have uniform standards to prevent arbitrary and disparate treatment of similarly-situated citizens when a fundamental right is at stake) requires all prosecutors have uniform standards as to the pursuit of capital punishment.[132] After entertaining oral argument, the trial court denied the motion, opining its logical conclusion would require a single master prosecutor over both the federal and state systems.

To establish an equal protection violation, the defendant must show that the alleged lack of uniform standards "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." **Montana v. Egelhoff,** 518 U.S. 37, 43, 116 S.Ct. 2013, 2015, 135 L.Ed.2d 361

---

[132] The defendant adopted co-defendant Mathis' Motion #54, entitled "Motion to Bar the Death Penalty Because Louisiana's Capital Punishment System is Unconstitutional Under **Bush v. Gore**."

(1996); **Patterson v. New York**, 432 U.S. 197, 201-02, 97 S.Ct. 2319, 2322, 53 L.Ed.2d 281 (1977) (stating that it is normally within the power of the State to regulate procedures under which its laws are carried out, and its decision in this regard is not subject to proscription under the Due Process Clause unless it "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.").

The defendant's attempt to analogize this case with **Bush v. Gore** to show there is a pattern of disparate treatment of similarly-situated capital defendants in Louisiana is unavailing. In **Bush v. Gore**, the Supreme Court rejected the Florida Supreme Court's attempt to determine voters' intent without uniform rules. 531 U.S. at 104-06, 121 S.Ct. at 530. Whether or not a ballot was counted varied from county to county and "within a single county from one recount team to another." **Id.**, 531 U.S. at 106, 121 S.Ct. at 531. Without objective criteria, each county and recount team could apply a different standard in defining a legal vote, resulting in arbitrary and disparate treatment of voters. **Id.**, 531 U.S. at 105, 121 S.Ct. at 530. The Court's overriding concern was the lack of sufficient guarantees of equal treatment. **Id.**, 531 U.S. at 107, 121 S.Ct. at 531. The defendant claims that the lack of uniform standards for determining Florida voter intent, in **Bush v. Gore**, is analogous to the alleged lack of uniform prosecutorial standards in Louisiana because, like Florida's electoral regulations, Louisiana affords the prosecutor in each parish discretion as to "whom, when, and how" to prosecute, including in capital penalty cases. See LSA-C.Cr.P. art. 61. See also **McCleskey v. Kemp**, 481 U.S. 279, 297, 107 S.Ct. 1756, 1770, 95 L.Ed.2d 262 (1987) (Prosecutorial discretion "is essential to the criminal justice process [and thus] we would demand exceptionally clear proof before we would infer that the discretion has been abused.").

A legitimate and unchallenged explanation for the prosecutor's decision to seek the death penalty in the instant case is fully supported by the record: the defendant committed an act for which the law permits imposition of the death penalty. Moreover, in **Gregg v. Georgia**, supra, the Supreme Court found the risk of arbitrary and capricious prosecution in a capital proceeding was minimized by the bifurcated nature of the proceedings, the requirement of an aggravating circumstance, the allowance of mitigating evidence, and the automatic appeal. **Id.**, 428 U.S. at 199-200, 96 S.Ct. at 2937-38. The Supreme Court elaborated:

> The existence of . . . discretionary stages is not determinative . . . . At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty . . . . Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution . . . . In order to repair the alleged defects pointed to by the petitioner, it would be necessary to require that prosecuting authorities charge a capital offense whenever arguably there had been a capital murder and that they refuse to plea bargain with the defendant . . . . Such a system in many respects would have the vices of the mandatory death penalty statutes we hold unconstitutional today . . . .

**Id.** (footnote incorporated). See also **Proffitt v. Florida**, 428 U.S. at 253, 96 S.Ct. at 2967 (rejecting petitioner's contention that the Florida death penalty is arbitrary because the prosecutor decides whether to charge a capital offense and accept or reject a plea to a lesser offense). Until such time as the Supreme Court decides to revisit the issue, **Bush v. Gore** cannot fairly be construed as having overruled **Gregg v. Georgia**, particularly when the Supreme Court expressly stated its decision was "limited to the present circumstances." **Bush**, 531 U.S. at 109, 121 S.Ct. at 532.[133]

---

[133] The federal Fifth Circuit has repeatedly acknowledged "**Bush v. Gore**'s utter lack of implication in the criminal procedure context." See **Coleman v. Quarterman**, 456 F.3d 537, 542-43 (5th Cir. 2006) (citing additional cases).

145

In the discharge of the duty imposed by the legislature to "review every sentence of death to determine if it is excessive," pursuant to LSA-C.Cr.P. art. 905.9, this court will review the record in a capital case to determine: (1) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factors; (2) whether the evidence supports the jury's finding of a statutory aggravating circumstance; and (3) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. La.S.Ct. Rule XXVIII, § 1.

**Passion, Prejudice, or Other Arbitrary Factors.** Neither the State nor the defendant address this consideration. It is clear the trial court sought to minimize the improper influence of passion by granting the defendant's change of venue motion with respect to the jury venire. Given the extent to which Angola touches the lives of the residents of West Feliciana Parish, selecting the jury from St. Tammany Parish reduced the risk of passion influencing the defendant's trial considerably. In addition, aside from the defendant's untimely and improperly raised pro se complaint about the racial composition of the venire, discussed hereinabove, there is nothing to suggest racial prejudice influenced the jurors' verdicts. The defendant is white, the victim was white, and the witnesses included black and white correctional officers and inmates. The defendant has not properly presented any complaint about the racial composition of the jury to this court.

Nor can it be said that issues related to fraternization between alternate jurors and deputies attending to sequestration of the jurors introduced an arbitrary factor into this case, as there is no indication that any of the jurors were aware of any of the alternate jurors' questionable activities. Similarly, we cannot say that remarks made by the State during penalty phase closing arguments arguing the appropriateness of the death penalty in this case, but bordering on excessive

societal commentary, injected an impermissible arbitrary factor into the proceedings or influenced the jury and contributed to the verdict.

**Aggravating Circumstances.** In light of the evidence presented, as well as the defendant's closing argument concessions and defense counsel's opening statement during the penalty phase (admitting the four aggravating circumstances had already been proven), there is no question that the State presented sufficient evidence of the four aggravating factors found by the jury, to wit: (1) Capt. Knapps was a peace officer engaged in his lawful duties; (2) the defendant stipulated that he was the same individual convicted of the unrelated first degree murder of Andrew Cheswick; (3) the defendant conceded, and ample evidence supported, his participation in the perpetration or attempted perpetration of an aggravated escape and aggravated kidnapping; and (4) the defendant knowingly created a risk of death or great bodily harm to more than one person. Indeed, the defendant's sentence review memorandum makes no argument regarding the aggravating circumstances. This consideration does not weigh in favor of excessiveness.

**Proportionality.** The federal Constitution does not require a proportionality review. **Pulley v. Harris**, 465 U.S. 37, 42-50, 104 S.Ct. 871, 875-79, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. **State v. Burrell**, 561 So.2d 692, 699-700 (La. 1990); **State v. Wille**, 559 So.2d 1321, 1341-42 (La. 1990); **State v. Thompson**, 516 So.2d 349, 356-57 (La. 1987). Although the court has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, *inter alia*, a sufficiently "large number of persuasive mitigating factors." **State v. Sonnier**, 380 So.2d 1, 9 (La. 1979). See also **State v. Weiland**, 505 So.2d 702, 707-10 (La.

1987) (in case reversed on other grounds, dictum suggesting that death penalty disproportionate).

The Uniform Capital Sentence Report provided little information about the defendant that has not previously been discussed. He has been incarcerated since 1984, was in his late 30s when he participated in Capt. Knapps' murder, and he is now in his mid-50s. He does not have any diagnosed mental issues or a history of substance abuse.

A review of the first-degree murder cases from the 20th Judicial District, as provided by the State in its sentencing review memorandum, reveals (excluding the trials of the co-defendants) two first degree murder cases in East Feliciana Parish and three first degree murder cases in West Feliciana Parish. None bear even slight resemblance to the circumstances of Capt. Knapps' death. See **State v. Reese**, 13-1905, 2014 WL 3843859 (La. App. 1 Cir. 6/25/14) (unpublished), (sixteen-year-old pled guilty to second degree murder of eight-year-old in knife attack and was sentenced to life imprisonment); **State v. Manzella**, 11-0984 (La. App. 1 Cir. 12/21/11) (unpublished), writ denied, 12-0194 (La. 5/18/12), 89 So.3d 1190 (man attempting to buy a pound of marijuana, who shot the drug dealer when the drug dealer allegedly attempted to rob him at gunpoint, was convicted of negligent homicide and sentenced to the maximum sentence of five years at hard labor); **State v. Kelly**, 08-0443, 2008 WL 4567283 (La. App. 1 Cir. 10/14/08) (unpublished), (twenty-three-year-old, who fatally shot his parents, was convicted of two counts of manslaughter, on an amended second degree murder indictment, and he was sentenced to the maximum sentence of two consecutive forty-year sentences); **State v. Stevens**, 06-0822, 2006 WL 3110712 (La. App. 1 Cir. 11/03/06), (unpublished) (the defendant, in apparent murder-robbery, pled *nolo contendere* to manslaughter and was sentenced to forty years imprisonment on an amended second degree murder indictment); **State v. Burge**, 486 So.2d 855 (La.

148

App. 1 Cir. 1986), <u>writ denied,</u> 493 So.2d 1204 (La. 1986) (wherein an Angola inmate was convicted of three counts of second degree murder on an amended indictment and sentenced to life imprisonment for fatally stabbing three fellow inmates with a homemade knife).

With respect to the defendant's subsequently tried co-defendants, Edge and Carley were found guilty of first degree murder and received life sentences because their respective juries could not unanimously agree to impose the death sentence. Mathis pled guilty to first degree murder and received a life sentence. Only the defendant and Brown received death sentences.

The defendant argues strenuously that there is less evidence of his culpability as compared to his co-defendants, and this court cannot conduct a meaningful proportionality comparison of the excessiveness of his sentence because it refused to permit him to supplement his appellate record with evidence from the trials of Carley, Edge, and Brown regarding their respective roles. The defendant acknowledges that the State provided some information regarding the respective roles of the co-defendants (i.e., Brown held Capt. Knapps down while others beat him to death; Carley participated in the restroom attack; Edge participated in the initial hallway attack; and Mathis acted as a lookout), and he argues evidence of his efforts to manipulate evidence and testimony, self-mutilation, and evolving versions of events "might establish that [the defendant] had a heavy predilection for poor (and even annoying) decision making," but they do not establish his death-worthiness, particularly as compared with his co-defendants.

While the defendant's demonstrated creativity, persistence, and manipulative nature do not, without more, justify imposition of the death penalty, the physical evidence and expert testimony regarding the defendant's direct role in Capt. Knapps' death (i.e., blood spatter on numerous items of clothing linked to the

149

defendant, showing close proximity and active participation in Capt. Knapps' bludgeoning; substantial saturation and transfer stains of Capt. Knapp's blood on the defendant's jeans and sweatpants; numerous stains of Capt. Knapps' blood on the defendant's shoes, as well as lift transfer shoe prints at the murder scene; Capt. Knapps' blood on samples taken from the defendant's hands) as well as Lt. Chaney's and inmate Robinson's testimony regarding the defendant's repeated early efforts to learn the location of the targeted officers and Sgt. Walker's testimony regarding the defendant's continuing role in managing aspects of the evolving plan, manipulation of evidence, and negotiations with Angola personnel provide ample support for rejecting defendant's contention that his role was any less culpable than that of his co-defendants. Moreover, the defendant's citations to partial snippets of testimony from the Carley, Edge, and Brown prosecutions in no way diminish the evidence of the defendant's substantial role.[134] In addition, the jury may have found credible inmate Shockley's testimony regarding the defendant's jailhouse confession that the defendant administered what may have been the fatal blows to Capt. Knapps' head. The jury may also have considered the implications of inmate Robinson's testimony that he last saw Capt. Knapps alive as he walked down the hallway toward the defendant and the officers' restroom and of the defendant's surrender at the same time as Brown and Carley (regardless of whether he signed Warden Cain's amnesty note). The remainder of the defendant's argument in his sentencing review memorandum repeats his insufficient evidence of specific intent and **Enmund/Tison**-related assignments of error, discussed

---

[134] The defendant cites testimony from the co-defendants' trials regarding (1) Carley's role as one of the leaders of the initial escape plan, as being seen bloody with the ice pick-like shank, and as being primarily responsible for taking Sgt. Walker hostage, initially, and forcing her to speak with Angola personnel at shank-point; (2) Edge's role in initially hitting Capt. Knapps in the hallway with the mallet (which were not the fatal blows, given evidence of Capt. Knapps' continued struggles with his attackers in the officers' restroom); (3) Brown's role in holding Capt. Knapps' down and dragging him, speaking on the phone with Angola personnel, and moving throughout the building and interacting with uninvolved inmates; and (4) Mathis' role as initially attacking Lt. Chaney with Durham, being armed with the half-scissors weapon most of the evening, and guarding the hallway.

hereinabove. Consideration of the proportionality of the defendant's sentence under the circumstances here does not support a finding of excessiveness.[135]

## DECREE

For the reasons assigned herein, the defendant's conviction and death sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under LSA-C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by LSA-R.S. 15:567(B), immediately notify the Louisiana Public Defender Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under LSA-R.S. 15:178; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.

**CONVICTION AND SENTENCE AFFIRMED.**

---

[135] In addition, the alleged **Brady** evidence at issue in Brown's motion for a new penalty phase was an uninvolved inmate's testimony that Edge informed him that the defendant and Edge made the decision to kill Capt. Knapps. See **State v. Brown**, 15-2001, pp. 3-4 (La. 2/19/16), 184 So.3d 1265, 1267-68.

**SUPREME COURT OF LOUISIANA**

**NO. 12-KA-0508**

**STATE OF LOUISIANA**

**VERSUS**

**JEFFREY CLARK**

**CRICHTON, J., additionally concurs and assigns reasons:**

While I agree with the unanimous opinion of this Court, I write separately to comment on the defendant's twenty-first through twenty-fifth assignments of error: the allegations of impermissible communication and contact between a deputy sheriff and a sequestered juror (here, an alternate juror, A.A.). The mere allegation of such in a capital case is troubling. But after thorough review of the post-verdict evidentiary hearing, I believe—as did the trial judge—that there is woefully insufficient evidence of misconduct that warrants further inquiry, much less reversal of this conviction and death sentence.

I take this opportunity, first, to admire the fundamental concept of the right to trial by jury; second, to emphasize the fact that court officers have a significant role in preserving and honoring what I embrace as sacred.

In DEMOCRACY IN AMERICA, Alexis de Tocqueville wrote these words about the uniquely democratic concept of trial by jury:

> The institution of the jury . . . preserves its republican character, in as much as it places the real direction of society in the hands of the governed, or of a portion of the governed, instead of leaving it under the authority of the Government.
>
> \*    \*    \*
>
> It invests each citizen with a kind of magistracy; [and] it makes them all feel the duties which they are bound to

discharge towards society; and the part which they take
in the Government.

ALEXIS DE TOCQUEVILLE, 1 DEMOCRACY IN AMERICA 263–266 (Henry Reeve trans., George Adlard 2d ed. 1839).

These powerful words are as applicable today as they were in the 19th century. When we view the jury as a democratic institution, we also embrace the obligation that its integrity be maintained, and never compromised. Because of the potential consequences, maintaining a pristine jury is especially important for a capital trial. *See*, *in particular*, *Wellons v. Hall*, 558 U.S. 220, 130 S.Ct. 727, 728, 175 L.Ed.2d 684 (2010) ("From beginning to end judicial proceedings conducted for the purpose of deciding whether a defendant shall be put to death must be conducted with dignity and respect.").

Deputy sheriffs—charged with overseeing a sequestered juror in a capital case—honor the institution of the jury by carrying out the dual roles of providing security and excluding outside influences to the jury. *See* La. C.Cr.P. art. 791(A)–(B). I agree with the St. Tammany Parish Sheriff's Office that the deputy sheriff exhibited "poor judgment." Nonetheless, here, as concluded by the trial judge, there is no error (i.e., no L.a. C.E. art. 606(B) outside influence or extraneous prejudicial information brought to bear on any of the 12 deliberating jurors).

For, as de Tocqueville observed almost two centuries ago, I believe we must honor the institution of the jury and safeguard its integrity—especially in capital trials. Our criminal justice system deserves no less.